**No. 2014-1348**
**(Serial No. 95/000,333)**

_____

# United States Court of Appeals
# for the Federal Circuit

_____

**FORHEALTH TECHNOLOGIES, INC.,**
**AKA FHT, INC.,**
*Appellant*
**v.**

**INTELLIGENT HOSPITAL SYSTEMS LTD.,**
*Appellee*

_____

Appeal from the United States Patent
and Trademark Office,
Patent Trial and Appeal Board.

_____

**BRIEF FOR APPELLANT**
_____

DAVID LEASON
LEASON ELLIS LLP
One Barker Avenue
Fifth Floor
White Plains, NY 10601
Telephone: (914) 288-0022
Facsimile: (914) 288-0023

*Attorney for Appellant*

# CERTIFICATE OF INTEREST

Counsel for Appellant Baxter Corporation Englewood certifies the following:

1.      The full name of every party or amicus represented by me is:

**Baxter Corporation Englewood (formerly, through corporate**

**transactions, "ForHealth Technologies, Inc.")**

2.      The name of the real party in interest (if the party named in the caption is not

the real party in interest) represented by me is:

**None**

3.      All parent corporations and any publicly held companies that own 10 percent

or more of the stock of the party or amicus curiae represented by me are:

**Baxter Corporation Englewood is a wholly owned direct subsidiary of**

**Baxter Colorado Holdings Inc., a Colorado corporation. Baxter Colorado**

**Holdings Inc. is a wholly owned direct subsidiary of Baxter International Inc.**

4.      The names of all law firms and partners or associates that appeared for the

party or amicus now represented by me in the trial court or agency or are expected

to appear in this court are:

**Leason Ellis LLP: David Leason**


May 12, 2014                                    /s/ David Leason
Date                                            David Leason

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ...................................................................v

TABLE OF ABBREVIATIONS ........................................................... vii

STATEMENT OF RELATED CASES ................................................ viii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................2

   A.  Preliminary Statement ................................................................2

   B.  Procedural History ......................................................................3

   C.  Statement of the Facts.................................................................4

     1.  Introduction to Automated Preparation of Prescription
        Medications in Hospitals ..................................................4

     2.  The Prior Art ......................................................................6

         a.     Spaulding et al. (U.S. Patent No. 5,337,919)........................6

         b.     Halvorson (U.S. Patent No. 4,847,764) ................................12

         c.     Dillon (U.S. Patent No. 6,161,141)........................................13

         d.     Official Notice ......................................................................13

     3.  Patent Owner's Novel Approach to Automated Preparation of
        Prescription Medications..........................................................14

     4.  The Claims Under Review...........................................................15

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW ...................................................................17

ARGUMENT ...........................................................................................17

I. The Board Erred In Failing To Construe The Claims
   Consistent With The Specification, Prosecution History
   And Evidence Of Record..........................................................17

   A. The Unambiguous Patent Owner Comments Support
      a Claim Construction Narrower Than the Ordinary
      and Customary Meaning ......................................................17

   B. TPR's Rebuttal is Overstated and Unavailing ....................27

   C. Claims 3 and 20 are Patentable Under a Proper Construction
      of the "manufacturing syringes" Limitation ........................29

II. The Board's Decision is Not Supported by
    "Substantial Evidence" such that a "Reasonable Mind
    Might Accept" the Conclusion ...............................................30

   A. The Overwhelming Evidence Contained in Spaulding's
      Disclosure Would Lead a Reasonable Mind to Conclude
      That Spaulding Teaches Printing All Labels at a Single Printer ..........31

   B. TPR Admitted and the Examiner Concluded That Spaulding
      Teaches a Single Printer That Prints All of the Labels.........................35

   C. TPR's Own Expert Does Not Find That Spaulding
      Teaches Printing Less Than All of the Labels at the
      Disclosed Label Printer .......................................................38

   D. The Board's Reliance on a Portion of Spaulding That Only
      Describes One Part of Spaulding's System Does Not Support
      the Board's Conclusion as to the Functionality of the
      Entire Spaulding System ......................................................43

CONCLUSION ......................................................................................46

iii

## **ADDENDUM**

PTAB Final Decision (Nov. 22, 2013)……………………………………..…A1

Patent-in-Suit ('212 Patent) (Aug. 22, 2006)………..……………………….A32

Examiner's Determination (Aug. 16, 2012)...............................……A183

PTAB Decision – Examiner Reversed / New Grounds of Rejection
(April 20, 2012)……………..………………………………….……..A677

Right of Appeal Notice (Dec. 2, 2009)……………………………………….A1108

# TABLE OF AUTHORITIES

**Cases**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
  350 F.3d 1365 (Fed. Cir. 2003) ..............................................................18

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
  713 F.3d 1090 (Fed. Cir. 2013) ................................... 18, 19, 27, 28, 29

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ............................................................... 17

*Enzo Biochem, Inc. v. Applera Corp.*,
  599 F.3d 1325 (Fed. Cir. 2010) ..............................................................20

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009) ..............................................................18

*In re Antor Media Corp.*,
  689 F.3d 1282 (Fed. Cir. 2012) ..............................................................17

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) ..............................................................17

*In re Baker Hughes Inc.*,
  215 F.3d 1297 (Fed. Cir. 2000) ..............................................................17

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ..............................................................17

*In re Giannelli*,
  739 F.3d 1375 (Fed. Cir. 2014) ..............................................................17

*Microsoft Corp. v. Multi-Tech*,
  357 F.3d 1340 (Fed. Cir. 2004) ..................................................... 19, 27

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ..................................................... 18, 27, 29

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)............................................ 17, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576, 1582 (Fed. Cir. 1996) ................................................. 17

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ...................................................................1

35 U.S.C. § 103(a) ............................................................... 4, 31

35 U.S.C. §112 ................................................................................................4

35 U.S.C. § 134(c) ...........................................................................................3

35 U.S.C. § 315(b) ...........................................................................................3

**Regulations**

37 C.F.R. § 1.132 ...................................................................................... 19, 20

37 C.F.R. § 41.77(b)(1) ............................................................................. 3, 16

37 C.F.R. § 41.77(c) .........................................................................................4

37 C.F.R. § 41.77(d) .........................................................................................4

37 C.F.R. § 41.77(e) .........................................................................................4

37 C.F.R. § 41.77(f) ..........................................................................................4

37 CFR § 90.3 ...................................................................................................4

37 CFR § 90.3(a) ..............................................................................................1

# TABLE OF ABBREVIATIONS

**Parties**

| | |
|---|---|
| Baxter *or* Patent Owner *or* Appellant | Baxter Corporation Englewood |
| IHS *or* TPR *or* Appellee | Intelligent Hospital Systems Ltd. |

**Defined Terms**

| | |
|---|---|
| '212 patent | U.S. Patent No. 7,096,212 B2 |
| Board | Patent Trial and Appeal Board |
| Court | The Court of Appeals for the Federal Circuit |
| Dillon | U.S. Patent No. 6,161,141 |
| Examiner | U.S. Patent and Trademark Office Examiner in *inter partes* reexamination of the '212 patent (Control No.. 95/000,333) |
| Halverson | U.S. Patent No. 4,847,764 |
| MPS | Medication Preparation System |
| Ortiz | U.S. Patent No. 5,884,457 |
| PTO | U.S. Patent and Trademark Office |
| Request | The request for *inter partes* reexamination of U.S. Patent 7,096,212 B2 (Control No.. 95/000,333) |
| Spaulding | U.S. Patent No. 5,337,919 |
| TPR | Third Party Requester, IHS |

## STATEMENT OF RELATED CASES

There is an appeal pending before the Patent Trial and Appeal Board regarding a related patent application (U.S. Patent Application No. 11/466,354) that may be affected by this Court's decision.

Baxter Corporation Englewood ("Appellant" or "Patent Owner") is not aware of any other case pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

On November 22, 2013, the Patent Trial and Appeal Board (the "Board") of the United States Patent and Trademark Office ("PTO") issued a final decision in Reexamination No. 95/000,333.  This appeal, noticed on January 10, 2014, is timely.  37 CFR § 90.3(a).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. *Claim Construction/Patentability:* Whether the Board erred by failing to construe the claims consistent with the specification, prosecution history and evidence of record, namely, that "manufacturing syringes for delivery and administration to each respective patient" causes a labeled syringe to be made by the automated medication preparation system; and whether claims 3 and 20 are patentable under a proper construction.

2. *Patentability:* Whether substantial evidence supports the Board's finding that Spaulding describes the printing of filled vial labels only.

## STATEMENT OF THE CASE

### A. Preliminary Statement

Patent Owner is appealing the obviousness determination of the Patent Trial and Appeal Board because it was predicated on an overly broad interpretation of the claims at issue. Patent Owner provided the Examiner in charge of the *inter partes* reexamination proceeding with unambiguous and definite statements on the record concerning the intended interpretation of certain claim language, as well as evidence that such interpretation is what would be fairly understood by persons having ordinary skill in the art. Indeed, the subject appeal squarely invokes the doctrine of prosecution history disavowal. Once that doctrine is applied, the claims at issue define patentably over the prior art rejections adopted by the Board.

This appeal also concerns a sharp dispute as to the scope and content of the prior art, and of one prior art citation in particular. The Board bases its conclusion on faulty premises which do not amount to "substantial evidence" so as to support its findings. The Board assesses the teachings of Spaulding as supporting a reading that the Spaulding system prints less than all of the labels supplied to it. One predicate for the Board's assessment is an intriguing statement of a professor from one of the finest academic institutions, which, upon inspection, offers no support for the Board's findings on this issue because his expert submission lacks an opinion as to whether the Board's assessment is true. The second faulty

premise is the Board's reliance on a discussion within Spaulding of one situation (the ability of the Spaulding system to fill medical vials) as providing a basis to extrapolate the operation of the Spaulding system in the other situation, namely, the one in which a medical vial cannot be filled. A deeper analysis of Spaulding, however, exposes that, indeed, there is no factual support for the Board's assessment.

## B. Procedural History

This appeal originates from a request for *inter partes* reexamination of U.S. Patent 7,096,212 B2 (U.S. Patent Application No. 95/000,333; the "Request"). The Request was filed on January 11, 2008. (A1411-34). The reexamination proceeding resulted in a Right of Appeal Notice being mailed in which unamended claims 3-5 and 7-14 and amended and new claims 2 and 15-58 were confirmed as patentable. (A1131-32). Third Party Requestor (TPR), Intelligent Hospital Systems Ltd., appealed under 35 U.S.C. §§ 134(c) and 315(b). (A1102).

On April 20, 2012, the Board entered an order reversing the Examiner's determination as to claims 2-5, 7-18, 46 and 50-56 and entering a new ground of rejection as to claims 19-20, 47-49, and 57-58. (A717). On May 21, 2012, pursuant to 37 C.F.R. § 41.77(b)(1), Patent Owner submitted a request to reopen prosecution. (A683-72). Patent Owner presented claim amendments and new claims, and so the claims then-pending were claims 2-5, 7-14, and 16-60. (A638-

3

50).  TPR filed comments pursuant to 37 C.F.R. § 41.77(c) on June 20, 2012.

(A321-39).  An Examiner Determination was mailed on August 16, 2012, pursuant

to 37 C.F.R. § 41.77(d), rejecting the then-pending claims under 35 U.S.C. §

103(a).  (A186-88).  Patent Owner and TPR each filed comments in response to the

Examiner's Determination on September 17, 2012, pursuant to 37 C.F.R. §

41.77(e).  (A165-70; A174-79).  On October 17, 2012, TPR filed a reply to Patent

Owner's September 17th comments.  (A154-60).

Pursuant to 37 C.F.R. §41.77(f), the Board affirmed (a) the Examiner's

rejections of claims 2-5, 7-14, and 16-60; (b) the Examiner's determinations not to

adopt proposed rejections of claims 8, 23-29, 31-45, 57, and 58; and (c) the

Examiner's determinations not to adopt proposed rejections of claims 2-5, 7-14,

and 16-60 under 35 U.S.C. §112.  (A2-4).

On January 10, 2014, Patent Owner timely appealed to the Court of Appeals

for the Federal Circuit pursuant to 37 CFR § 90.3.  (A147).

## C. Statement of the Facts

### 1. Introduction to Automated Preparation of Prescription Medications in Hospitals

Hospitals use electronic information systems to manage patient data,

including medication doses that are to be administered to the patients.  (A36 (1:15-

17)).  In a prototypical hospital arrangement, the hospital information system is

linked to an electronic pharmacy system[1] within the hospital facility such that the

two systems communicate with one another and process the data appropriately.

(A36 (1:18-22)).  In order to establish this type of two way communication,

software providers for each system usually must meet and agree upon

specifications, and that can come at great expense and difficulty.  (A36 (1:22-27)).

In part, these systems can send data to a label printer that identifies the

patient, the medication to be administered, the time of administration,

contraindications for the medication, and other relevant data.  (A36 (1:28-31)).

Seemingly, that is the easy part.  The harder part is to ensure that all of the data is

processed by someone or something so that the medication doses that are to be

administered are prepared and properly labeled.  The claims in this appeal address

this issue by trapping a printer output stream of an order entry system, identifying

label data in that stream, and dividing it into a first stream that launches automated

medication preparation processes and a second stream that is redirected to a

conventional printer for manual handling within the pharmacy.  (A36 (1:41-45)).

The automated medication preparation processes cause the manufacture of syringes

for delivery and administration from the syringe to each respective patient.  (A37

(4:10-13)).

_____

[1] The electronic pharmacy system discussed in the background section of the '212
patent is referred to as being an automated medication preparation system ("MPS")
throughout the disclosure of the '212 patent.

## 2. The Prior Art

### a. *Spaulding et al.* (U.S. Patent No. 5,337,919)

Spaulding is the principal citation relied upon by the Board.[2] Spaulding discloses an automatic prescription dispensing system 1 that includes, among other things, a dispenser system controller 7, which is part of a dispensing system 1 described in connection with the first twenty-eight figures of Spaulding.

Fig. 1 is reprinted below. The dispenser system controller 7 puts the dispensing system 1 into action. In particular, the controller 7 activates a vial manipulator assembly 6 to retrieve a vial 11 (*see* A44) from the selected vial supply assembly 3 and causes the retrieved vial 11 to (1) be conveyed to a selected dispenser unit 5, (2) to count and deposit a required number of pills from that dispenser unit 5 into that vial, and (3) the transfer the filled vial 11 to an offload carousel 4 using the vial manipulator. (A53 (8:28-40).

---

[2] Indeed, the Board synopsized the manner in which the other citations were applied in one paragraph:

> Dillon is relied upon for its teaching of a bidirectional TCP /IP network such as the internet to enable Spaulding to be used in a network environment; Halvorsen for printing a released output stream at a printer; and lastly, the Examiner found it to be known commonly that medication can be delivered in a syringe. (Examiner's Determination, pages 10-18, generally).

(A14).



Spaulding obtains the drug name and quantity of pills from an external system. Specifically, a pharmacy host computer 10 is equipped with an interface 16 with outputs to a label printer 14 and to the dispenser system controller 7, as shown in Fig. 30 below. (A41, A49).



The pharmacy host computer 10 sends prescription label print data such as the name and quantity of the medication through a conventional printer port 15 to a host interface 16. (A53 (8:44-50)). The conventional printer port allows the computer 10 to be used with a large number of commercially available printers 14. (A53 (8:53-57)).

In contrast to the twenty-eight figures allocated to the construction of the dispensing system 1, the construction of the host interface 16 is minimally documented. Spaulding teaches that it is positioned between the printer port 15 and the label printer 14. (A49; A53 (8:57-62)). The host interface "intercepts" (or "obtains") the prescription label data and conveys it to the dispenser system controller 7, which is itself a computer. (A53 (8:63-65); A56 (14:51-53)). Dependent claim 4 elucidates, somewhat, the operation of the host interface. In particular, the data "intercepted" by the host interface is "additionally" being transferred from the printer port 15 "to said label printer." (A57 (16:8-19)). The manner of operation of the host interface (*e.g.*, whether it merely splits the data stream into two paths) is central to the Board's obviousness determinations.

The lower half of Fig. 30 illustrates Spaulding's dispenser system controller 7 and its connections to a prescription database 17 and a robotic dispenser apparatus 20. (A49; *see also* A53 (8:65-68)). The controller 7 receives from the host interface 16 prescription label data that includes "drug name, quantity, dosage

instructions, and additional data identifying the prescribing physician, the

recipient, and the like ...." (A53 (8:44-50)).  However, the controller 7 is taught as

only extracting the data needed for operation of the system 1, *i.e.*, a drug name and

quantity:

> "[S]ystem controller 7 intercepts prescription label print data, including a drug name and a quantity, from a pharmacy host computer 10 (FIG. 30), ***extracts the drug name and quantity from the label print data***, and selects a dispenser unit 5 and a vial supply assembly 3 accordingly.[3]  The controller 7 then activates the vial manipulator assembly 6 to retrieve a vial 11 (FIG. 11) from the selected vial supply assembly 3 and convey the vial 11 to the selected dispenser unit 5, controls the vial manipulator 6 to activate the selected dispenser unit 5 to count out the required pills 12 into the gripped vial 11, controls the vial manipulator 6 to transfer the filled vial 11 to the offload carousel 4 ..."

(A53 (8:28-40) (emphasis and footnote added)).

In short, the controller 7 sends search inquiries to the prescription data base

and receives data in response which is used to determine if the particular

medication is present in the dispenser apparatus 20 in the desired amount.  (A53-54

(8:65-9:2)).  If the medication is present, then the controller 7 activates the

dispenser apparatus 20 to cause vials to be filled with tablets and be off-loaded to

an available carousel location, as described in connection with Fig. 29.  (A48; A57

(15:5-17)).

---

[3] Spaulding makes this point several times in the written description.  (*See* A53-54 (8:44-9:11) ("The drug name and the prescription quantity is extracted from the label data, and the drug name is searched within the database 17 to determine if one of the dispenser units 5 in the system is loaded with the desired drug."); *see also* A56-57 (14:47-15:15) ("...the controller 7 searches the prescription data base 17 for the drug name extracted from the prescription label data")).

Fig. 29 illustrates the overall program logic by which Spaulding's dispensing system operates. (A53 (7:66-68)). Fig. 29 corresponds to the activity by and between the controller 7, the data base 17, and the dispenser apparatus 20. As such, the logic illustrated in Fig. 29 corresponds to the lower half of Fig. 30 that is depicted below the host interface 16. Below, Appellant reproduces Fig. 29 of Spaulding, modified, as indicated, in order show its relationship to the flow chart of Fig. 30.



As can be seen in combined Fig. 29 and Fig. 30, as modified by Patent Owner ("PO Modified"), data from the host interface 16 is received by the

controller 7 which performs the logic steps illustrated in Fig. 29.  Steps 176 and

179 occur by and between the controller 7 and the data base 17.  Steps 180-184

occur by and between the controller 7 and the dispenser apparatus 20.  This

modified, combined illustration of Figs. 29 and 30 provides a clear and more

complete understanding of the workflow of Spaulding.  (A54 (9:2-8); A56 (14:68);

A57 (15:1-15)).

In more specific aspects of Spaulding's system, Spaulding describes in great

detail the steps that result in a filled vial appearing at the output of a dispenser

carousel.  (A54-56 (9:43-14:46)).  Spaulding also teaches printing the labels at

label printer 14, but says nothing about placing the labels on the vial.  Indeed, the

discussion of Fig. 29 regarding the filled vials appearing at the dispenser carousel

does not pertain to labeling the vials.  (A48; A56-57 (14:47-15:17)).  Rather, the

labels are located at the label printer 14 awaiting retrieval by the pharmacist and

manual application to the filled vials.  (A56 (14:42-44)).  Thus, the labels that have

been printed at label printer 14 that correspond to the vials that were filled by the

dispenser apparatus 20 are manually placed on the appropriate vials for the

particular medication doses.  (A1231; A190-91 (Line 29 through line 5)).

Meanwhile, labels sent to the label printer 14 that could not be filled by the

dispenser are also available to be utilized with manually filled orders.[4]

---

[4] In those instances in which the dispenser apparatus does not contain the desired

### b. *Halvorson (U.S. Patent No. 4,847,764)*

Halvorson was added to the set of citations for its teaching of a dispensing system to which multiple printers are attached.  (A712-15)).[5]

In Halvorson, multiple dispensers are distributed throughout a health care institution and connected to a common computer.  (A85 (Abstract)).   Medication orders are input at terminals and software controls the dispensers to dispense medications according to the orders specified.  (A85 (Abstract)).  The mechanical dispensers are preferably unit dose dispensers for the dispensing of one unit dose at a time.  (A99 (3:34-37)).  Each mechanical dispenser contains various medications that can be dispensed to hospital personnel upon demand.  (A99 (4:28-31)).  Printers connect to the Halvorson system for printing purposes, including among other things printing inventory control reports, patient records, and medication labels.  (A99 (3:23-27)).

---

medication (*e.g.*, the medication name is not in the database), no medication vial is dispensed by the dispenser apparatus and an error message is sent to a display panel.  (A56 (14:53-60)).  The label printer, in the meantime, will still have printed a label for the pharmacist to use with that medication dose, despite the fact that it was not available to be dispensed. (A49; A53 (8:44-50)).

[5] Halvorson was not included in TPR's request; rather, it was introduced late in the reexamination proceeding and was not cited in any rejection until the Board's Decision on April 20, 2012, after which Patent Owner requested that prosecution be reopened to address the new rejection.

### c.   Dillon (U.S. Patent No. 6,161,141)

Dillon is cited for its disclosure that certain IP packet structures were known in the art which are pertinent to the claims of the '212 patent on appeal.  The particular arrangement in Dillon concerns a high-speed, one-way connection between a TCP/IP network and a computer.  (A77 (3:5-9)).  That high-speed connection makes use of a satellite link.  (A76 (1:51-60); A77 (3:28-30)).

### d.   Official Notice

The Examiner acknowledged that Spaulding, as modified by Dillon and Halvorson does not expressly teach that the dose is delivered to the respective patients in a syringe or that label data is printed on an adhesive label, features recited in independent claims 3 and 20.

The Examiner cites to Ortiz (U.S. Patent No. 5,884,457) as evidence that it would have been obvious to manufacture syringes using the Spaulding system for delivery to respective patients.  Ortiz describes a method of automatically producing a plurality of prefilled, sterile delivery devices with a desired quantity of fluid.  (A124(Abstract)).  The syringe filling method of Ortiz and the apparatus disclosed do not label the syringes, and Ortiz does not discuss any patient data or particular dose orders.

The Examiner contends that it would have been *prima facie* obvious to use adhesive-backed labels in a label printer.

13

### 3. Patent Owner's Novel Approach to Automated Preparation of Prescription Medications

Patent Owner's solution as defined by the claims in this appeal, properly interpreted, concerns systems and methods for selectively trapping data streams from an electronic information system to be used in a medication preparation system. The trapped data streams include medication dose data. The patented system determines whether the medication dose data corresponds to a request that is suitable for automated handling and, if so, the medication preparation system utilizes medication dose data to manufacture syringes for delivery and administration to each respective patient. This method, in part, comprises the steps of trapping a printer output stream, parsing that output stream for prescribed information, testing the output stream against a pharmacy database to determine whether the data can be handled by the medical preparation system (*e.g.*, whether the system can prepare the medication in question), using the medication preparation system to manufacture syringes for administration from the syringe to patients, while releasing *only* those portions of the output stream that cannot be handled by the medical preparation system, with the released output stream being printed for manual handling. Thus, this method reduces the number of medication orders that require manual handling as compared with the prior art. (A50 (Summary)).

### 4. The Claims Under Review

Independent claims 3 and 20 recite, *inter alia*, methods and/or a system that provide for a printer with a filtered output stream consisting of *only* those jobs that require manual handling, while the orders determined as suitable for the automated medication preparation system are manufactured by the automated medication preparation system for administration from the syringe to patients. As discussed in more detail below, the step of manufacturing a syringe for administration to a patient is properly interpreted in view of the intrinsic record to include printing and applying a label to the filled syringes. It is respectfully submitted that neither Spaulding, Halvorson, Dillon, nor Official Notice, disclose or suggest at least these features of independent claims 3 or 20.

### SUMMARY OF THE ARGUMENT

The decision of obviousness must be reversed because it is based on an erroneous construction of the claim terms. The invention of the '212 patent concerns the creation of two exclusive sets of data from a serial stream of data output by an order entry system, one destined for automated handling all the way to complete manufacture of a syringe that is suitable for distribution and administration to a patient, and another which awaits a pharmacist to manually fill the dose order. The automated handling is attendant with the creation of a labeled

15

syringe, as a result of amendments after re-opening prosecution under 37 C.F.R. §41.77(b)(1). That clarified scope is unambiguously argued and supported in the record on appeal. However, the Board treated the amended language of the independent claims more broadly, disregarding the interpretation which is applicable to the amended claim features, and rejecting the claim over an automated dispenser which operates alongside a separate label printer requiring pharmacist action for each and every dose order.

The Board also erred in rejecting at least independent claim 3 as being obvious over Spaulding in view of Dillon, Halvorson, and what was known in the art, and independent claim 20 as being obvious over Spaulding in view of Halvorson and what was known in the art. Underlying the Board's rejection of the above claims is the view that Spaulding discloses a filtering operation on the output of its printer port. The Board relies on this interpretation to arrive at its conclusion that Spaulding teaches the printing of two exclusive sets of labels at two different printers. However, the factual findings relied upon by the Board are not supported by the substantial evidence of record. To the contrary, Spaulding fails to teach or suggest a filtering operation on the output of Spaulding's printer port and, instead, teaches the printing of all the labels. Accordingly, because the conclusions drawn by the Board are erroneous and not supported by substantial evidence, the decision should be reversed.

## STANDARD OF REVIEW

The Federal Circuit treats the question of obviousness as a question of law to be reviewed *de novo*. *In re* Antor Media Corp., 689 F.3d 1282, 1287 (Fed. Cir. 2012); *In re* Applied Materials, Inc., 692 F.3d 1289, 1294 (Fed. Cir. 2012). The Board's legal conclusions regarding claim construction are also to be reviewed *de novo*. *In re* Baker Hughes Inc.*,* 215 F.3d 1297, 1301 (Fed. Cir. 2000).

The factual findings underlying a determination of obviousness are reviewed for "substantial evidence." *In re* Gartside, 203 F.3d 1305, 1316 (Fed. Cir. 2000). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding." *In re* Giannelli, 739 F.3d 1375, 1379 (Fed. Cir. 2014) (citing *Consol. Edison Co. v. NLRB,* 305 U.S. 197 (1938)).

## ARGUMENT

### I. THE BOARD ERRED IN FAILING TO CONSTRUE THE CLAIMS CONSISTENT WITH THE SPECIFICATION, PROSECUTION HISTORY AND EVIDENCE OF RECORD

#### A. The Unambiguous Patent Owner Comments Support a Claim Construction Narrower Than the Ordinary and Customary Meaning

Claims terms "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). But a

term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history. *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003); *see also Phillips,* 415 F.3d at 1314. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips,* 415 F.3d at 1317. In the latter circumstance, this Court has recognized that a "clear and unmistakable" disavowal during prosecution overcomes the "'heavy presumption' that claim terms carry their full ordinary and customary meaning." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003); *see also Epistar Corp. v. Int'l Trade Comm'n,* 566 F.3d 1321, 1334 (Fed. Cir. 2009) ("A heavy presumption exists that claim terms carry their full ordinary and customary meaning, *unless it can be shown the patentee expressly relinquished claim scope.*" (emphasis added)). "Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013); *Omega*, 334 F.3d at 1324.

18

The disavowal can take the form amendment, argument, or both. *See Biogen,* 713 F.3d at 1095. For instance, the patentee's summary in an office action response was determined to be representative "of its own understanding of the inventions disclosed in all three patents" and invoked prosecution history disclaimer. *Microsoft Corp. v. Multi-Tech,* 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

After the Board Decision of April 20, 2012 setting forth new grounds of rejection, Patent Owner requested that prosecution be re-opened. (A638-72). In its Request to Re-Open Prosecution, Patent Owner presented amendments which narrowed certain claim features, including the feature in claim 3 of using the MPS for "preparing one or more medications" to instead recite that the MPS is used for "manufacturing syringes for delivery and administration to each respective patient." (A639-40 (claim 3)). Similarly, claim 20 was narrowed in that submission to recite features such as having the orders determined to be suitable for the automated medication preparation system be "manufactured by the automated medication preparation system for administration from the syringe to patients." (A643-44 (claim 20)).

Critically, however, the Request to Re-Open Prosecution included unambiguous remarks and added further intrinsic evidence to the record in the form of Rule 1.132 Declarations of individuals with experience in pharmacy

requirements and hospital information systems.  (A659-64; A587-95; A596-26).

The remarks were directed to the amended claim features, including the feature of

manufacturing syringes for delivery and administration to each respective patient.

(A659-61).  The Declarations submitted under 37 C.F.R. § 1.132 are part of the

intrinsic evidence that can be helpful in matters of claim interpretation.  *Enzo*

*Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010).

One clear and definitive statement by Patent Owner – quite uncommon in

patent prosecution in which preserving claim breadth is almost always the rule of

practice – is the following:

> By the present amendment, the claim scope is clarified that the medication preparation system is manufacturing doses "for delivery and administration to each respective patient," and, as such, **implicitly** *recite that the medication data is being split and provided to the printer, on the one hand, when not suitable for automated handling, and are being manufactured* **with labels** *for administration to respective patients by the medication preparation system.*

> Applicant would amend the claims at this juncture to expressly recite that the medication preparation system "applies a label" to the manufactured dose if there were *ipsis verbis* support for such an amendment…"

(A661 (emphasis in original)).

Patent Owner unabashedly explained to the Examiner in its Request to Re-

Open Prosecution that the phrase "applies a label" does not appear within the text

of the '212 patent in so many words, but that this feature was inherently part of the

disclosure and implicitly intended to be within the meaning of "manufacturing" a
syringe "for distribution and administration to each respective patient" because
automated syringe MPSs such as the PARxD IV system (discussed below) apply
labels to the syringes they produce. (A661).  These statements are supported by the
intrinsic evidence (*see* A587-95; A596-26; and A661-64).

In connection with this position unambiguously set forth on the record,
Patent Owner stated --at the same time that these amendments were presented--
that an amendment to recite *applying a label* "is not required to establish that the
claims implicitly define the manufacture of a dose by the medication preparation
system that includes a label and otherwise complies with generally accepted
pharmacy requirements, as demonstrated by the accompanying Declarations and
associated Exhibits."  (A661-62).

Further to an understanding of the meaning of "manufacturing syringes for
distribution and administration to each respective patient" being advanced by
Patent Owner in the Request to Re-Open Prosecution, Patent Owner explained that
the filtered output provided to the claimed "printer" was provided with a limited
set of labels comprising "only those jobs that require manual handling."  (A37
(4:23-32)).  As such, the labels of the syringes that were manufactured for
administration to patients by the automated medical preparation system must be
applied by that automated machine as part of the "manufacturing" because the

filtered output at the claimed printer is not the device supplying those labels.[6]

Rather, as the '212 patent teaches in connection with the exemplary automated

MPS, the PARxD IV system, the MPS already knows how to make the syringes

(*e.g.*, final dose volume, required diluents, etc.) and only *needs* to have specified

the drug and dose to be delivered, the patient name, the location of the patient, and

other administrative information that may be of use to have on the syringe label.

(A37 (3:42-47)).  This is *needed* because the MPS applies the label to the so-

manufactured syringes, as Mr. Tribble and Mr. Blair both confirm (A598-601

(¶¶6(e)(iv) and 8-9); A588-89 (¶¶9-12)) and as further demonstrated in the

evidence included as Exhibits to the Tribble Declaration (A602-26).  Applying

labels to manufactured syringes is within the capabilities of automated MPSs such

as the PARxD IV.  (A662 ("proactive and dynamic filtering of drug orders as they

come in over serial data lines from order entry systems" can be achieved "in view

of the *capabilities* of the automated systems and their current stock of

medications") (quoting A39 (7:9-12)(emphasis added))).

The evidence of record documents the "capabilities" of automated

medication preparation systems that manufacture syringes to have labels applied to

the so-manufactured syringes.  For instance, the PARxD IV machine, which is

---

[6] The Blair Declaration includes his assessment of this portion of the Board's
Decision of April 20, 2012: "The BPAI's suggestion [that the syringe labels can go
to the same printer as the manually prepared doses] is contrary to that teaching, in
my opinion."  (A590 (¶15)).

specifically noted in the '212 patent as the only example of a syringe medication preparation system, was known to persons having ordinary skill in the art as having a dedicated printer for applying labels. (A599-01 (¶¶7-9)). In this respect, the Blair Declaration provides probative testimony which supports the arguments made in the record by Patent Owner:

> With further regard to the portion that is suitable for manufacture by the medication preparation system, if the medication is to be suitable for administration from a respective syringe to respective patients with respective names (identities), ***there is no doubt that such an automated medication system is fairly understood by persons having ordinary skill in the art as having a labeling station of its own for safety's sake***.

(A590 (¶16; emphasis added)). The Board quoted the Blair Declaration on this very important point, stating:

> Mr. Blair is a former employee of a company which had Baxter International as a client. He is a pharmacy informatics analyst and a self-stated "person of ordinary skill in the art." He asserts that it is an inherent teaching in the '212 patent that the automated system PARxD IV would apply a label. Otherwise, the syringe would not be suitable for a patient. Indeed, he goes so far as to say ***an automated system must have "a labeling station of its own for safety's sake"*** and points to other systems as having this as a safety feature.
>
> ***Again, similar to Mr. Tribble, this specific testimony appears logical and credible.***

(A16 (internal citations omitted; emphasis added)).

Beyond those Declarations, the record includes evidence that details of the label printer and label applicator of the PARxD IV machine were described in a

then co-pending patent application, now U.S. Patent No., 6,722,404, describing the manufacture of labeled syringes using the same machine referenced in the '212 patent. (A598 (¶7c); A613-26). The record also includes evidence that the Declarant Blair was aware of other automated syringe manufacturing systems having their own label application subsystems, including U.S. Patent No. 6,048,086 of Valerino. (A591 (¶¶17-18)).

More generally, it can be appreciated that generally accepted pharmacy standards pervade the industry such that there is no need to point out to the skilled reader all points of pertinence for the teaching to be understandable from reading the document, such as when reading the '212 patent. The intrinsic record includes examples in support of Patent Owner's clear statements on the record that the phrase "manufacturing syringes for delivery and administration to each respective patient" is understood, implicitly, as applying labels to the syringes. One example of an inherent teaching of the '212 patent is the fact that syringes must be sterile before being filled, which is something that does not need to be explicitly stated. (*See* A589 (¶12)). Another example –one acknowledged by the Board (at A712)— is that persons having ordinary skill in the art would recognize that every prescription requires a label before given to a patient. (*Accord,* A590 (¶14)). Indeed, Blair explains that labeling a ***syringe*** that has been manufactured by a medication preparation system as discussed in the '212 patent is another example

of such an inherent teaching to persons having ordinary skill in the art.  (A588-89 (¶¶ 9-11)).  The need for a dedicated printer is all the more apparent in arrangements, such as being claimed, in which medication data concerns respective patients and specifies a dose of a medication to be delivered to each respective patient in a *syringe*.

Because the PARxD IV system has always included a dedicated printer for printing syringe labels (A598-601 (¶¶6, 6(e)(iv), 6(f), 6(g), 8-9)), the reference in the '212 patent to manufacturing syringes using the PARxD IV system as the automated syringe MPS would have been understood by persons having ordinary skill in the art as including the application of labels onto the manufactured syringes.  Moreover, Blair corroborates Tribble's comment that "at no time has the PARxD IV ever been used in a manner that required or permitted the printing of labels for syringes it prepared using an external printer."  (A599 (¶6(g)); A588-89 (¶¶8-11)).

Equally important, in this regard, is the fact that the PARxD IV system was known to persons having ordinary skill based on presentations to members of the American Society of Health-System Pharmacists (ASHP).  Tribble explains that ASHP has over 30,000 members and, in relevant part, pharmacists and technicians were made aware that PARxD IV (based on concept drawings and discussions) would include a dedicated label printing system that both printed and applied

labels to syringes that such system would prepare.  (A599-600 (¶7(a))).  Likewise,

Tribble avers that at no time to his knowledge had syringe labeling using labels

from a networked printer external to the PARxD IV device ever been contemplated

or promoted.  (A599 (¶6(g))).  He further avers that a Points of Understanding

document was created regarding a sale (or proposed sale) of the PARxD IV system

to American Biomedical Group in and around October 2001 (A601 (¶7(b))), which

is further evidence that persons of skill in the art would have understood that the

reference to the PARxD IV exemplary automated medication operations system

disclosed in the specification included its own printer as part of the system.  (A601

(¶¶8-9)).

The facts that the PARxD IV system has always included a dedicated printer

for printing syringe labels and that the PARxD IV system was known to persons

having ordinary skill in the art support the implicit understanding, as argued

*expressly* in the record, that the phrase "manufacturing syringes for delivery and

administration to each respective patient" is understood, implicitly by persons

having ordinary skill in the art as producing labeled syringes.

## B. TPR's Rebuttal is Overstated and Unavailing

TPR contends that that the broadest reasonable interpretation standard precludes "PO's plea to read limitations into their claims." However, Patent Owner did not make a "plea" of any kind. The unambiguous and definite statements made by Patent Owner during the *inter partes* reexamination proceeding are precisely the type of comments that support a conclusion that Patent Owner *expressly relinquished claim scope under the doctrine of prosecution history disavowal. Biogen,* 713 F.3d 1090; *Omega*, 334 F.3d at 1314; *Microsoft*, 357 F.3d 1340. Meanwhile, Patent Owner's position is entirely consistent with the broadest reasonable interpretation standard. In this case, Patent Owner was forthright and unambiguous in disavowing claim scope at the time that the amendments were made to define the manner in which the automated operation of the MPS acts on medication data determined to be suitable for that system. In particular, when the broad step in claim 3 of "preparing one or more medications…" was amended to more particularly recite "manufacturing syringes for delivery and administration to each respective patient...,"[7] Patent Owner made definite arguments that applying a label was implicitly what the claim interpretation requires.

_____

[7] Similar language was added to independent claim 20.

In circumstances such as this, the doctrine of prosecution history disavowal applies to "narrow[] the meaning of the claim consistent with the scope of the claim surrendered." *Biogen Idec, Inc. v. Glxosmithkline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013). The effect is that the meaning can be narrowed so as to overcome even the term's ordinary and customary meaning. Application of the doctrine of prosecution history disclaimer serves a public notice function by allowing the public and competitors to rely on definitive statements made during prosecution when launching a new product or designing-around a patented invention. (*See id.* at 1324).

TPR asserts that the limitation of syringes being manufactured with labels applied is merely "implicit" and not part of the proper construction of the claims and would permit harassment of competitors due to the Patent Owner only considering the explicit language of the claims. (A336). However, such a "tactical" maneuver, as suggested by TPR (*id.*), is foreclosed by the doctrine of prosecution history disavowal. Upon interpreting the claims as requiring the automated syringe MPS to manufacture labeled syringes, Patent Owner is concomitantly foreclosed from advancing a broader interpretation of the claims. (*See* A165-70 and A659-64). Application of the doctrine of prosecution history disclaimer serves a public notice function by allowing the public and competitors to rely on definitive statements made during prosecution when launching a new

product or designing-around a patented invention.  *Omega*, 334 F.3d at 1324.  As

such, TPR's argument that there are merely "'implicit' limitations" is overstated.

The amendments and unambiguous remarks, as a matter of law, are true constraints

on the interpretation of the claim language which Patent Owner submits this Court

should recognize for the same reasons as in *Biogen* and the other cases cited above

which apply the doctrine of prosecution history disavowal.

### C. Claims 3 and 20 are Patentable Under a Proper Construction of the "manufacturing syringes" Limitation

Turning to the prior art cited in the rejection of the independent claims, none

of the art nor their combination teaches or suggests the feature of syringes

manufactured by an automated medication preparation system, as argued during

prosecution, so as to have a label applied to it so that it can be delivered and

administered to respective patients.  The claimed system differs from, say,

Spaulding, in that Spaulding offloads unlabeled vials within a pharmacy for the

pharmacist to presumably review and retrieve a label from the label printer 14.

(A56 (14:42-44)).

In order to sustain the rejection, this Court would have to construe the phrase

in question more broadly than the unambiguous record permits.  Yet Patent Owner

was forthright in explaining that there was not *ipsis verbis* support for applying a

label, and provided an unambiguous explanation as to what the claim means to a

person having ordinary skill in the art. The case law on this point is clear that the correct interpretation of a term in this circumstance should be one that is narrowed consistent with the scope of the claim surrendered. The Board erred by not giving credence to the narrower construction which binds the Patent Owner, and for that reason, reversal of the Board is requested.

## II. THE BOARD'S DECISION IS NOT SUPPORTED BY "SUBSTANTIAL EVIDENCE" SUCH THAT A "REASONABLE MIND MIGHT ACCEPT" THE CONCLUSION

Claims 3 and 20 are properly interpreted as requiring two exclusive data streams, namely, one data stream that is used to print only those labels for prescriptions that could not be automatically filled and another, separate and exclusive data stream that is used in the automated manufacturing of syringes for administration to a patient in which labels are printed for only the automatically filled prescriptions. Spaulding, in view of Dillon, Halvorson, and what was known in the art, does not fairly teach or suggest creating two separate and exclusive data streams such that labels for the prescriptions that can be filled automatically are printed separately from the labels for the prescriptions that cannot be filled automatically. That is, Spaulding does not teach or suggest each and every limitation of independent claims 3 and 20 and the secondary references cited by the Board do not cure this deficiency of Spaulding. As such, for the reasons detailed

below, Appellant submits that the Board's conclusion that the instant invention is

unpatentable under 35 U.S.C. §103(a) is erroneous because it is not supported by

the evidence of record and, in fact, is contrary to the substantial weight of the

evidence.

### A. The Overwhelming Evidence Contained in Spaulding's Disclosure Would Lead a Reasonable Mind to Conclude That Spaulding Teaches Printing All Labels at a Single Printer

Spaulding teaches a system in which all the label data originates from a

pharmacy host computer and is passed through a host interface 16 to a printer, as

portrayed in Fig. 30. (*See* A49).  Specifically, Fig. 30 shows duplicate routing of

the data stream from the host interface 16 into two duplicate data streams: a first

stream to the label printer 14 ("stream 1"), and another stream to the dispenser

system controller 7 ("stream 2").[8]  *Id.*  As described in the discussion of Fig. 30 in

Spaulding, the pharmacy host computer 10 is normally connected via the printer

port 15 to the label printer 14 to send "prescription data *therethrough* to cause the

printer 14 to print a prescription label with the drug name, quantity, dosage

instructions, and additional data identifying the prescribing physician, the

recipient, and the like."  A53 (8:44-50).  Accordingly, as Spaulding's starting

---

[8] Claim 4 of Spaulding recites a method in which the dosage quantity data is intercepted by the host interface is "additionally" being transferred from the printer port "*to said label printer*" (emphasis added).  (A57 (claim 4)).

point, Spaulding plainly describes a process in which the prescription data is sent from the pharmacy host computer *through* the printer port to the label printer.

Spaulding adds, as part of the disclosed system, a host interface 16 between the printer port 15 and the label printer 14. However, the function of the host interface 16 is limited to duplication of two separate, identical data streams mentioned above: stream 1 traveling to the label printer and stream 2, having the same information as stream 1, but traveling to the dispenser system controller 7. There is no teaching or suggestion that the host interface is "filtering" the data from the pharmacy host computer. Rather, the host interface extracts the data for transportation to the dispenser system controller, while also sending the data to the label printer, describing this variously as "retrieving," "intercepting," or "obtaining" the label data. (A53 (8:3-5; 8:63-65); A56 (14:51-53)). But none of these verbs, nor any other discussion of the host interface, teaches or suggests a "filtering" step being carried out by the host interface.

Accordingly, a fair understanding of Spaulding, as depicted by Fig. 30, is that the pharmacy host computer sends the label data through the printer port to the host interface and the unmodified label data stream (stream 1), in its entirety, is sent through the host interface to the label printer. (A53 (8:8-11 and 44-62)). There are no contradictory teachings in Spaulding that the printer 14 prints *less than* all of the labels. Moreover, since Spaulding only teaches a single printer 14

in the system, it follows that that the one and only printer must print *all* the labels. To conclude otherwise, *i.e.*, that the one and only printer prints less than all the labels, would result in a situation of prescriptions that are missing labels.

The specific arrangement depicted in the flow diagram of Fig. 30 itself further supports the conclusion that the label printer 14 prints all of the labels.  As can be seen in the Fig. 30, the label printer 14 is not attached to the controller 7. While the controller 7 may perform some steps to determine whether the ***dispenser*** apparatus 20 is capable of filling a prescription,[9] the controller 7 is not located in the path of the printer port 15 and so is not fairly understood as affecting the data received by the printer.  Once the label data leaves the pharmacy host computer 10, the only structure disclosed by Spaulding that would be capable of making a determination to print less than all of the labels is the dispenser system controller 7. However, the system controller is not in the data path to the printer 14 and therefore does not affect the data reaching the printer.

In Fig. 30, it is significant that the arrow between the host interface 16 and the dispenser system controller 7 is a one-way arrow—from the host interface to the dispenser system controller—thereby unambiguously showing that the

---

[9] It is also noted that the controller 7 extracts limited data, namely, drug name and quantity from the label print data, which is insufficient information for printing a complete label because it is missing the dosage instructions, and additional data identifying the prescribing physician, the recipient, and the like. *See*, *infra*, note 3 and the accompanying text.

prescription data is only sent in one direction. Thus, information processed by the controller 7 (*i.e.*, information that would be needed to cause the label printer to print less than all the labels) clearly does not reach the label printer 14. The significance of Spaulding's use of the one-way arrows in Fig. 30 is reinforced by the fact that Spaulding used two-way arrows in other parts of Fig. 30. For example, the two-way arrows between the prescription database 17, the dispenser system controller 7, and the dispenser apparatus 20, illustrate that information is exchanged between these modules. In other words, the information received by the dispenser system controller 7 from the host interface 16, *i.e.,* one directionally, is only used to communicate with data base 17 and the dispenser apparatus 20 to determine which medications to dispense, and to display an error message when a particular medication is not able to be dispensed. (A56 (14:56-60); *see generally*, A56-57 (14:53-15:17)). There is no teaching in Spaulding that the controller 7 prevents the complete data stream from reaching the printer and instead only sends a partial data stream back up to the printer.[10] Thus, Fig. 30, when evaluated with the text in the detailed description, clearly demonstrates that *all* labels are printed by the single, attached label printer 14 under the teachings of Spaulding.

---

[10] The mention in Spaulding that the printer port 15 adheres to a standard protocol does not inform whether the hose interface 16 does so too. (A53 (18:53-55)).

## B. TPR Admitted and the Examiner Concluded That Spaulding Teaches a Single Printer That Prints All of the Labels

As discussed above, Spaulding discloses a system in which all of the labels are printed by a single printer 14. This conclusion regarding the teachings of Spaulding is not only supported by Spaulding's specification and drawings as outlined in Appellant's argument, but both TPR and the Examiner also concluded that Spaulding teaches printing all of the labels to a single printer 14.

During the reexamination proceeding, TPR admitted that Spaulding discloses a system in which <u>all</u> the labels are printed by the printer 14. In fact, TPR, in the Third Party Comments dated July 7, 2008, argued and admitted the following:

> Spaulding teach[es] printing all the labels simply because in the Spaulding system a single printer is used for all prescriptions and pharmacists manually apply labels to all vials regardless of whether they were manually or automatically prepared.

(A1231 (claim chart of Third Party Requester discussing claim 20)).

Thus, TPR, who has a vested interest in the invalidation of the claims of the '212 patent and was the impetus for this reexamination proceeding, studied Spaulding's disclosure and concluded that Spaulding teaches that all labels are

printed by the printer 14 of Spaulding. Accordingly, TPR's admission against its interests provides strong support regarding the teaching of Spaulding.[11]

Moreover, the Examiner reached the same conclusion regarding the teaching of Spaulding, namely, that Spaulding teaches that all of the labels are printed by the printer 14. After the Board reached the conclusion that Spaulding taught sending less than all labels to printer 14, prosecution was reopened and TPR submitted the Declaration of Professor Trumper in order to provide support for the Board's interpretation that Spaulding does not send all prescription orders to the label printer 14. (A715; A340-348 (¶18)). Notwithstanding the Board's interpretation and the Declaration of Trumper, the Examiner quite correctly was not persuaded of this strained interpretation of Spaulding. (A190). The Examiner provides a reasoned and consistent interpretation of Spaulding in which the Examiner expressly disagrees with the Board's understanding of Spaulding as adopted by TPR's purported expert, noting:

> Spaulding stresses that the intercepted and extracted prescription information from the prescription label data is used for the Spaulding's system 1; and the prescription label data is conveyed through the interface 16 to the label printer 15 to cause the printer 14 to print a label for the filled vial 11 (See col. 8, line 63 through col. 9, line 11). **In other words, the labels for the automatically filled prescriptions are printed by the label printer 14, and the labels for the manually filled prescriptions are also printed by the same**

---

[11] TPR later changed its position regarding this aspect of Spaulding and submitted the Declaration of Trumper, which is discussed below.

> **label printer 14** because the operations of intercepting and extracting the prescription information from the prescription label data in the interface 16 never interrupt (e.g., halt, stop, cut, suspend, etc.) the flow of the prescription label data from the pharmacy host computer 10 to the label printer 14; and the dispenser system 1 does not equip any printer for the prescription label (See Figs. 1, 30 and col. 8, lines 44-62).

(A190 (Lines 17-28)(emphasis added)).

The Examiner was correct in noting the limited functionality of the controller 7 in the Spaulding system. Not only does the dispenser system 1 lack any printer for the prescription label, Spaulding teaches that the controller 7 extracts only the drug name and quantity from the label data to send to the dispenser system 1 and so the dispenser system 1 would lack the necessary data to print an acceptable label. (A53 (8:28-40); A53-54 (8:44-9:11); A56-57 (14:47-15:15)).

In addition to relying on the disclosure of Spaulding as clearly teaching a system in which all the labels are printed by printer 14, the Examiner was also correct to point out that the same conclusion was previously advanced by TPR. The Examiner noted that:

> Furthermore, the **Third Party Requester represented by the declarant** *admitted* **that Spaulding teaches printing all the labels simply because in the Spaulding system a single printer is used for all prescriptions** and pharmacists manually apply labels to all vials regardless of whether they were manually or automatically prepared (see the right most column at page 10 in the Third Party Requester's

comments filed on 7th of July 2008), and **the declarant fails to show any clue from Spaulding such as the label printer 14 of Fig. 30 only prints the labels for automatically filled prescriptions**.

(A190-91 (Line 29 through line 2)(emphasis added)).

Accordingly, the admission against interest of TPR and the conclusions of the Examiner provide strong corroborating evidence regarding the limited teaching of Spaulding that all of the labels are printed by the printer 14.

### C. TPR's Own Expert Does Not Find That Spaulding Teaches Printing Less Than All of the Labels at the Disclosed Label Printer

Although TPR originally admitted that Spaulding teaches that all of the labels are printed by the printer 14, TPR changed its position midway through the reexamination proceeding and attempted to support its new found position with the Trumper Declaration. The Board, in its final decision, relied heavily on the Trumper Declaration to support its conclusion that Spaulding teaches that the printer 14 only prints labels for the filled vials, *i.e.*, less than all the labels are printed at printer 14. (A16-18). However, a close reading of the Trumper Declaration reveals that Dr. Trumper never concluded that Spaulding teaches printing less than all of the labels and so the Board's reliance on the Trumper Declaration is misplaced.

In his declaration, Dr. Trumper says that "Spaulding never states that the label printer prints all of the labels" (A343 (¶18)), but he goes no further.

Specifically, he never opines, for instance, that Spaulding causes the printer 14 to print less than all of the labels. Thus, Dr. Trumper's statement about what Spaulding does not say, and his failure to state what Spaulding does teach, merely asserts a false equivalency: Spaulding never states that it prints "all" of the labels, therefore Dr. Trumper implies that Spaulding prints *less than all* of the labels. This argument is deeply flawed. It is axiomatic that the lack of an affirmative statement alone cannot be the basis for proving the negative of such statement. In this case, the mere fact that Spaulding does not explicitly state the word "all," in reference to labels, does not mean that Spaulding does not teach that all labels are printed.

Notwithstanding Dr. Trumper's focus on Spaulding's failure to explicitly state "all" labels are printed when that is fairly understood from a reading of Spaulding, Dr. Trumper never states that Spaulding teaches anything other than printing all of the labels at printer 14. Dr. Trumper's silence in this regard speaks volumes. It would be expected that if Spaulding taught printing less than all of the labels at the label printer 14, this fact would be front and center in Dr. Trumper's declaration. Rather, Dr. Trumper draws no such conclusion. Dr. Trumper's conspicuous silence regarding whether Spaulding teaches the printing of less than all the labels supports a contrary, unstated opinion: that Spaulding does not actually teach the printing of less than all the labels.

As discussed above, it is clear from the flow of information depicted in Fig. 30 and its accompanying text that Spaulding does in fact teach that *all* labels must be printed.  In order for the Trumper Declaration to provide factual support for a conclusion that the less than all the labels are printed at printer 14, Dr. Trumper would have to show that the host interface 16 initially prevents the label data from reaching the printer 14 and that only after the controller 7 performs its analysis does the label printer 14 receive less than all the labels for printing, *i.e.*, only labels corresponding to vials that could be automatically filled.  However, Dr. Trumper does not provide any opinion as to what the host interface does with the prescription label data before it gets to the label printer—he simply summarizes what is in the specification of Spaulding which does not concern this specific aspect of the host interface (A342-43 (¶¶14, 15)).  Thus, the Trumper Declaration offers no factual support for reaching a different conclusion.

Dr. Trumper declares that "Spaulding discloses a bidirectional communication path between the computer and the printer" because, according to the specification, "the **printer port** usually adheres to a standard printer interface protocol" (A344 (¶20); emphasis added).  Dr. Trumper does not discuss the fact that nothing in Spaulding describes or illustrates any bidirectional communication between the ***host interface 16*** and the printer port 15, or between the ***controller 7*** and the host interface.  Assuming *arguendo* that the communication path between

the host computer 10 and the printer 14 were bidirectional, Dr. Trumper still does not opine as to what the host interface does with the prescription label data prior to relaying it to the printer.  More specifically, Dr. Trumper does not explain in his Declaration what the host interface sends to the controller, or what information, if any, supposedly comes back to the host interface **from** the controller.[12]

In short, Dr. Trumper's failure to provide an opinion in regard to whether the label printer 14 print less than all of the labels eviscerates the value of  his statement that "Spaulding never states that the label printer prints all of the labels" (A343 (¶18)).  Thus, Dr. Trumper's testimony, in this regard, should not have been relied upon by the Board. (A19).

The Board also agreed with Professor Trumper's assessment that Spaulding teaches a "filtered output stream" of special handling prescriptions for the pharmacist—namely, an error message on a display panel.  The Board views the error message on a display panel as akin to the filtered output of the printed labels in the instant invention, and subsequently concluded that a filtered output of printed labels rather than an error message on a screen is simply a "rudimentary design choice" for one skilled in the art.  (A18).  Even assuming *arguendo* that

---

[12] It should be recognized that Spaulding provides a "host interface" which interfaces to the "host computer" to intercept label data for the benefit of the controller 7.  The nomenclature suggests that the interface is to the host, and once connected, serves the purpose of "obtaining" the label data (*see* A53 (8:59) and then "conveying" it to the controller 7.  (A53 (8:63-64)).

replacing a display of error messages on a screen with a filtered output of printed labels were a "rudimentary design choice" for one skilled in the art, in the case of Spaulding, replacing the display screen with another printer would result in two printers, and, consequently, duplicate printing.  In particular, because a proper reading of Spaulding teaches the printing of all the labels to label printer 14, the further printing of only the labels for which manual handling is necessary (*i.e.*, the error messages) at the additional printer would result in two sets of labels wherein both sets include labels for prescriptions that require manual filling.  (A168-69). Accordingly, even as modified, Spaulding fails to teach splitting the data stream in order to print two exclusive label sets, which is the scope of independent claims 3 and 20 (*see* last "wherein" clause (A639-40 and A643-44)).  At best, Spaulding, as modified, teaches printing labels for prescriptions it cannot fill and printing a second set of labels that includes both labels for the prescriptions it can and cannot fill, *i.e.*, a non-exclusive, comingled label set.  Thus, the modification of Spaulding advanced by the Board (*i.e.*, Spaulding in view of Halvorson) is not fairly understood as teaching the creation of exclusive data streams in which one stream is sent to an adhesive label printer for those prescriptions that require manual filling and a second, exclusive stream that is suitable for automated manufacturing

for administration to patients, as is recited in independent claims 3 and 20 of the instant invention.[13]

### D. The Board's Reliance on a Portion of Spaulding That Only Describes One Part of Spaulding's System Does Not Support the Board's Conclusion as to the Functionality of the Entire Spaulding System

In its decision, the Board relies on a passage of the Spaulding reference (A53-54(8:63-9:11)) that is concerned with a specific circumstance in the Spaulding system, namely, the circumstance in which the vial can be automatically filled. The Board contends that this passage is temporal in nature and then further concludes that "the temporal nature of column 8, line 63 through column 9, line 11 of Spaulding" indicates that the host interface intercepts the prescription label data, analyzes it, and then conveys to the label printer only the prescription label data for the filled vials. (A18). We respectfully disagree with this interpretation as it runs contrary to plain language of Spaulding.

The Board relies on the fact that the passage at column 8, line 63 through column 9, line 11 of Spaulding only specifically mentions printing labels for the filled vials as evidence that the label printer 14 *only prints* the labels for the filled

---

[13] As discussed in Argument I.A, *infra*, "manufacturing" a syringe for distribution and administration to a patient, as claimed in the instant invention, is understood by persons having ordinary skill in the art to mean that the manufacturing includes a printed label applied to the syringe.

vial.  The passage cited by the Board deals with the specific circumstance in

Spaulding system in which the system is capable of filling the prescription.  To be

clear, Spaulding identifies two situations as part of the disclosed system, one in

which the dispenser apparatus is able to automatically fill a vial with the required

drug, and another in which the dispenser apparatus in not able to fill a vial.  The

passage cited by the Board only concerns the situation in which the dispenser

apparatus is able to fill the vial.  Consequently, it is not surprising that the

paragraph describing the situation in which a vial has been filled concludes with a

reference to the printing the label for the "filled vial" (A54 (9:11)).  The fact that

this portion of the Spaulding specification does not refer to labels for the unfilled

vials does not bear on whether those labels have also been printed.  It would not be

expected for Spaulding to discuss the printing of labels for unfilled vials when

Spaulding is discussing a situation in which vials are filled.  As such, the fact that

Spaulding fails to mention labels for the unfilled vials in the discussion of filled

vials does not provide evidence to support the Boards conclusion that Spaulding

only prints labels for filled vials.

Moreover, it is apparent that the Board's reading of Spaulding, that the

printer 14 only prints a label for filled vials, is not supported by the evidence

because such a reading creates a problem in the data flow of Spaulding.  Since

Spaulding only discloses a single printer 14, a reading that printer 14 **only** prints

labels for filled vials would result in a situation in which labels for unfilled vials would ***never be printed***.  Rather than appreciating that the Board's reading of Spaulding would result in this problem and, therefore, reach the conclusion that Spaulding's label printer 14 must print all the labels, the Board sought to further modify Spaulding in view of Halverson and Dillon to include a new, second printer to handle the labels for the unfilled vials.  The fact that the Board was required to further modify Spaulding in order to logically support its conclusion regarding the reading of Spaulding indicates that the Board's conclusion was in error.[14]

In addition, while the board cites the "temporal nature" of the above referenced section of Spaulding (A53-54 (8:63-9:11)), that section contains no temporal language.  Specifically, there is no language, such as "next" or "then" or "afterward" to suggest that the prescription label data is only conveyed to the label printer after it has been analyzed or altered by the host interface.  This section of Spaulding does not require that the label data be conveyed to the printer only ***after*** the vials have been filled.  Thus, the section of Spaulding relied upon by the Board does not support the Board interpretation.

Accordingly, Applicant submits that the overwhelming evidence supports the conclusion that Spaulding teaches printing all the labels at printer 14 and that

---

[14] Moreover, as discussed in Argument II.C, this would result in duplicate printing and is a modification beyond the fair realm of what one would do to Spaulding without still further, unspecified modifications to the controller at the heart of the Spaulding system.

the Board's decision is not supported by substantial evidence. Therefore, the

Board's determination should be reversed.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should reverse the ruling of the

Patent Trial and Appeal Board, and remand the case with instructions to allow all

pending claims.

May 12, 2014                                        Respectfully submitted,


                                                   LEASON ELLIS LLP


                                                   /s/  David Leason
                                                   David Leason
                                                   Leason Ellis LLP
                                                   One Barker Avenue, Fifth Floor
                                                   White Plains, NY 10601
                                                   Tel: 914-288-0022
                                                   Fax: 914-288-0023
                                                   *Attorney for Appellant*
                                                   *Baxter Corporation Englewood, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The brief for the appellant complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B). The relevant portions of the brief, including all footnotes, contains 10,559 words, as determined by Microsoft Word 2010.

/s/ David Leason
David Leason
Leason Ellis LLP
One Barker Avenue, Fifth Floor
White Plains, NY 10601
Tel: 914-288-0022
Fax: 914-288-0023
*Attorney for Appellant*
*Baxter Corporation Englewood, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2014, I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system. I further certify that all of the participants in this case are registered CM/ECF users.

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450

Greg H. Gardella
Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.
1940 Duke Street
Alexandria, VA 22314

/s/ David Leason
David Leason
Reg. No. 36, 195

CASE PARTICIPANTS ONLY

## ADDENDUM



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,333 | 01/18/2008 | 7096212 | 20010-016RX1 | 1001 |

76808          7590          11/22/2013

Leason Ellis LLP
One Barker Avenue
Fifth Floor
White Plains, NY 10601-1526

| EXAMINER |
|---|
| LEE, CHRISTOPHER E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/22/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

INTELLIGENT HOSPITAL SYSTEMS LTD.
Requester and Appellant

v.

FORHEALTH TECHNOLOGIES, INC.
Patent Owner and Respondent
_____

Appeal 2013-002295
*Inter partes* Reexamination Control No. 95/000,333
Patent 7,096,212 B2
Technology Center 3900
_____

Before JAMES T. MOORE, KARL D. EASTHOM, and
KEVIN F. TURNER, *Administrative Patent Judges*.

JAMES T. MOORE, *Administrative Patent Judge*.

DECISION
37 C.F.R. §41.77(f)

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

STATEMENT OF THE CASE

This proceeding arose from a request for *inter partes* reexamination of U.S. Patent 7,096,212 B2. The request was filed on January 11, 2008. The Third-Party Requester, Intelligent Hospital Systems Ltd., appealed under 35 U.S.C. §§ 134(c) and 315(b) from the Examiner's determination that the following previously disputed claims were patentable over the cited prior art references: original claims 3-5, 7-14 and 17, amended claims 2, 15-16, and 18-30, and then new claims 31-58. This Board heard oral argument from the Third Party Requester and Patent Owner on April 10, 2012. A written transcript of the oral hearing was entered into the record on July 9, 2012. On April 20, 2012, this Board entered an order reversing the Examiner's determination and entering a new ground of rejection as to claims 19-20, 47-49, and 57-58.

Pursuant to 37 C.F.R. § 41.77(b)(1), the Patent Owner elected to reopen prosecution on May 21, 2012. The claims were amended and new claims added, yielding claims 2-5, 7-14, and 16-60 remaining in this proceeding. The Third Party Requester filed comments on June 20, 2012 pursuant to 37 C.F.R. § 41.77(c), asserting that the amendments failed to distinguish over the cited art, that limitations were being included improperly into the claim interpretation by the patent owner, and that the amended claims failed to comply with provisions of 35 U.S.C. §112.

On August 16, 2012, the Examiner issued a determination pursuant to 37 C.F.R. § 41.77(d). Following 37 C.F.R. § 41.77(e), on September 17, 2012, both the Third-Party Requester and the Patent Owner filed comments in response to the Examiner's determination. Finally, as permitted by 37 C.F.R. §41.77(e), on

2

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

October 17, 2012, the Patent Owner filed a reply to the Third Party Requester's comments of September 17, 2012. Among those comments is found additional evidence in the form of expert and fact witness declarations.

The proceeding now returns to the Board under 37 C.F.R. §41.77(f), for a new decision. This decision, which incorporates in large part the reasoning of the Examiner's Determination following the Board's original decision and also considers anew the evidence of record, constitutes the new decision of the Board.

We have jurisdiction under 35 U.S.C. §§ 134(c) and 315(b).

We AFFIRM the Examiner's rejections (designated A-W, *infra*.) of claims 2-5, 7-14, and 16-60.

We AFFIRM the Examiner's determinations not to adopt the proposed rejections of claims 8, 23-29, 31-45, 57, and 58 (designated 1-10, *infra*.).

We AFFIRM the Examiner's determinations not to adopt the proposed rejections of claims 2-5, 7-14, and 16-60 under 35 U.S.C. §112, first and second paragraphs (designated 11 and 12, *infra*.).

*The Invention*

The invention of the claims of the present proceeding relates to the automation of preparation of prescription medications in syringes. More specifically, the '212 Patent relates to both a method and a system for integrating a computerized pharmacy host information system (e.g., an order entry system in a hospital or pharmacy) and an automated medication preparation system for preparation of doses of medicine. (Col 1:11-45; col. 3:9-11, 30-33.) In particular,

3

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

the system includes an interface that enables serial data streams[1] (e.g., prescription orders) to be trapped, parsed, and tested for suitability for automated handling by a medication preparation system. (Abs.) The interface includes a listener software module that receives serial data streams and a parser software module that operates on the data streams to cause the automated medication preparation system selectively to manufacture drug dosages in syringes or to reject the data as not suitable for handling. (Abs.; col. 3:67-col. 4:13.) Those prescription orders that are not suitable are sent to a label printer for manual handling. (Col. 4:21-23.)

*Claims on Appeal*

The independent claims are claims 3, 7, 20, 57, and 58. The following claim is exemplary of the subject matter on appeal, with emphasis added by the Board to highlight issues in dispute.

3. (Amended) A computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy, said one or more medication data concerning respective patients and specifying a dose of a medication to be delivered to the respective patients in a syringe, comprising the steps of:

(A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream;

(B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source;

(C) testing the parsed output stream against an order database to determine suitability of the medication data therein for automated handling by a medication preparation system associated with the pharmacy;

(D) using the medication preparation system, manufacturing syringes for delivery and administration to each respective patient having the medication dose which corresponds to the one or more medication data determined to be suitable;

---

[1] Such as a printer output from a serial port.

4

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

(E) *releasing only those portions of the output stream that are not suitable*,

(F) *printing onto an adhesive label at a printer the released output stream for manual handling within the pharmacy*; and

(G) populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules,

wherein the *printing at the printer comprises a filtered output stream consisting of only those jobs that require manual handling* while the medication data determined as suitable for the medication preparation system are manufactured by the medication preparation system for administration from the syringe to patients,

wherein the printer output stream identifies a particular listener software module ("LSM").

*Prior Art*

The following is documentary evidence in the record concerning patentability:

| Yoshida | US 4,829,524 | May 9, 1989 |
| Halvorson | US 4,847,764 | Jul. 11, 1989 |
| Brinker et al. | US 5,169,642 | Dec. 8, 1992 |
| Charhut | US 5,208,762 | May 4, 1993 |
| Housel, III | US 5,339,421 | Aug. 16, 1994 |
| Spaulding et al. | US 5,337,919 | Aug. 16, 1994 |
| Liff et al. | US 5,797,515 | Aug. 25, 1998 |
| Rieker | US 5,832,447 | Nov. 3, 1998 |
| Sattizahn et al. | US 5,884,273 | Mar. 16, 1999 |
| Ortiz | US 5,884,457 | Mar. 23, 1999 |
| Tayi | US 6,096,561 | Aug. 1, 2000 |
| Smith et al. | US 6,141,412 | Oct. 31, 2000 |
| Dillon | US 6,161,141 | Dec. 12, 2000 |
| Davies et al. | US 2003/0046114 A1 | Mar. 6, 2003 |

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*The Rejections*

All the claims of the instant reexamination proceeding stand rejected in the following manner. The rejections adopted are referenced by letter, and the rejections not adopted are referenced numerically for purposes of clear distinction and understanding of the procedural posture of this appeal.

*The Adopted Rejections*

(A) Claims 2-4, 18, 46, 47, and 59 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art. (Examiner's Determination, page 10).

(B) Claims 50, 51, and 54-56 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art and further in view of Housel. (Examiner's Determination, page 18).

(C) Claim 48 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Sattizahn. (Examiner's Determination, page 20).

(D) Claims 5, 16, and 17 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Reiker. (Examiner's Determination, page 21).

(E) Claim 19 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Charhut. (Examiner's Determination, pages 22-23).

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

(F) Claim 49 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, what was known in the art, and Charhut and further in view of Smith. (Examiner's Determination, page 23).

(G) Claim 52 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Yoshida. (Examiner's Determination, page 24).

(H) Claim 53 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, what was known in the art, and Yoshida and further in view of Davies. (Examiner's Determination, page 25).

(I) Claim 7 and Claims 9-14 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Reiker, and what was known in the art. (Examiner's Determination, page 26).

(J) Claim 8 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Reiker, and what was known in the art. (Examiner's Determination, page 34).

(K) Claim 57 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Liff, Halvorson, and what was known in the art. (Examiner's Determination, page 35).

(L) Claim 58 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was known in the art. (Examiner's Determination, page 41).

(M) Claims 20-22 and 60 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art. (Examiner's Determination, page 47).

7

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

(N) Claim 23 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Dillon. (Examiner's Determination, page 52).

(O) Claim 24 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Rieker. (Examiner's Determination, pages 53-54).

(P) Claim 25 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art and Rieker and further in view of Dillon. (Examiner's Determination, pages 54-55).

(Q) Claim 30 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Charhut. (Examiner's Determination, page 55).

(R) Claims 26-29 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, Rieker, and Dillon. (Examiner's Determination, page 57).

(S) Claim 31 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Charhut and further in view of Smith or Tayi. (Examiner's Determination, page 59).

(T) Claims 32, 33, 36-40, and 42-45 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Housel. (Examiner's Determination, page 60).

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

(U) Claim 34 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Yoshida. (Examiner's Determination, page 65).

(V) Claim 35 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Yoshida and further in view of Davies. (Examiner's Determination, page 67).

(W) Claim 41 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Housel. (Examiner's Determination, page 68).

*The Rejections Not Adopted*

(1) The Examiner has not adopted a proposed rejection of Claim 8 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Liff, and what was known in the art. (Examiner's Determination, page 33).

(2) The Examiner has not adopted a proposed rejection of Claim 57 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Liff, and what was known in the art. (Examiner's Determination, page 35).

(3) The Examiner has not adopted a proposed rejection of Claim 58 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art. (Examiner's Determination, page 41).

(4) The Examiner has not adopted a proposed rejection of Claims 23-25 and 30 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Halvorson and what was well known in the art. (Examiner's Determination, page 51).

(5) The Examiner has not adopted a proposed rejection of Claims 26-29 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Rieker. (Examiner's Determination, page 56).

(6) The Examiner has not adopted a proposed rejection of Claim 31under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art and further in view of Smith or Tayi. (Examiner's Determination, page 59).

(7) The Examiner has not adopted a proposed rejection of Claims 32, 33, 36-40, and 42-45 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, and what was well known in the art and further in view of Housel. (Examiner's Determination, page 60).

(8) The Examiner has not adopted a proposed rejection of Claim 34 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, and what was well known in the art and further in view of Yoshida. (Examiner's Determination, page 65).

(9) The Examiner has not adopted a proposed rejection of Claim 35 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, what was well known in the art, and Yoshida and further in view of Davies. (Examiner's Determination, page 66).

(10) The Examiner has not adopted a proposed rejection of Claim 41 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson,

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Dillon, what was well known in the art, and Housel and further in view of Brinker. (Examiner's Determination, page 68).

(11) The Examiner has not adopted a proposed rejection of Claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement. (Examiner's Determination, page 69).

(12) The Examiner has not adopted a proposed rejection of Claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, second paragraph, as failing to particularly point out and distinctly claim the subject matter which the patent owner regards as the invention. (Examiner's Determination, page 70).

Subsequent to the Examiner's Determination, the Patent Owner submitted comments directed to the Spaulding and Halvorson references. The Patent Owner essentially argues that as Spaulding lacks any teaching or suggestion of a filtering operation on the output of its printer port to cause fewer than all of the labels to be printed, even after modification by Halvorson, the proposed combination of references fails to meet the features of claims 3 and 20. (Patent Owner's Response to Examiner's Determination, September 17, 2012).

Also subsequent to the Examiner's Determination, the Third Party Requester submitted comments, directed to Spaulding, as well as to the non-adopted rejections under 35 U.S.C. § 112.

## ANALYSIS

Under Board Rule 77(f) we are to "reconsider the matter and issue a new decision." However, as the claims have been amended subsequent to the decision and new evidence adduced, this is not the *same* matter, strictly speaking. We start

11

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

with the rejections as they stand, in light of the arguments made in the original
appeal briefing as well as those arguments made and evidence submitted in the
subsequent briefings following amendment. We have reviewed the previous
arguments of record as well. *Rexnord v. Kappos*, 705 F.3d 1347 (Fed. Cir. 2013).

**(A) The rejection of Claims 2-4, 18, 46, 47, and 59 under 35 U.S.C.
§ 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson,
and what was known in the art.**

The Examiner has recited the specific grounds of rejection at pages 10-18 in
the Examiner's Determination of August 16, 2012, and we shall not further clutter
the record with a complete restatement thereof. We do note that we adopt the
Examiner's reasoning therein as our own as set forth on pages 10-18 and that it is
not inconsistent with the Board's prior decision.

For ease of reference, we summarize the cited references. Spaulding
describes medication data specifying a dose to be delivered to a patient in a vial. A
pharmacy host computer tracks prescriptions and inventory. The computer can
cause a label to be printed on a printer connected to a serial port. A system
controller intercepts prescription data from the label print, extracts the pertinent
drug information, and then searches the database for the drug. If the drug is in
inventory, the controller selects a vial, dispenses pills, and awaits another
prescription. The label data are conveyed to the label printer to cause the printer to
print a label for a filled vial. If the drug name is not in the database, the controller
sends an error message to a display panel. A data structure is used to hold the
extracted drug name and prescription quantity.

The Spaulding error messages which are displayed on a display are a filtered
output of those unsuitable for automated handling.

12

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Dillon is relied upon for its teaching of a bidirectional TCP/IP network such as the internet to enable Spaulding to be used in a network environment; Halvorsen for printing a released output stream at a printer; and lastly, the Examiner found it to be known commonly that medication can be delivered in a syringe. (Examiner's Determination, pages 10-18, generally).

In traverse, the Patent Owner urges that the Spaulding reference directs all labels to a single, attached printer. (Patent Owner Comments in Response to Examiner's Determination, September 17, 2012) (pages 1-5). Claims 3 and 20, according to the Patent Owner, provide a printer with a filtered output stream consisting of only those jobs requiring manual handling. This argument has been made consistently throughout the reexamination proceeding and appeal (*e.g.*, Respondent Brief, April 5, 2010, page 4). The implication raised by this argument is that Spaulding does not filter the parsed output from the printer data and, accordingly, cannot be used properly in the rejection to render the claim obvious.

Claim 3, completely reproduced above, recites in most pertinent part: "(E) releasing only those portions of the output stream that are not suitable, [and] (F) printing onto an adhesive label at a printer the released output stream for manual handling within the pharmacy."

The central issue raised by the Patent Owner at this juncture is whether, in the context of the claimed invention, Spaulding's error message would have rendered obvious the claimed forwarding of only the drug orders requiring manual handling to a printer in view of Dillon's network. Spaulding describes the messaging to a pharmacist of prescriptions requiring manual handling of drug orders, the message being sent to a system output 178 (Fig. 29), exemplified as a display screen 31 at Col. 9, lines 32-33. According to the Patent Owner and its

13

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

declarants, a commercial system would necessarily print labels for a medication prepared automatically using its own attached printer, for safety reasons.

In analyzing this issue, we now turn to the declarations of Fahrni, Blair, and Tribble (all filed May 21, 2012 by the Patent Owner) and that of Trumper, filed by the Third Party Requester on June 20, 2012, all subsequent to the original Decision on Appeal.

*The Fahrni Declaration*

The entire substance of the Fahrni declaration is found in paragraph 7 as follows. "I have read U.S. Patent No. 7,096,212 ("the '212 patent") and have also read the 'Declaration Under 37 C.F.R. § 1.132' that was signed by Jerry Blair. I agree with the statements in that declaration under the heading 'Part II.'" We have no independent analysis or consideration of the merits of the issue from Mr. Fahrni, and as such, we find this declaration entitled to little accord of credibility or weight.

*The Tribble Declaration*

Mr. Tribble is a named inventor on the patent at issue. He also is an employee of Baxter Healthcare, which is a company controlled by Baxter International, Inc. Baxter International, Inc. also controls the real party in interest in this case, FHT, Inc., the patent owner. (Tribble Declaration, paragraphs 1- 3).

Mr. Tribble testifies that the PARxD IV, an automated dosage preparation device, had its own dedicated label printer and had not been used "in a manner that required or permitted the printing of labels for syringes it prepared using an external printer." (*Id.*, paragraph 6(g)). The system printed and applied its own labels. (*Id.*, paragraph 7.) Based on public disclosures and United States Patent

14

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

6,722,404, he concludes that automated medication preparation systems would have included their own dedicated printer as part of a system. (*Id.*, paragraphs 8 and 9.)

Mr. Tribble's testimony appears logical and founded in documentary evidence; consequently, we deem his testimony credible even in light of his status as an employee of a company which has an interest in the outcome of this proceeding.

### *The Blair Declaration*

Mr. Blair is a former employee of a company which had Baxter International as a client. (Blair Declaration, Paragraphs 4 and 5.) He is a pharmacy informatics analyst and a self-stated "person of ordinary skill in the art." (*Id.*, paragraphs 4 and 9). He asserts that it is an inherent teaching in the '212 patent that the automated system PARxD IV would apply a label. Otherwise, the syringe would not be suitable for a patient. (*Id.*, paragraphs 9 and 10.). Indeed, he goes so far as to say an automated system must have "a labeling station of its own for safety's sake" (*Id.*, paragraph 16) and points to other systems as having this as a safety feature. (*Id.*, paragraphs 17 and 18).

Again, similar to Mr. Tribble, this specific testimony appears logical and credible.

### *The Trumper Declaration*

We also have considered carefully the Trumper declaration (filed June 20, 2012 by the Third Party Requester).

Professor Trumper is a compensated expert witness who is a Professor at the Massachusetts Institute of Technology. Professor Trumper takes a different

15

**A16**

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

viewpoint, one from the point of the cited prior art reference Spaulding. He asserts that the only difference between the Spaulding controller and the parsing software module of the instant patent is that the Spaulding controller sends the manually filled drug orders to a system output, and the '212 patent sends that information to the label printer. (Trumper Declaration, paragraph 17). He testifies that one of skill in the art would utilize networks and as many printers as needed.

Professor Trumper's testimony likewise appears logical and well-reasoned; accordingly, we accord weight and credibility as to this specific factual and opinion testimony.

We observe that the Patent Owner's argument and the declarations too narrowly focus the issue at hand. While it certainly is credible that the commercially used machines, including the PARxD IV, would be configured to apply a label to a prepared vial for reasons of safety, it is by no means the only configuration possible or required. As found by the Examiner and supported by the record and testimony of Professor Trumper, prescriptions that are not automatically filled in Spaulding must be prepared manually. Consequently, the message to the pharmacist necessarily would contain portions of the output stream (Examiner's Determination, Page 13).

We think the correct analysis of the issue is that put forth by the Examiner– that Spaulding teaches that the pharmacist will receive a message of those orders requiring special handling, and one of ordinary skill in the art would turn to conventional message delivery mechanisms. Among them are a visual display (Examiner's Determination, page 13, item "F") or other networks such as Dillon's well-known TCP/IP network (*Id.*) to a networked pharmacy printer (Halvorson).

Like the "filtered output stream" sent to the printer in the instantly claimed invention, the display of Spaulding also shows a filtered output of special handling prescriptions for the pharmacist. Whether printed on a screen or printed on a label from a networked printer, both have a filtered output. (*See, e.g.* Trumper Declaration, paragraphs 15, 16, 33 and 34). We agree that this would have been a rudimentary design choice for one of ordinary skill in the art. As a consequence, we are unpersuaded by the Patent Owner's contention regarding the Spaulding reference's lack of filtering output.

In a related issue, the Patent Owner also asserts that the prior panel of the Board erred in stating that Spaulding does not forward all labels to the printer. (Patent Owner Response May 21, 2012, page 28). The Patent Owner calls this interpretation "strained" (Patent Owner Response to Third Party Requester Comments, September 17, 2012, page 2). Utilizing Figure 30 and Column 9, lines 8-11, the Patent Owner notes that "[t]he prescription label data is conveyed through the interface 16 to the label printer 15 to cause the printer 14 to print a label for the filled vial 11." (*Id.* at page 3) The Examiner is of a similar view.

On the other hand, the Third Party Requester urges that the Examiner is incorrect with regard to his finding that the label printer prints all the labels. The Examiner stated that because the interception and extraction do not halt the information flow to the printer, and only one printer is available, all labels must be printed at that printer. (Requester Comments, September 17, 2012, pages 4-5, citing Examiner's Determination, pages 6-7). The prior panel decision, however, aligned with the Third Party Requestor's view that not all need be printed at the printer of Spaulding. The Third Party Requester similarly calls the Patent Owner's

17

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

interpretation of Spaulding "strained" (Third Party Requester Comments in Response to Patent Owner's Response, October 17, 2012, page 4).

Professor Trumper has observed that Spaulding does not state that the label printer 14 prints all of the labels for the manually filled and automatically filled prescriptions. (Trumper Declaration, paragraph 18). As far as we can tell, this is an accurate assessment of Spaulding's disclosure.

We see the language of Spaulding, column 3, lines 8-11, as supporting the contrary view from the Examiner and Patent Owner–that the reference also can be interpreted fairly as describing a circumstance in which the label printer prints labels for *filled* vials only. Figure 30 does not include the completely described routine of Figure 29 for displaying error messages to the pharmacist. While the description is not perfectly clear, the temporal nature of column 8, line 63 through column 9, line 11 of Spaulding indicates that the host interface 16 first "intercepts" the prescription label data, then analyzes them. Once that occurs, the prescription label data are then conveyed through the interface to the label printer to print a label for the filled vial. On balance, one of ordinary skill in the art could theoretically read this as describing either situation, but we find a preponderance of the evidence of record supports a description of printing the filled vial labels only, while the error messages go to the system output.

We therefore are unpersuaded by this additional argument of error.

**(B) The Rejection of Claims 50, 51, and 54-56 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art and further in view of Housel.**

As above, the Examiner has stated the rejection at pages 18-20 of the Examiner's Determination, and as it is consistent with our prior decision, we adopt

18

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party

Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(C) The Rejection of Claim 48 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Sattizahn**.

As above, the Examiner has stated the rejection at page 20 of the Examiner's

Determination, and as it is consistent with our prior decision, we adopt the

Examiner's reasoning as our own. Neither the Patent Owner nor Third Party

Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.


**(D) The Rejection of Claims 5, 16, and 17 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Reiker**.

As above, the Examiner has stated the rejection at pages 21-22 of the

Examiner's Determination, and as it is consistent with our prior decision, we adopt

the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party

Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(E) Claim 19 stands rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Charhut.**

As above, the Examiner has stated the rejection at pages 22-23 of the

Examiner's determination, and as it is consistent with our prior decision, we adopt

19

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

the Examiner's reasoning as our own.  Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(F) The Rejection of Claim 49 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art, and Charhut and further in view of Smith.**

As above, the Examiner has stated the rejection at page 23 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own.  Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(G) The Rejection of Claim 52 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art and further in view of Yoshida.**

As above, the Examiner has stated the rejection at page 24 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own.  Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(H) The Rejection of Claim 53 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, what was known in the art, and Yoshida and further in view of Davies.**

As above, the Examiner has stated the rejection at page 25 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own.  Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

20

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Accordingly, this rejection is affirmed.

**(I) The Rejection of Claim 7, and Claims 9-14 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Reiker, and what was known in the art.**

As above, the Examiner has stated the rejection at page 26 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(J) The Rejection of Claim 8 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Reiker, and what was known in the art.**

As above, the Examiner has stated the rejection at page 34 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(K) The Rejection of Claim 57 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Liff, Halvorson, and what was known in the art.**

As above, the Examiner has stated the rejection at page 35 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

21

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

**(L) The Rejection of Claim 58 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was known in the art.**

As above, the Examiner has stated the rejection at page 41 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(M) The Rejection of Claims 20-22 and 60 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art.**

As above, the Examiner has stated the rejection at page 47 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(N) The Rejection of Claim 23 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Dillon.**

As above, the Examiner has stated the rejection at page 52 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(O) The Rejection of Claim 24 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Rieker.**

22

A23

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

As above, the Examiner has stated the rejection at page s 53-54 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(P) The Rejection of Claim 25 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art and Rieker and further in view of Dillon.**

As above, the Examiner has stated the rejection at pages 54-55 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(Q) The Rejection of Claim 30 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Charhut.**

As above, the Examiner has stated the rejection at page 55 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(R) The Rejection of Claims 26-29 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, Reiker, and Dillon.**

As above, the Examiner has stated the rejection at page 57 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the

23

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(S) The Rejection of Claim 31 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Charhut, further in view of Smith or Tayi.**

As above, the Examiner has stated the rejection at page 59 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(T) The Rejection of Claims 32, 33, 36-40, and 42-45 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Housel.**

As above, the Examiner has stated the rejection at page 60 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(U) The Rejection of Claim 34 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Yoshida.**

As above, the Examiner has stated the rejection at page 65 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

24

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Accordingly, this rejection is affirmed.

**(V) The Rejection of Claim 35 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Yoshida and further in view of Davies.**

As above, the Examiner has stated the rejection at page 67 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

**(W) The Rejection of Claim 41 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Housel.**

As above, the Examiner has stated the rejection at page 68 of the Examiner's determination, and as it is consistent with our prior decision, we adopt the Examiner's reasoning as our own. Neither the Patent Owner nor Third Party Requestor has made an observation or argument regarding this rejection.

Accordingly, this rejection is affirmed.

We now turn to the rejections which were not adopted by the Examiner.

**(1) The Examiner has not adopted a proposed rejection of Claim 8 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Liff, and what was known in the art.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(2) The Examiner has not adopted a proposed rejection of Claim 57 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Liff, and what was known in the art.**

25

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(3) The Examiner has not adopted a proposed rejection of Claim 58 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was known in the art.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(4) The Examiner has not adopted a proposed rejection of Claims 23-25 and 30 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson and what was well known in the art.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(5) The Examiner has not adopted a proposed rejection of Claims 26-29 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art and further in view of Rieker.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(6) The Examiner has not adopted a proposed rejection of Claim 31under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art and further in view of Smith or Tayi.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

26

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

**(7) The Examiner has not adopted a proposed rejection of Claims 32, 33, 36-40, and 42-45 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, and what was well known in the art; further in view of Housel.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(8) The Examiner has not adopted a proposed rejection of Claim 34 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, and what was well known in the art and further in view of Yoshida.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(9) The Examiner has not adopted a proposed rejection of Claim 35 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, what was well known in the art, and Yoshida and further in view of Davies.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

**(10) The Examiner has not adopted a proposed rejection of Claim 41 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, Dillon, what was well known in the art, and Housel and further in view of Brinker.**

Neither party has provided any argument or comments as to the non-adoption of this rejection. Accordingly, we affirm the nonadoption of the rejection.

27

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

**(11) The Examiner has not adopted a proposed rejection of Claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, first paragraph, as failing to comply with the written description requirement.**

The Third Party Requester had proposed rejections of claims which had the language "manufacturing syringes" inserted. According to the Third Party Requester, the Patent Owner was attempting to combine isolated occurrences of the word "manufacturing" and "syringe," and there is no written descriptive support for that language in the claims. (Third Party Requester Comments on Patent Owner Response, June 20, 2012, pages 17-18).

We agree with the Examiner that this contention is without merit. The discussion of the exemplary automated system, beginning at column 3, line 33, describes the preparation system as manufacturing orders for syringes.

Accordingly, we affirm the nonadoption of this rejection.

**(12) The Examiner has not adopted a proposed rejection of Claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, second paragraph, as failing to particularly point out and distinctly claim the subject matter which the patent owner regards as the invention.**

The Third Party Requester proposed rejecting Claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, second paragraph. The Requester asserts that the added limitation "while" is indefinite because it is subject to one or more interpretations. More specifically, the Requester asserts that "while" is a term one of ordinary skill in the art could interpret as either having a temporal component or not having a temporal component. (Requester's Comments on Examiner's Determination, September 17, 2012, page 4.)

We reproduce the language from the pertinent portion of claim 3 for context during this analysis:

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

> wherein the printing at the printer comprises a filtered output
> stream consisting of only those jobs that require manual handling
> while the medication data determined as suitable for the medication
> preparation system are manufactured by the medication preparation
> system for administration from the syringe to patients

The Third Party Requester argues that "'while' is a term that a person of ordinary skill in the relevant art would read with more than one plausible interpretation." (Requester Comments on Examiner's Determination, September 17, 2012, page 4). The Third Party Requester also urged that both actions (the printing and the manufacturing) must occur at the same time. (Requester Comments following Board Decision, page 18).

The Examiner, on the other hand, feels that the claim term is temporally limited, and as such, both actions must be happening at the same time. (Examiner's Determination, page 70).

In analyzing the claim, it becomes readily apparent that this is a method claim with several sequential steps and used within the context of an automated medicine preparation system. In operation, some of the medicines will be manufactured, and others will not, but instead will have a label printed. It seems clear to us that the method steps would be occurring as the machine worked its way through a batch of orders, some printing when others were being processed. Accordingly, we see no error with the Examiner's determination that this rejection should not be adopted.

29

**A30**

Appeal 2013-002295
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

DECISION

We AFFIRM the Examiner's rejections (designated A-W, *supra*.) of claims 2-5, 7-14, and 16-60.We AFFIRM the Examiner's determinations not to adopt the proposed rejections of claims 8, 23-29, 31-45, 57, and 58 (designated 1-10, *supra*.).

We AFFIRM the Examiner's determinations not to adopt the proposed rejections of claims 2-5, 7-14, and 16-60 under 35 U.S.C. §112, first and second paragraphs (designated 11 and 12, *supra*.)

Requests for rehearing this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 41.79.

AFFIRM

37 C.F.R. § 41.77(b)

peb

THIRD-PARTY REQUESTER:

GREG H. GARDELLA
OBION, SPIVAK, MCCLELLAND, MAIER & NEUSTADT, L.L.P.
1940 DUKE STREET
ALEXANDRIA, VIRGINIA 22314

PATENT OWNER:

DAVID LEASON
LEASON ELLIS LLP
ONE BARKER AVENUE, FIFTH FLOOR
WHITE PLAINS, NY 10601

30



US007096212B2

(12) **United States Patent**
Tribble et al.

(10) Patent No.: **US 7,096,212 B2**
(45) **Date of Patent:** **Aug. 22, 2006**

(54) **SERIAL DATA CAPTURE AND PROCESSING**

(75) Inventors: **Dennis Tribble**, Oklahoma City, OK (US); **Joel A. Osborne**, Oklahoma City, OK (US)

(73) Assignee: **ForHealth Technologies, Inc.**, Daytona Beach, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 880 days.

(21) Appl. No.: **09/991,048**

(22) Filed: **Nov. 21, 2001**

(65) **Prior Publication Data**

US 2003/0097368 A1    May 22, 2003

(51) **Int. Cl.**
*G06F 17/30*    (2006.01)

(52) **U.S. Cl.** ................................ **707/1**; 707/3; 707/10

(58) **Field of Classification Search** .................. 707/3, 707/6, 1, 10;  705/2, 3;  235/375, 385;  600/300
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,337,919 A | * | 8/1994 | Spaulding et al. | .............. 221/2 |
| 5,805,454 A | | 9/1998 | Valerino, Sr. et al. | |
| 5,883,370 A | * | 3/1999 | Walker et al. | .............. 235/375 |
| 5,915,089 A | | 6/1999 | Stevens et al. | |
| 6,048,086 A | | 4/2000 | Valerino, Sr. | |

| | | | | |
|---|---|---|---|---|
| 6,202,923 B1 | * | 3/2001 | Boyer et al. | ................ 235/375 |
| 6,226,745 B1 | * | 5/2001 | Wiederhold | .................... 707/9 |
| 2002/0188467 A1 | * | 12/2002 | Eke | .................... 705/2 |
| 2003/0033532 A1 | * | 2/2003 | Marks | ........................ 713/182 |
| 2004/0088187 A1 | * | 5/2004 | Chudy et al. | .................... 705/2 |
| 2004/0236630 A1 | * | 11/2004 | Kost et al. | .................... 705/14 |

OTHER PUBLICATIONS

Ateniese et al. Anonymous E-Prescriptions, Workshop On Privacy In The Electronic Society, Proceeding of the 2002 ACM workshop on Privacy in the Electronic Society, 2002, pp. 19-31.*

* cited by examiner

*Primary Examiner*—Jean M. Corrielus
*Assistant Examiner*—Baoquoc N. To
(74) *Attorney, Agent, or Firm*—Darby & Darby

(57)    **ABSTRACT**

A method and software interface enables serial data streams to be trapped, parsed, tested for suitability for automated handling by a medication preparation system. Only those portions of the serial data stream that are not suitable for such handling are released for printing and manual handling. A serial data interface includes a listener software module ("LSM") that receives serial data streams and a parser software module ("PSM") communicatively connectable to the LSM that processes the serial data streams received from the LSM. A set of configuration rules accessible by the PSM defines the manner of processing by the PSM on the serial data streams. A data structure results that enables data handling by an automated medication preparation system.

**30 Claims, 3 Drawing Sheets**





# Figure 1



# Figure 4



**FIG. 2**



# FIG. 3

US 7,096,212 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**SERIAL DATA CAPTURE AND PROCESSING**

FIELD OF THE INVENTION

The present invention relates to interfaces using serial printer emulators and, more specifically, to a serial data interface that permits data configuration and trapping.

BACKGROUND OF THE INVENTION

The task of integrating multiple systems into a computer network is often associated with custom programming and delays. This is particularly true when dealing with proprietary network components such as may often be found in hospital environments. For example, hospital information systems are conventionally employed to manage patient data and input medications that are to be administered to a patent. An electronic hospital information system typically must interact with an electronic pharmacy system within an automated facility, the interface between these two systems requires that the software communicate and process the data appropriately. When integrating a new network component into an existing system, the software providers of each system must meet and agree upon specifications prior to even establishing a project timetable, in order to ensure that the necessary communications and processing needs are met. This is attendant with great expense and difficulty.

On the other hand, most hospital information systems and pharmacy systems send data to label printers that identify a patient, a medication to be administered, the time of administration, contra-indications, and other data. It makes no difference whether the label printer is a local or network device. Thus, one way of obtaining a reliable data stream from one system for importing into another is to capture the data that is intended to be printed to a label. However, in order to operate on this data, subsequent processing is required. The present invention provides improvements in device interaction by initiating tasks in response to the receipt of data at a serial port that parse and manage the information in that data stream for handling by other network devices. In further aspects, the present invention identifies label data in a serial data stream and divides the label data into a first stream that launches automated medication preparation processes and a second stream that is redirected to a conventional printer.

SUMMARY OF THE INVENTION

In accordance with one aspect of the invention, a method for selectively trapping data streams intended for a pharmacy comprises the steps of: trapping a printer output stream of an order entry system; parsing the output stream for prescribed information; testing the parsed output stream against an order database to determine suitability for automated handling by a medication preparation system associated with the pharmacy; and releasing only those portions of the output stream that are not suitable, the released output stream being printed for manual handling.

In a particular embodiment of the invention, the foregoing method includes additional steps of populating a data structure with data parsed from the printer output stream in accordance with a set of configuration rules. In another embodiment, the printer output stream can identify its source so that the parsing step can parse the printer output stream in accordance with a set of configuration rules for that source.

In a particularly preferred embodiment, the printer output stream is saved as a record in a database. In this preferred method, metadata can be associated with the output stream to assist in further processing. Thus, for example, the metadata can identify the source of the printer output stream and include that source data for each record for use in parsing the printer output stream. The metadata can also include a marker indicative of whether a given record has been parsed, with the marker being used in database queries to locate a subset of records that have been marked as not yet having been parsed. The data in the record can be used to populate the data structure, as described above. It should be understood, however, that printer output streams and, more generally, serial data streams, can be mangaed by the methods of the present invention whether saved in a database or operated upon on the fly.

In accordance with another aspect of the present invention, a serial data interface is provided which comprises: at least one listener software module ("LSM") executing on a first machine, the LSM receiving serial data streams from a port of the first machine; a parser software module ("PSM") communicatively connectable to the LSM and executing on a second machine, the PSM processing the serial data streams received from the LSM to extract data therefrom and populate a data structure therewith; and a set of configuration rules accessible by the PSM, the set of configuration rules defining the manner of processing by the PSM on the serial data streams from a prescribed LSM, wherein the data structure enables data handling by an automated medication preparation system.

Depending on the complexity or needs of a given implementation, the PSM and LSM can execute on the same machine. In a preferred embodiment, the serial data stream identifies a particular LSM and the set of configuration rules used for processing the serial data stream is selected for the identified LSM. As in the method above, embodiments can save the received serial data streams as records in a database or operate on the data as it comes in over a port of the machine, and preferably utilize metadata of the type mentioned above and described more fully hereinbelow.

These and other aspects, features, steps and advantages can be appreciated further from the accompanying Drawing Figures and Detailed Description of Certain Embodiments.

BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 is a functional block diagram of a software listener and parser module in accordance with an exemplary embodiment, and further illustrating its functional connections to a computer network.

FIG. 2 is a flow diagram illustrating the operation of an exemplary embodiment of a listener software module (LSM).

FIG. 3 is a flow diagram illustrating the operation of an exemplary embodiment of a parser software module (PSM).

FIG. 4 is a distributed hardware arrangement in which the PSM is responsive to multiple LSMs.

DETAILED DESCRIPTION OF CERTAIN EMBODIMENTS

By way of overview and introduction, the present invention provides a software interface that enables a network device to emulate a printer that is attached to a network serial port in order to trap and filter serial data for automated handling by downstream equipment. Externally, the inter-

US 7,096,212 B2

**3**

face exposes itself as a printer device that receives serial print strings, traps the data into a buffer or data store, parses the print string to extract data, and outputs the extracted data into a format usable by the network device. Preferably, the parsing routine is configurable to handle a variety of different data streams thereby permitting the interface to be used with standard printers and network devices without programming their respective output and input streams.

In a preferred implementation, the serial interface is used to bridge a hospital information system to an automated medication preparation station. The hospital information system, in response to operator input or a program resident in that system, generates a stream of output data preconfigured to print onto labels. Ordinarily, this output stream is directed to a printer in a local or on-premises pharmacy and is used to prepare medications. The label is thereafter applied to the preparation. The preferred embodiment of the invention provides a configuration routine that permits an installer to configure a set of rules by which a parser software module (described below) locates the start and end of the data for each label, as well as discrete data elements within the label data. The configuration routine thereby allows a user to configure messages that pass through the interface to be properly parsed for a given pharmacy system. Because users ordinarily can format labels for pharmacy systems as desired, both the structure of the incoming message to the pharmacy system and the rules for parsing these messages are field configurable, thereby providing great flexibility to the interface of the present invention.

In the preferred implementation, both the listener and the parser are included on the same machine within an automated medication operation system to provide an interface to an order entry system ("OES"). An exemplary automated medication operation is the PARxD IV medication preparation system of For Health Technologies, Inc., Oklahoma City, Okla., which prepares syringes for intravenous introduction. An exemplary OES is the PharmNet Millennium hospital information system of Cerner Corporation, of Kansas City, Mo. The PARxD IV is a software-controlled medical device that receives and manufactures orders for syringes for future (batch) or current (new order) production. The PARxD IV device contains knowledge about how the syringes are to be prepared (final dose volume, diluents, etc.) and so the incoming order from the OES need only specify the drug and dose to be delivered, the patient name, the location of the patient, and other administrative information that may be of use to have on the syringe label.

With reference now to FIG. **1**, a functional block diagram of a software listener and parser module **100** is shown within an automated medication preparation system **110** that may be used within a pharmacy or other formulary. In conventional pharmacies in which the automated system **110** is not present, an OES **120** located somewhere in the building sends new and batch orders for drugs to a label printer **130** over a serial data communication connection **140**. For example, the OES **120** has an RS-232 serial port for one-way data communication over the link **140** to a standard printer **130** fitted with paper or, more typically, adhesive labels. However, in accordance with the present invention, the automated system **110** is fitted with listener software, described below, that is preferably running resident in the automated system **110**, for example by being loaded into a memory **150** and executed by a central processing unit ("CPU") **160**. The automated system **110** is connected directly or through a computer network to the serial port of the OES **120** through a one-way communication connection **170**. The listener module manages data received across the

**4**

connection **170**, for example, through a data bus **180** within the automated system **110**. The serial data on connection **170**, the CPU **160**, the memory **150** and the listener module **100** are preferably all communicatively coupled to the data bus **180**.

The arrangement of FIG. **1** provides a listener module and a parser module together at the automated system **110**, but these modules can be resident in different machines, as described below in connection with the arrangement of FIG. **4**. The parser module operates on the data received from the OES **120** to selectively cause the automated system **110** to manufacture drug dosages for administration to patients or to reject the data as not suitable for handling. Thus, depending on the configuration of the automated system **110**, the parser can cause the automated system to prepare intravenous doses, oral doses, or doses suitable for specific therapies such as chemotherapy. Typically, the automated system **110** is configured to prepare only one of these dosages types and so any dosage form outside the system's configuration (e.g., tablets) is rejected as not being suitable for handling. Those drug orders that are not suitable are sent to the label printer **130** as a serial data output stream **190**. Consequently, the listener/parser module **100** enables drug orders to be better managed, with those susceptible to automated preparation being prepared without user intervention and with only those drug orders that are not suitable for the automated system **110** being sent to the label printer. This arrangement thereby reduces the number of drug orders that require manual handling, determines which orders require manual handling, and provides a filtered output stream **190** at the label printer **130** consisting of only those jobs that require manual handling.

The operation of the listener software module and the parser software module are described with reference to FIGS. **2** and **3**, respectively.

The listener software module opens a serial communications channel on a serial port of the automated system **110** at step **210**. For example, the listener module can be communicatively connected with the port making the connection **170** to the OES **120**. Once communications have been opened, the listener software module (LSM) listens to that serial port for any data, at step **220**. Preferably, drug orders are preceded by a character or character string that marks the beginning of a serial data stream. The LSM continuously tests to see whether a beginning-of-string character is detected at step **230**, because such character or string denotes the start of label data. If a beginning character is not detected, then the LSM loops back to the listening step **220**. On the other hand, if the start of a label is detected, then the serial data is written to a database together with (e.g., by appending) metadata.

As soon as the output stream is written to the database, the database assigns a unique transaction number, at step **240**, to a newly opened log entry or record that will contain the incoming serial data. The LSM generates other data that is written to each log entry including the date and time of the transaction, the name assigned to the particular LSM that is writing the new database record, the serial data itself (sometimes referred to as "transaction text"), a marker to indicate whether the record requires parsing, a reference pointer that permits one database record to refer to another (e.g., for error checking purposes), and error condition information concerning errors that were observed on the communications line **170** during data transfer. This information is assigned to the transaction at step **240** as well. All of this information can be reviewed, if desired, using a viewer that

US 7,096,212 B2

**5**

displays each log entry together with any error messages that might have been generated or associated with a particular database record.

At step **250**, the serial data itself is written to the record that was opened at step **240**. The serial data continues to be written to that record until a label with an end-of-string character is detected or until a time-out event (e.g., end-of-message reached if no activity for X milliseconds) is detected, at step **260**. Depending on the format of the data received from the OES **120**, there may or may not be an end of data stream character delimiting the end of a particular drug order. In the absence on the specific end-of-string delimiter, one drug order can be distinguished from the next either by detecting a beginning-of-string character or by permitting a prescribed time period to pass since the last data came in. Until an end-of-string condition is determined, the serial data continues to be sent to the database at step **250** and the end-of-string test at step **260** is repeated. When the end-of-string condition is determined, the record is time stamped at step **270** and the process flow loops back to step **230** to determine if a beginning-of-string character has been detected. As a result of the foregoing steps, records are created in the database by the LSM.

With reference now to FIG. **3**, the operation of the parser software module (PSM) is described. At step **305**, the PSM queries the database for any data that is to be parsed (i.e., data records that are marked as requiring parsing). As noted above, the LSM engrafts metadata to the serial stream coming into the automated system **110** over the connection **170**. Part of the metadata includes a marker that tracks whether a given record has been parsed already (Parse="True") or not (Parse="False"). The marker can also be set to ensure that an error log entry is not parsed (by setting Parse to be "True" for that entry). The database query except **305** can take on a variety of forms, but generally selects all fields from the transaction log in which Parse="False." An index can be used to speed query processing, as understood by those of skill in the art. Essentially, the PSM uses the marker to determine which records have not been parsed, and returns a list of the labels that still must be parsed in order to fill all the drug orders (whether new or batch).

Using the returned list, a record is retrieved at step **310** and parsed by the PSM at step **315**. Parsing is conducted in accordance with configuration rules that have previously been established for that LSM. The configuration rules can accommodate a variety of data formats including fixed formats, name-value pairs, and XML formats. For example, if the serial data is in a fixed format, then the drug order data will have prescribed positions within the serial data stream such as a patient name occupying character positions 15-45 on the fourth line of the label or positions 15–45 on the same line of the label as the word "patient." As another example, if the serial data is in the name—value pair format, the data may be located between a variable delimiter ("<Patient>") and an end-of-line character (e.g., CR, LF or both). Also, because the particular LSM is preferably identified in the data record, multiple data formats can be accommodated by the PSM and properly parsed by selecting a suitable set of configuration rules. A set of configuration rules, therefore, enables proper parsing of the data from the printer output stream into the data structure used by the PSM to determine suitability for handling and handling of drug orders by the automated medication preparation system.

With brief reference to FIG. **4**, a distributed system **400** is illustrated in which the automated system **410** comprises the PARxD IV drug preparation system of For Health Technolo-

**6**

gies, Inc. The system **410** has a parser software module **415** executing as a resident software application on one machine. In this arrangement, there are two order entry systems, denoted **420**A and **420**B, comprising physically different machines than the one executing the PSM **415**. The OESes **420**A, **420**B also comprise physically distinct systems, such as an inpatient system and an outpatient system configured to service different patient sets. Each OES has its own LSM **425**A, **425**B, respectively, which writes data records having uniquely assigned transaction numbers to a database **435**. OES **425**A and **425**B can have different data formats, yet because each new data record identifies the source of the record (L**1** or L**2**), the parser **415** can properly parse records as they are retrieved at step **315**.

Continuing the discussion of FIG. **3**, a test is made at step **320** to determine whether the data received from the OES was received correctly. For example, the test can ensure that the checksum was valid and check its type (Mod **43**, 16-bit cycle redundancy check ("CRC"), 32 bit CRC, etc.). If the data entered into the data record did not write correctly, the error is written to the database at step **325**, for example as a new log entry, and the next database record in the list is retrieved at step **360**. The new log entry preferably includes a reference pointer back to the log entry that had the error.

On the other hand, if the checksum were valid, then the transaction data is populated into a data structure at step **330**. The data structure is selected to be compatible with the automated system **110**, **410** and serves to assign each of the required data values with a variable. The variables that are included in the data structure can include, but are not limited to: the patient's name, location within the hospital or other institution, a drug code (e.g., the national drug code ("NDC"), the drug named in the drug order, the dose, the units, the administration date, the administration time, the order date, the order time, the checksum, any label comments, the order type (e.g. batch or new), and order frequency (e.g. "q6h6," for every six hours starting at 6 A.M.).

With the serial data now contained in the data structure of the automated system **110**, **410**, the drug order is tested at step **335** by the parser to see whether it is suitable for handling by the automated system. A given drug order is generally suitable for handling unless one of the following limited circumstances exists:

1. The automated medication preparation system cannot recognize the drug code included in the drug order.
2. The automated medication preparation system recognizes the drug code but does not handle the drug in the drug order and therefore cannot fill the drug order.
3. The automated medication preparation system understands the drug code and ordinarily can fill the drug order, but does not have the required drug in stock at the present time.

Apart from these three circumstances, the test at step **335** should result in a determination that the drug order can be handled by the automated system. Preferably, the test for suitability for handling is made with reference to an order database that maintains tables of data concerning drug names and drug codes associated with those names in various dosages. In the event of the drug cannot be handled by the automated system, the next step **340** the drug order is forwarded to the label printer **130** for printing (e.g., onto an adhesive label) and manual handling by staff. If, however, the test that step **335** resulted in the determination that the drug order can be handled by the automated system, then the populated data structure is forwarded to the automated system for handling at step **345**. In sophisticated applications, the data structure can first be routed to a scheduler for

US 7,096,212 B2

**7**

queue handling in accordance with a prescribed priority. For example, a new order can be processed ahead of a batch order if the prescribed priority is "whether time permits" such routing. It should be understood that the step of determining whether the drug order is suitable for handling results in the drug order being automatically processed or, if not automatically processed, a label being generated for only those drug orders that cannot be automatically processed. This results in proactive and dynamic filtering of drug orders as they come in over serial data lines from order entry systems, in view of the capabilities of the automated systems and their current stock of medications.

At step **350**, a test is made to determine whether there are any more listed records to retrieve in response to the database query at step **305**. If there are no more records to retrieve, the process ends at step **355**. Otherwise, if there are more records, the next record is retrieved at step **360** and the process flow loops back to step **315** where the newly retrieved record is parsed in accordance with the configuration rules for the listener that created that record.

In operation, the PSM may return several different errors, each of which is preferably recorded as a log entry in the database. In the process flow of FIG. **3**, steps **315**, **320**, and **330** are marked with an asterisk ("*") to indicate the steps at which errors might be returned. In particular, if data is missing that was expected to be included in the transaction data or that was to be provided by the LSM, an error code could result at step **315**. If the checksum test at step **320** determines that the checksum is missing or does not match, an error code results and is written to the error log at step **325**. Also, if required data is missing, the parser will determine this when populating the data structure with the transaction data, at step **330**. Other errors can result which are not specifically noted above concerning interactions between the parser and one or more automated systems. A reference pointer to the problematic data record is preferably included whenever appropriate. A reference pointer is not appropriate, for example, when the error concerns a failure of the serial port or other hardware error.

It should be understood that the one-way serial listener interface lacks handshaking to permit confirmation that all information has been received intact into the OES. A more robust protocol such as HL7 over TCP/IP using a minimal lower layer protocol can be used, if necessary, to provide such confirmations.

The LSM is designed to trap a serial output stream of the type that is ordinarily sent to a label printer. This output stream is in the clear, that is, is non-proprietary, and includes critical information for preparing a medication. Thus, by trapping the output stream ordinarily intended for a label printer, the automated system can ensures compatibility with any hospital information system.

While the invention has been described in detail with particular reference to certain embodiments thereof, the invention is capable of other and different embodiments, and its details are capable of modifications in various obvious respects. As would be readily apparent to those skilled in the art, variations and modifications can be affected while remaining within the spirit and scope of the invention. Accordingly, the foregoing disclosure, description, and Drawing Figures are for illustrative purposes only, and do not in any way limit the invention, which is defined only by the claims.

**8**

We claim:

**1**. A computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy, comprising the steps of:

(A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream;

(B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source;

(C) testing the parsed output stream against an order database to determine suitability of the medication data therein for automated handling by a medication preparation system associated with the pharmacy;

(D) using the medication preparation system, preparing one or more medications corresponding to the one or more medication data determined to be suitable;

(E) releasing only those portions of the output stream that are not suitable, the released output stream being printed for manual handling; and

(F) population a data structure with data parsed from the printer output stream in accordance with the set of configuration rules.

**2**. The method of claim **1**, including the additional step of populating a data structure with data parsed from the printer output stream in accordance with a set of configuration rules.

**3**. The method of claim **1**, wherein the printer output stream identifies a particular listener software module ("LSM").

**4**. The method of claim **3**, wherein the source is the particular LSM and wherein the step of populating the data structure with data parsed from the printer output stream in accordance with the set of configuration rules for the particular LSM.

**5**. The method of claim **3**, wherein the parsing step further comprises testing the output stream for a beginning of serial data stream character.

**6**. The method of claim **1**, wherein the trapping step comprises saving the output stream as a record in a database.

**7**. The method of claim **6**, including the additional step of associating metadata with the output stream.

**8**. The method of claim **7**, wherein the printer output stream is from a listener software module ("LSM") and the metadata for each record identifies the trapped printer output stream as being from that said LSM.

**9**. The method of claim **7**, wherein the metadata includes a marker indicative of whether a given record has been parsed.

**10**. The method of claim **9**, including the additional step of querying the database to identify a subset of records marked as not having been parsed.

**11**. The method of claim **10**, wherein the parsing step includes the steps of:

(A) retrieving the subset of records; and

(B) parsing the subset of records in accordance with a set of configuration rules.

**12**. The method of claim **11**, including the additional step of populating a data structure with data parsed from each retrieved record in accordance with the set of configuration rules.

**13**. The method of claim **11**, wherein the printer output stream is from a listener software module ("LSM"), the metadata for each record identifies the trapped printer output stream as being from that said LSM, and the set of configuration rules is prescribed for that said LSM.

US 7,096,212 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

**14**. The method of claim **13**, including the additional step of populating a data structure with data parsed from each retrieved record in accordance with the set of configuration rules.

**15**. The method of claim **1**, including the additional step of printing the released output stream onto an adhesive label.

**16**. The method of claim **1**, wherein the testing step comprises testing whether the printer output stream was trapped correctly.

**17**. The method of claim **16**, wherein the testing step performs a checksum test on the printer output stream.

**18**. The method of claim **1**, wherein the printer output stream of the order entry system includes a drug order and wherein the drug order fails the testing step as not suitable for automated handling by the medication preparation system under one or more of the following conditions:

  1. the automated medication preparation system cannot recognize a drug code included in the drug order;
  2. the automated medication preparation system recognizes the drug code but does not handle the drug specified in the drug order and therefore cannot fill the drug order;
  3. the automated medication preparation system recognizes the drug code and ordinarily can fill the drug order, but does not have the required drug in stock at the present time.

**19**. The method of claim **1**, including the additional step of routing a suitable order to a scheduler for handling in accordance with a prescribed priority.

**20**. A computer system including software loaded into a memory of one or more machines executable by one or more processors to support serial data stream management, comprising:

  (a) at least one listener software module ("LSM") executing on a first machine, the LSM receiving serial data streams containing one or more medication data from a port of the first machine;
  (b) a parser software module ("PSM") communicatively connectable to the LSM and executing on a second machine, the PSM processing the serial data streams received from the LSM to extract the one or more medication data therefrom and populate a data structure therewith; and

  (c) a set of configuration rules accessible by the PSM, the set of configuration rules defining the manner of processing by the PSM on the serial data streams from a prescribed LSM,

  wherein the PSM is configured to determine suitability for handling of drug order by an automated medication preparation system with reference to an order database, and

  wherein the data structure enables data handling and preparation of one or more medications by an automated medication preparation system.

**21**. The interface of claim **20**, wherein the PSM communicates with only one LSM.

**22**. The interface of claim **20**, wherein the first and second machines are the same machine.

**23**. The interface of claim **20**, wherein the serial data stream identifies a particular LSM and wherein the set of configuration rules used for processing the serial data stream by the PSM is selected for the identified LSM.

**24**. The interface of claim **20**, wherein the LSM saves the received serial data streams as a record in a database.

**25**. The interface of claim **24**, wherein the LSM associates metadata with the received serial data streams.

**26**. The interface of claim **25**, wherein the metadata includes a marker indicative of whether a given record has been parsed.

**27**. The interface of claim **26**, wherein the PSM is configured to query the database and identify a subset of records marked as not having been parsed.

**28**. The interface of claim **27**, wherein the PSM is further configured to retrieve the subset of records and parse the subset of records in accordance with the set of configuration rules.

**29**. The interface of claim **28**, wherein the processing by the PSM includes selectively printing portions of the received serial data stream onto an adhesive label.

**30**. The interface of claim **20**, wherein the PSM is configured to route the data in the populated data structure to a scheduler for handling in accordance with a prescribed priority.

\*   \*   \*   \*   \*



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,333 | 01/18/2008 | 7096212 | 20010-016RX1 | 1001 |

76808        7590        08/16/2012
Leason Ellis LLP
One Barker Avenue
Fifth Floor
White Plains, NY 10601-1526

| EXAMINER |
|---|
| LEE, CHRISTOPHER E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/16/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

A183



**UNITED STATES DEPARTMENT OF COMMERCE**
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
       P.O. Box 1450
       Alexandria, Virginia 22313-1450

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/000,333 | 1/18/2008 | 7096212 | 20010-016RX1 |

| | EXAMINER |
|---|---|
| | Christopher E. Lee |

Leason Ellis LLP
One Barker Avenue
Fifth Floor
White Plains, NY 10601-1526

| ART UNIT | PAPER |
|---|---|
| 3992 | 20120720 |

DATE MAILED:

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner for Patents

Responsive to the decision of Board of Patent Appeals and Interferences,
(i) the Patent Owner's Response was filed on 21st of May 2012; and
(ii) the Third Party Requester's Comments was filed on 20th of June 2012.

Hereby, the Examiner's determination under 37 CFR § 41.77(d) is attached.

The time periods and other requirements pertaining to comments on this determination are identified in 37 CFR § 41.77(e). Within one month of the Examiner's determination pursuant to 37 CFR 41.77(d), the Patent Owner may once submit comments in response to the Examiner's determination; and within one month of the date of service of the Patent Owner's comments in response to the Examiner's determination, the Third Part Requester may file a reply to the Patent Owner's comments.

/Christopher E. Lee/
Patent Reexamination Specialist
Central Reexamination Unit / Art Unit 3992

PTO-90C (Rev.04-03)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Greg H. Gardella
Oblon, Spivak, McClelland, Maier & Neustadt, L.L.P.
1940 Duke Street
Alexandria, Virginia 22314

**MAILED**

AUG 1 6 2012

CENTRAL REEXAMINATION UNIT

## Transmittal of Communication to Third Party Requester
### *Inter Partes* Reexamination

REEXAMINATION CONTROL NO. : *95/000,333*

PATENT NO. : *7096212*

TECHNOLOGY CENTER : *3999*

ART UNIT *3992*

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the Patent Owner responds to this communication, the Third Party Requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the Patent Owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* Third Party Requester is permitted.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070 (Rev.07-04)

Control Number: 95/000,333                                                      Page 2

Art Unit: 3992                          Examiner's determination under 37 CFR § 41.77(d)

## DETAILED ACTION

1.        This is an *inter partes* reexamination of Tribble et al. [US 7,096,212 B2;
hereinafter '212 Patent].

### *Receipt Acknowledgement*

2.        Receipts are acknowledged of Patent Owner's response filed on 21st of May
2012 (hereinafter "the Response") and Third Party Requester's comments filed on 20th of
June 2012 (hereinafter "the Comments") to the Decision of Appeal No. 2012-001975
mailed on 20th of April 2012 (hereinafter "the Decision").  The Patent Owner requested
reopening of prosecution before the Examiner under the provision of 37 CFR §
41.77(b)(1); and the Examiner issues a determination pursuant to 37 CFR § 41.77(d)
that the new grounds of rejections remanded in the Decision are maintained or have
been overcome.

3.        Claims 3, 7, 20, 40, 57, and 58 have been amended; claim 15 has been
canceled; and claims 59 and 60 have been newly added[1] since the Decision was mailed.
Currently, the claims 2-5, 7-14, and 16-60 are subject to reexamination in this *inter
partes* reexamination.

### *Summary of the Decision*

4.        In the Decision, the Board of Patent Appeals and Interferences (hereinafter "the
Board") relied upon the following references:

| | | |
|---|---|---|
| US 5,337,919 A | Spaulding et al. | 08-1994 (hereinafter "Spaulding") |
| US 6,161,141 A | Dillon, Douglas M. | 12-2000 (hereinafter "Dillon") |
| US 5,832,447 A | Rieker et al. | 11-1998 (hereinafter "Rieker") |
| US 5,208,762 A | Charhut et al. | 05-1993 (hereinafter "Charhut") |
| US 4,847,764 | Halvorson, Jerry L. | 07-1989 (hereinafter "Halvorson") |
| US 6,141,412 A | Smith et al. | 10-2000 (hereinafter "Smith") |
| US 6,096,561 A | Tayi, Apparao | 08-2000 (hereinafter "Tayi") |
| US 5,339,421 A | Housel, III, Barron C. | 08-1994 (hereinafter "Housel") |
| US 4,829,524 | Yoshida, Takehiro | 05-1989 (hereinafter "Yoshida") |
| US 2003/0046114 A1 | Davies et al. | 03-2003 (hereinafter "Davies") |
| US 5,169,642 A | Brinker et al. | 12-1992 (hereinafter "Brinker") |

---

[1] MPEP § 2682 II.(B) *Submission of Amendment or Showing of Facts After Decision Which Includes a New Ground of Rejection*

|  US 5,884,273 A | Sattizahn et al. | 03-1999 (hereinafter "Sattizahn") |
|  US 5,797,515 A | Liff et al. | 08-1998 (hereinafter "Liff") |

5.    The Board concluded that (i) one of ordinary skill in the art would have combined the teachings of Spaulding and Dillon; (ii) the combination of Spaulding and Liff would have taught or suggested the limitation "wherein the preparing step prepares plural mediations among the one or more medication data determined to be suitable in a batch production" as recited in claim 57; (iii) the combination of Spaulding and Halvorson would have taught or suggested the limitation "wherein the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form" as recited in claim 58; and (iv) the combination of Spaulding and Halvorson would have taught or suggested a controller configured "to forward only drug orders determined as not being suitable [for the automated medication preparation system] to a printer for manual handling" as recited in claim 20.

    Therefore, the Board decided to (i) reverse the Examiner's determination as to the proposed rejections of the claims 2-5 and 7-18, 46, and 50-56 the Examiner refused to adopt, which constitutes new grounds of rejection under 37 CFR § 41.77(b)[2]; (ii) enter new grounds of rejection under 37 CFR § 41.77(b) as to the claims 19-20, 47-49, and 57-58; and (iii) leave the Examiner to discretionally reconsider the patentability of the dependent claims 21-45 of the claim 20 in view of the prior art of record and the new grounds of rejection.

6.    The Board made the following new grounds of rejection:
• **Group A** - Independent Claims 3 and 7
    o  Claims 2-4, 7, 8, and 15 as unpatentable over Spaulding and Dillon
    o  Claims 5, 9-14, 16, and 17 as unpatentable over Spaulding, Dillon, and Rieker
    o  Claims 18 and 46 as unpatentable over Spaulding, Dillon, and what was well known in the art
    o  Claim 19 as unpatentable over Spaulding, Dillon, and Charhut

---

[2] MPEP § 2682 III. BOARD DECISION REVERSES EXAMINER'S DETERMINATION NOT TO MAKE PROPOSED REJECTION

- o   Claim 47 as unpatentable over Spaulding, Dillon, Halvorson, and what was well known in the art
- o   Claim 48 as unpatentable over Spaulding, Dillon, Halvorson, Sattizahn, and what was well known in the art
- o   Claim 49 as unpatentable over Spaulding, Dillon, Charhut, Smith, and what was well known in the art
- o   Claims 50, 51, and 54-56 as unpatentable over Spaulding, Dillon, and Housel
- o   Claim 52 as unpatentable over Spaulding, Dillon, and Yoshida
- o   Claim 53 as unpatentable over Spaulding, Dillon, Yoshida, and Davies
- **Group B** - Independent Claim 57
  - o   Claim 57 as unpatentable over Spaulding and Liff
- **Group C** - Independent Claim 58
  - o   Claim 58 as unpatentable over Spaulding and Halvorson
- **Group D** - Independent Claim 20
  - o   Claims 20, 21, 23, and 24 as unpatentable over Spaulding and Halvorson
  - o   Claims 22 and 30 as unpatentable over Spaulding, Halvorson, and what was well known in the art
  - o   Claim 25 as unpatentable over Spaulding, Halvorson, and Dillon
  - o   Claims 26-29 as unpatentable over Spaulding, Halvorson, Dillon, and Rieker
  - o   Claim 31 as unpatentable over Spaulding, Halvorson, Smith, and what was well known in the art
  - o   Claim 31 as unpatentable over Spaulding, Halvorson, Tayi, and what was well known in the art
  - o   Claims 32, 33, 36-40, and 42-45 as unpatentable over Spaulding, Halvorson, and Housel
  - o   Claim 34 as unpatentable over Spaulding, Halvorson, and Yoshida
  - o   Claim 35 as unpatentable over Spaulding, Halvorson, Yoshida, and Davies
  - o   Claim 41 as unpatentable over Spaulding, Halvorson, Housel, and Brinker

### Information Disclosure Statement

7.      The information disclosure statement submitted on 21st of May 2012 by the Patent Owner and the information disclosure statement submitted on 20th of June 2012 by the Third Party Requester were filed after the mailing date of the Decision on 20th of

Control Number: 95/000,333                                     Page 5

Art Unit: 3992                          Examiner's determination under 37 CFR § 41.77(d)

April 2012.  The submissions are in compliance with the provisions of 37 CFR §§
1.97(e), 1.505, and 1.555.  Accordingly, the information disclosure statements are being
considered by the Examiner.

5                                   ***Affidavits/Declarations***

8.      The declarations under 37 CFR § 1.132 from the Patent Owner's declarants
Dennis Tribble, William J. Blair, and Jerry Fahrni, filed with the Response have been
considered, but all of the declarations are insufficient to overcome the rejection of claims
subject to reexamination in this *inter partes* reexamination.

10              Essentially, (i) the declarant Dennis Tribble, who is a patentee of the '212 Patent,
states the personal knowledge of the PARxD IV system using its own dedicated label
printing and application mechanism (See the declaration of Dennis Tribble, <u>PART II</u>), (ii)
the declarant William J. Blair, who is a software designer with experience with hospital
information systems and pharmacy requirements, states the personal knowledge of an

15      automated syringe-preparation system (e.g., PARxD IV system) and declares that the
'212 Patent inherently teaches the automated syringe-preparation system manufactures
a syringe labeled by a dedicated label printer as part of the system, and a filtered output
stream is provided at another label printer consisting of only those jobs that require
manual handling (See the declaration of William J. Blair, ¶¶ 9, 12, 15, and 16), and (iii)

20      the declarant Jerry Fahrni, who is a pharmacist with experience with hospital information
systems and pharmacy requirements, merely declares agreeing with the statements
under the heading "PART II" in the declaration of William J. Blair.

        However, the respective declarations *supra* refer only to the system described in
the '212 Patent and not to the individual claims of the '212 Patent.  Thus, there is no

25      showing that the objective evidence of nonobviousness shown in the Decision is
commensurate in scope with the claims (See MPEP § 716).  In other words, all of the
declarations fail to provide any facts relevant to the analysis of the cited references in
the Decision in comparison with the appealed claims.

        In view of the foregoing, when all of the evidence is considered, the totality of the

30      rebuttal evidence of nonobviousness fails to outweigh the evidence of obviousness
shown in the Decision.

Control Number: 95/000,333                                          Page 6
Art Unit: 3992                    Examiner's determination under 37 CFR § 41.77(d)

9.      The declaration under 37 CFR § 1.132 from the Third Party Requester's
declarant David L. Trumper filed with the Comments has been considered.

        The declarant David L. Trumper, who is a professor of Mechanical Engineer at
MIT, essentially attempts to establish the relevance of the references Spaulding,
5   Halvorson, Dillon, and their combination to the alleged obviousness of the claimed
invention in the '212 Patent.

        This expert opinion is substantially correct, however, the Examiner believes that
the declarant misinterprets a part of the Spaulding's disclosure as shown in the
followings:

10      In the paragraph 18, the declarant alleges such as Spaulding never states that
the label printer 14 of Fig. 30 prints all of the labels for automatically filled prescriptions
and manually filled prescriptions.
Contrary to the declarant's allegation, Spaulding clearly discloses that the system
controller 7 **intercepts**[3] prescription label print data, including a drug name and a
15   quantity, from a pharmacy host computer 10, **extracts**[4] the drug name and quantity from
the label print data, and **selects** a dispenser unit 5 and a vial supply assembly 3
accordingly (See col. 8, lines 28-33).  Furthermore, Spaulding stresses that the
intercepted and extracted prescription information from the prescription label data is
used for the Spaulding's system 1; and the prescription label data is conveyed through
20   the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled
vial 11 (See col. 8, line 63 through col. 9, line11).  In other words, the labels for the
automatically filled prescriptions are printed by the label printer 14, and the labels for the
manually filled prescriptions are also printed by the same label printer 14 because the
operations of intercepting and extracting the prescription information from the
25   prescription label data in the interface 16 never interrupt (e.g., halt, stop, cut, suspend,
etc.) the flow of the prescription label data from the pharmacy host computer 10 to the
label printer 14; and the dispenser system 1 does not equip any printer for the
prescription label (See Figs. 1, 30, and col. 8, lines 44-62).
Furthermore, the Third Party Requester represented by the declarant admitted that
30   Spaulding teaches printing all the labels simply because in the Spaulding system a

---

[3] "intercept"verb: to receive (a communication or signal directed elsewhere) usually secretly;
    definition from Merriam-Webster's Collegiate® Dictionary (10th ed.)
[4] "extract"verb: to select (excerpts) and copy out or cite;

Control Number: 95/000,333                                      Page 7
Art Unit: 3992              Examiner's determination under 37 CFR § 41.77(d)

single printer is used for all prescriptions and pharmacists manually apply labels to all
vials regardless of whether they were manually or automatically prepared (See the right-
most column at page 10 in the Third Party Requester's comments filed on 7th of July
2008), and the declarant fails to show any clue from Spaulding such as the label printer
5    14 of Fig. 30 only prints the labels for automatically filled prescriptions.

        Thus, the Examiner will refer to this expert opinion with the Examiner's discretion,
if necessary, during the analysis of the claims rejection proposed by the Third Party
Requester.


10    ***Third Party Requester's Grounds of Rejections proposed after the Decision***
<u>Group A</u>: Independent Claims 3 and 7
*   Ground #A-1:
    Claims 2-4, 18, 46, 47, and 59 to be unpatentable over Spaulding taken with Dillon,
    Halvorson, and what was well known in the art
15  *   Ground #A-2:
    Claims 50, 51, and 54-56 to be unpatentable over Spaulding taken with Dillon,
    Halvorson, what was well known in the art, and further taken with Housel
*   Ground #A-3:
    Claim 48 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was
20    well known in the art, and further taken with Sattizahn
*   Ground #A-4:
    Claims 5, 16, and 17 to be unpatentable over Spaulding taken with Dillon, Halvorson,
    what was well known in the art, and further taken with Rieker
*   Ground #A-5:
25    Claim 19 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was
    well known in the art, and further taken with Charhut
*   Ground #A-6:
    Claim 49 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was
    well known in the art, Charhut, and further taken with Smith
30  *   Ground #A-7:

---

definition from Merriam-Webster's Collegiate® Dictionary (10th ed.)

Claim 52 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was well known in the art, and further taken with Yoshida

- Ground #A-8:

Claim 53 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was
5      well known in the art, Yoshida, and further taken with Davies

- Ground #A-9:

Claims 7 and 9-14 to be unpatentable over Spaulding taken with Dillon, Halvorson, Rieker, and what was well known in the art

- Ground #A-10:

10     Claim 8 to be unpatentable over Spaulding taken with Dillon, Halvorson, Liff, and what was well known in the art

**Group B**: Independent Claim 57

- Ground #B:

15     Claim 57 to be unpatentable over Spaulding taken with Dillon, Halvorson, Liff, and what was well known in the art

**Group C**: Independent Claim 58

- Ground #C:

20     Claim 58 to be unpatentable over Spaulding taken with Dillon, Halvorson, and what was well known in the art

**Group D**: Independent Claim 20

- Ground #D-1:

25     Claims 20-25, 30, and 60 to be unpatentable over Spaulding taken with Halvorson, and what was well known in the art

- Ground #D-2:

Claims 26-29 to be unpatentable over Spaulding taken with Halvorson, what was well known in the art, and further taken with Rieker

30    - Ground #D-3(a):

Claim 31 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was well known in the art, and further taken with Smith

- Ground #D-3(b):

Claim 31 to be unpatentable over Spaulding taken with Dillon, Halvorson, what was well known in the art, and further taken with Tayi

- Ground #D-4:

  Claims 32, 33, 36-40, and 42-45 to be unpatentable over Spaulding taken with Halvorson, Dillon, what was well known in the art, and further taken with Housel

- Ground #D-5:

  Claim 34 to be unpatentable over Spaulding taken with Halvorson, Dillon, what was well known in the art, and further taken with Yoshida

- Ground #D-6:

  Claim 35 to be unpatentable over Spaulding taken with Halvorson, Dillon, what was well known in the art, Yoshida, and further taken with Davies

- Ground #D-7:

  Claim 41 to be unpatentable over Spaulding taken with Halvorson, Dillon, what was well known in the art, Housel, and further taken with Brinker

**Group E**: In compliance with 35 U.S.C. § 112, 1st and 2nd paragraphs

- Ground #E-1:

  Claims 2-5, 7-14, and 16-60 to be unpatentable under 35 U.S.C. § 112, 1st paragraph

- Ground #E-2:

  Claims 2-5, 7-14, and 16-60 to be unpatentable under 35 U.S.C. § 112, 2nd paragraph

**_Statutory Basis for Grounds of Rejections - 35 U.S.C. §§ 103 and 112_**

10.    The following is a quotation of 35 U.S.C. § 103(a) which forms the basis for all obviousness rejections set forth in this Office Action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This patent under reexamination currently names joint inventors. In considering patentability of the claims under 35 U.S.C. § 103(a), the Examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Patent Owner is advised of the obligation under 37 CFR § 1.56 to point out the inventor and invention

dates of each claim that was not commonly owned at the time a later invention was made in order for the Examiner to consider the applicability of 35 U.S.C. § 103(c) and potential 35 U.S.C. § 102(e), (f) or (g) prior art under 35 U.S.C. § 103(a).

5    11.      The following is quotations of the 1st and 2nd paragraphs of 35 U.S.C. § 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same
10 > and shall set forth the best mode contemplated by the inventor of carrying out his invention.
>
> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

15          ***Analysis of Proposed Third Party Requester's Rejection***

**Regarding Group A: Independent Claims 3 and 7**

12.      Contrary to the Examiner's determination as to the proposed rejections of the originally appealed claims 2-5, 7-19, and 46-56, the Examiner refused to adopt (See RAN[5] at page 6, ¶5 through page 10, ¶12 and at page 16, ¶31 through page 21, ¶42),
20    the Board decided that (i) the reference Dillon qualifies as analogous art, (ii) there is rationale to combine the teachings of Spaulding and Dillon, and (iii) the proposed combination of Spaulding and Dillon does not require any modification to Spaulding's system (See the Decision, *Group A* at pages 15-32).  As such, the Decision set forth new grounds of rejections for the originally appealed claims 2-5, 7-19, and 46-56 under
25    37 CFR § 41.77(b).

The Patent Owner has filed a response with <u>amended claims</u> requesting reopening of prosecution before the Examiner pursuant to 37 CFR § 41.77(b)(1), and the Third Party Requester has filed comments on the Patent Owner's response pursuant to 37 CFR § 41.77(c).  The Examiner will consider, *de novo*, the Patent Owner's response
30    and the Third Party Requester's comments under 37 CFR § 41.77(d).

• **Re. Ground #A-1:**

13.      <u>Claims 2-4, 18, 46, 47, and 59 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A],</u>
35    <u>Halvorson [US 4,847,764], and what was well known in the art.</u>

---

[5] Right of Appeal Notice mailed on 2nd of December 2009 (hereinafter "RAN").

*Referring to claim 3,* Spaulding discloses a computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy (Spaulding discloses the recited method in Figs. 29 and 30), said one or more medication data (i.e., label print data) concerning respective patients and specifying a dose of a medication (i.e., pill-form medication; See col. 3, lines 17-18) to be delivered to the respective patients in a vial (See col. 6, line 9), comprising the steps of:

- (A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream (Spaulding describes: "The pharmacy host computer is normally used for keeping records of prescriptions filled for customers or patients and for prescription inventory tracking. In addition, the computer usually has the capability of causing prescription labels to be printed by a label printer interfaced to the computer by way of the printer port. The control system of the dispensing system of the present invention includes a host computer interface which connects to the pharmacy host computer printer port and which conveys label print data to the control system ..." at col. 3, lines 7-18; "... interfacing the controller of the system to the printer port of the pharmacy computer, intercepting the prescription label data ..." at col. 6, lines 1-4; "The system controller 7 intercepts prescription label print data, including a drug name and a quantity, from a pharmacy host computer 10 ..." at col. 8, lines 28-30 and Fig. 30; "The system 1 employs the fairly high level of standardization in computer printers to obtain data for controlling the automatic dispensing of prescriptions by connecting a host interface 16 between the printer port 15 and the label printer 14." at col. 8, lines 57-62 and Fig. 30; "The host interface 16 intercepts the prescription label data and conveys it to the controller 7, which is itself a computer." at col. 8, lines 63-65 and Fig. 30; "[t]he controller 7 obtains the prescription label data from the printer port 15 of the host computer 10 by way of a host interface 16." at col. 14, lines 51- 53 and Fig. 29);
- (B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source (Spaulding describes: "The prescription label data is coded in one of a limited number of standard data formats, such as ASCII coding ..." at col. 8, lines 50-52; "The control system of the dispensing system of the present invention includes a host computer interface ... which extracts the drug name and quantity of dosage units from the

label print data." at col. 3, lines 13-18; "... intercepting the prescription label data
and extracting the drug name and quantity therefrom." at col. 6, lines 2-4; "The
system controller 7 ... extracts the drug name and quantity from the label print
data ..." at col. 8, lines 28-32; "The drug name and the prescription quantity is
extracted from the label data ..." at col. 8, lines 66-68 and Fig. 30, i.e., the
Spaulding system follows the configuration rules for formatting the label print
data to extract the drug name and prescription quantity.);

- (C) testing the parsed output stream against an order database to determine
  suitability of the medication data therein for automated handling by a medication
  preparation system associated with the pharmacy (Spaulding describes: "The
  drug name is searched within the database 17 to determine if one of the
  dispenser units 5 in the system 1 is loaded with the desired drug" at col. 8, line
  68 through col. 9, line 2 and Fig. 30; "[i]n step 176, the controller 7 searches the
  prescription data base 17 for the drug name extracted from the prescription label
  data." at col. 14, lines 53-56 and Fig. 29);

- (D) using the medication preparation system (See Fig. 30), manufacturing vials
  for delivery and administration to each respective patient (See col. 6, line 9)
  having the medication dose which corresponds to the one or more medication
  data (See col. 3, lines 17-18) determined to be suitable (i.e., medication data is
  "suitable" if it can be prepared using the dispenser apparatus in Spaulding's Fig.
  30; Spaulding describes: "In step 179, if the required drug name is in the data
  base 17, the packing factor for the drug is obtained and multiplied by the required
  pill quantity to determine the required size of vial 11 and to select the vial size at
  step 180. The controller 7 then activates the vial manipulator assembly 6 to
  obtain a vial 11 of the correct size from the selected vial supply assembly 3 in
  step 181, and more the gripped vial 11 to the selected dispenser cell 5 in step
  182. At step 183, the dispenser drive motor 94 is activated to cause the selected
  dispenser cell 5 to dispense pills 12 into the vial 11 and count and weigh the pills
  12 to ensure accuracy of the count. At step 184, the vial manipulator 6 is
  activated to convey the filled vial 11 to the offload carousel 4 where the filled vial
  11 is deposited on th6 next available carousel sector 167. Finally, the program
  174 returns to step 175 to await the next prescription to be filled" at col. 14, line
  68 through col. 15, line 17; and Fig. 29; and "The prescription label data is

conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11" at col. 9, lines 8-1 and Fig. 30);

- (E) releasing only those portions of the output stream that are not suitable (Spaulding describes: "At branch 177, if the drug name is not found in the data base 17, the program branches to step 178 wherein an error message is sent to the system output, such as the display panel 31, and the program returns to step 175" in Fig. 29 and at col. 14, line 56–60. Any prescriptions that are not automatically filled must be prepared manually, and so the message to the pharmacist would contain portions of the output stream (e.g., drug name, quantity) that are sufficient to identify the prescriptions that are to be manually prepared (See Fig. 29, Step 176). As such, Spaulding discloses releasing portions of the label data back to the pharmacist for those prescriptions that cannot be automatically prepared by the dispenser unit at Step 177 in Fig. 29);

- (F)' sending onto a display panel at a system output a message (i.e., the released information for the drug not in the system) for manual handling within the pharmacy (i.e., those released portions of the output stream that are not suitable; See Step 178 in Fig. 29 and col. 14, lines 47-60); and

- (G) populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules (i.e., from the above step (B), it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Fig. 29, Step 176),

  o wherein the messaging at the system output comprises a filtered output stream (i.e., filtering the drug orders between those that can be filled by the automated dispenser apparatus and those art unsuitable for automated handling; See Step 177 in Fig. 29)[6] consisting of only those jobs that require manual handling (i.e., Drug is not in the System; See Steps 177-178 in Fig. 29) while the medication data determined as suitable for the medication preparation system are manufactured by the medication preparation system for administration from the vial to patients (See Steps 179-184 in Fig. 29 and col. 6, line 9).

---

[6] See the Declaration of David L. Trumper, at paragraphs 16, 25, and 26.

Spaulding does not teach that the printer output stream identifies a particular listener software module ("LSM").

Dillon discloses a system in which a personal computer sends messages into a TCP/IP network (See Abstract), wherein

5    • a printer output stream identifies a particular listener software module ("LSM")
       (i.e., if the prescription label data are sent over Internet from Spaulding's host
       interface 16 (the source system), the prescription label data packet would identify
       the source address (i.e., the host interface 16), because Dillon describes that a
       normal data IP packet contains the source IP address and destination IP address
10     in Fig. 3).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have utilized a bidirectional communication link (i.e., Internet, which is an example of a TCP/IP network), as disclosed by Dillon, in place of a one-way communication link (See Spaulding, Fig. 3), as disclosed by Spaulding, for the
15    advantage of providing the bidirectional communication between the order entry system and the medication preparation system via the bidirectional communication link (i.e., Internet), which had over 10 million users at the time the invention (See Dillon, col. 1, lines 14-48)[7].

Spaulding, as modified by Dillon, does not expressly teach (F) printing onto a label at
20    a printer the released output stream for manual handling within the pharmacy.

Halvorson discloses a system for dispensing medications in health care institutions (See Abstract), wherein

      • printing onto a label (i.e., medication label) at a printer (i.e., printers 21 in Fig. 1)
         a released output stream (i.e., information including patient information, all
25        medication orders, inventory data and patient order; See col. 3, lines 15-27).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have combined the teachings of Halvorson and Spaulding, as modified by Dillon, so that Spaulding's system (as modified by Dillon) could configure the controller to forward the released output stream within the pharmacy (i.e., within the
30    institution), and thus, a pharmacist that is remotely located in a different building could print the labels of those drugs that are filled by the pharmacist to determine whether the

---

[7] Refer to the Decision at page 10, FF6; and at page 16, lines 6-22.

drug order has any interaction problem with another drug order for the same patient and
to issue warning to the personnel who is entering the order, as disclosed by Halvorson
(See Halvorson, Abstract, Fig. 1, and col. 2, lines 54-61, col. 8, lines 5-31, and col. 26,
lines 41-60)[8].

5      Spaulding, as modified by Dillon and Halvorson, does not expressly teach that the
dose of said medication is delivered to the respective patients in a syringe; and the label
is an adhesive label.

The Examiner takes Official Notice that the dose of said medication is delivered to
the respective patients in a syringe, what was well known to one of ordinary skill in the

10    art, as evidenced by Ortiz[9], such that the dose of medication is delivered in a syringe
(i.e., automatically filled sterile delivery device; See Ortiz, col. 3, line 49 through col. 4,
line 64).

Therefore, it would have been obvious to one having ordinary skill in the art at the
time the invention was made to have manufactured said syringes, as evidenced by Ortiz,

15    using said medication preparation system (i.e., automatic prescription dispensing system
1 in Fig. 30 of Spaulding) since it would have allowed to deliver the dose of medication
to the respective patients in a syringe (i.e., sterile delivery device 12 of Fig. 7A) using the
medication preparation system (i.e., automated apparatus 10 of Fig. 7A) with the
advantage of savings in time and money (See Ortiz, col. 3, lines 32-45).

20    In addition, one of ordinary skill in the art would readily recognize that a pharmacy
label printer usually provides adhesive-backed labels for application to a medical
container (e.g., vial, syringe, etc.) containing the dose of medication to be delivered to
the respective patients using said adhesive labels.

Therefore, it would have been *prima facie* obvious for a skilled artisan to use said

25    adhesive label to print the released output stream (i.e., regarding the dose of
medication) that would necessarily be preferable since it can reduce the medical
administration errors during the delivery of the dose of medication to the respective
patients.

30    *Referring to claim 2,* Spaulding teaches

---

[8] Refer to the Decision at page 14, FF14; and at page 21, lines 1-15 and page 28, lines 14-19.
[9] Ortiz et al. [US 5,884,457 A; hereinafter "Ortiz"]

- the additional step of populating a data structure with data parsed from the printer output stream in accordance with a set of configuration rules (i.e., from the above step (B) in the claim 3, it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Fig. 29, Step 176).[10]

*Referring to claim 4,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, teaches that

- the source (viz., "the source of the printer output stream" recited in the claim 3) is the particular LSM (Spaulding describes: "The prescription label data is conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11" at col. 9, lines 8-11 and Fig. 30; and Dillon describes that a normal data IP packet contains the source IP address and destination IP address in Fig. 3; thus, the combination of Spaulding and Dillon teaches the source of the printer output stream identified by source address in the IP packet is the particular LSM for the printer identified by the destination address in the IP packet) and
  o wherein the step of populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules (i.e., from the above step (B) in the claim 3, it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Spaulding, Fig. 29, Step 176) for the particular LSM (i.e., the particular LSM for the printer identified by the destination address in the IP packet, taught by Dillon).

*Referring to claim 18,* Spaulding teaches the method of claim 3,

- wherein the printer output stream of the order entry system includes a drug order (i.e., prescription data; See col. 8, lines 28-33) and

---

[10] The language of step (F) recited in the claim 3 is repeated in its dependent claim 2.

- wherein the drug order (i.e., said prescription data) fails the testing step as not suitable for automated handling by the medication preparation system (i.e., automatic prescription dispensing system 1 in Fig. 30) under <u>one or more</u> of the following conditions:

  5
  - o 1. the automated medication preparation system cannot recognize a drug code included in the drug order;
  - o 2. the automated medication preparation system recognizes the drug code but does not handle the drug specified in the drug order and therefore cannot fill the drug order;

  10
  - o 3. The automated medication preparation system recognizes the drug code and ordinarily can fill the drug order, but does not have the required drug in stock at the present time.

As discussed in step (E) of claim 3, Spaulding expressly discloses that if the drug name is not found in the database 17, it is considered as not suitable for automated

15 handling at col. 14, lines 56-60 and Fig. 29, i.e., Spaulding teaches condition 2, at least.

Spaulding does not expressly disclose that if the system cannot recognize a drug code included in the order or the required drug is not available in stock at the present time, then it is also considered as not suitable for automated handling as called for in the claim. However, one of ordinary skill would readily recognize that a prescription order is

20 also not suitable for automated handling for conditions 1 and 3 recited in the claim. Therefore, it would have been *prima facie* obvious for a skilled artisan to modify Step 177 of Spaulding to take the negative branch for manual handling upon identifying such conditions that would necessarily prevent the order from being automatically prepared.

25 *Referring to claim 46,* Spaulding teaches that, in the absence of the one or more conditions (i.e., drugs not suitable for automatic handling),

- the drug order is determined as being handleable by the medication preparation system (i.e., being directed to the system output message facility; See col. 14, lines 56-60).

30

*Referring to claim 47,* Halvorson teaches that

- the test for suitability is made with reference to an order database that maintains tables of data concerning drug names and drug codes associated with said drug

names (Halvorson describes a database that maintains tables of data concerning drug names and drug codes associated with said drug names at col. 8, lines 5-31 and col. 26, lines 41-60)[11].

5    *Referring to claim 59,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, teaches that

- the medication data concerning each respective patient that is received in the trapped printer output stream (Spaulding describes: "The system controller 7 intercepts prescription label print data, including a drug name and a quantity,
10    from a pharmacy host computer 10 ..." at col. 8, lines 28-30 and Fig. 30) is either forwarded to the medication preparation system (i.e., to the dispenser apparatus 20 in Fig. 30 of Spaulding) or to the printer for manual handling (i.e., manual handling suggested by Halvorson)[12].

15    - **Re. Ground #A-2:**
    14.    Claims 50, 51, and 54-56 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], and what was well known in the art, as applied to claims 2-4, 18, 46, 47, and 59 above, and further in view of Housel [US 5,339,421 A].

20    *Referring to claim 50,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, discloses all the limitations of the claim 50, except that does not expressly teach the limitation "the parsing step further includes determining whether required data is missing from the output stream" (See Ground #A-1: Claim 3 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon,
25    Halvorson, and what was well known in the art).
    Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein
    - a parsing step includes determining whether required data is missing from an output stream (See col. 15, line 64 through col. 16, line 3, wherein items marked as required are identified and produce an error if missing).
30    Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have included said parsing feature of determining step, as

---

[11] Refer to the Decision at page 14, FF14; and page 28, lines 5-22.

disclosed by Housel, in said parsing step, as disclosed by Spaulding, as modified by
Dillon, Halvorson, and what was well known in the art, for the advantage of providing
error notification (See Housel, col. 16, lines 1-2).

5          *Referring to claim 51,* Housel teaches that
   • the populating step further includes the step of including a reference pointer in
     the data structure in the event that required data is missing (See col. 15, line 64
     through col. 16, line 3, wherein the corresponding item vector null flag indicates
     that no input value is present).

10

          *Referring to claim 54,* Spaulding, as modified by Dillon, Halvorson, and what was
well known in the art, discloses all the limitations of the claim 54, except that does not
expressly teach the limitation "the additional step of configuring the set of configuration
rules by which the parsing step parses the output stream to locate a start and end of the
15    output stream for each label" (See Ground #A-1: Claims 3 and 2 are rejected under 35
U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and
what was well known in the art).
          Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein
   • a parsing step includes configuring the set of configuration rules by which the
20         parsing step parses an output stream to locate a start and end of the output
           stream for each label (See col. 5, lines 53-57, wherein locating the beginning and
           end of groups of data such as a label).
          Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have included said parsing feature of configuring step, as
25    disclosed by Housel, in said method, as disclosed by Spaulding, as modified by Dillon,
Halvorson, and what was well known in the art, for the advantage of enabling the system
to handle diverse data formats (See Housel, col. 1, lines 7-13).

          *Referring to claim 55,* Housel teaches that
30    • the step of configuring the set of configuration rules by which the parsing step
        parses the output stream to locate discrete data elements within the output

---

[12] See the Declaration of David L. Trumper, at paragraph 26.

stream for each label (See col. 5, lines 4-5; i.e., parse tables are used that tell the parser how to encode and decode any given data stream implies the claimed limitation).

5      *Referring to claim 56,* Housel teaches that

- the configuration step responds to an installer at an interface to the computer-implemented method so as to provide field configurability via the interface (See Fig. 10 and col. 5, lines 11-13; i.e., field-configurable rules by use of a parse table which contains a data item descriptor for each field).

10

- **Re. Ground #A-3:**

15.   Claim 48 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], and what was well known in the art, as applied to claims 2-4, 18, 46, 47, and

15   59 above, and further in view of Sattizahn [US 5,884,273 A].

*Referring to claim 48,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, discloses all the limitations of the claim 48, except that does not expressly teach the limitation "the drug codes in the database are in various dosages" (See Ground #A-1: Claims 3, 18, 46, and 47 are rejected under 35 U.S.C. § 103(a) as

20   being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art).

Sattizahn discloses a device for dispensing prescription slip (See col. 1, lines 7-11), wherein

- drug codes in a database (i.e., drug and physician databases in Fig. 2B; See col.

25       4, lines 12-14) are in various dosages (See col. 2, lines 12-14).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have included said drug codes in various dosages, as disclosed by Sattizahn, in said order database (i.e., prescription database 17 of Fig. 30 in Spaulding), as disclosed by Spaulding, as modified by Dillon, Halvorson, and what

30   was well known in the art, for the advantage of providing a physician with a plethora of information at his or her fingertips, which can help to prevent mistakes when the physician is writing the prescription (See Sattizahn, col. 2, lines 53-67).

- **Re. Ground #A-4:**

16.    Claims 5, 16, and 17 are rejected under 35 U.S.C. § 103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A],
Halvorson [US 4,847,764], and what was well known in the art, as applied to claims 2-4,

5    18, 46, 47, and 59 above, and further in view of Rieker [US 5,832,447 A].

    *Referring to claim 5,* Spaulding, as modified by Dillon, Halvorson, and what was
well known in the art, discloses all the limitations of the claim 5, except that does not
expressly teach the limitation "the parsing step further comprises testing the output
stream for a beginning of serial data stream character" (See <u>Ground #A-1:</u> Claim 3 is

10    rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of
Dillon, Halvorson, and what was well known in the art).

    Rieker discloses an automated system and method for providing real-time
verification of health insurance eligibility (See Abstract), wherein

- a parsing step comprises testing the output stream for a beginning of serial data
15    stream character (Spaulding describes: "The prescription label data is coded in
one of a limited number of standard data formats, such as ASCII coding ..." at
col. 8, lines 50-52, which implicitly anticipates that the host interface would need
to test ASCII data received from the host printer port to detect a beginning
character so that the entire prescription is captured; and Rieker's Steps 200-206
20    in Fig. 6 support that this feature was well known in the art at the time the
invention was made)[13].

    Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have included said step of testing the output stream, as
evidence by Rieker, in the parsing step (i.e., the feature in Spaulding's host interface), as

25    disclosed by Spaulding, as modified by Dillon, Halvorson, and what was well known in
the art, since it was well known in the art at the time of the invention to capture and save
print data as a database record in the medication preparation system (i.e., health-care
computer system) for maintaining a permanent record of the data (See Rieker, col. 8,
lines 19-22).

30

---

[13] Refer to the Decision at pages 14-15, FF15.

     *Referring to claim 16,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, discloses all the limitations of the claim 16, except that does not expressly teach the limitation "the testing step comprises testing whether the printer output stream was trapped correctly" (See <u>Ground #A-1:</u> Claim 3 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art).

    Rieker discloses an automated system and method for providing real-time verification of health insurance eligibility (See Abstract), wherein

- a testing step comprises testing whether a printer output stream was trapped correctly (Rieker discloses checking for errors on received data: "...if there is an error detected in the received response, an error flag is set and control returns to another part of the control process 174 (decision block 358, block 354)" at col. 11, lines 63-65).

    Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have readily modified said medication preparation system (i.e., Spaulding's system), as disclosed by Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, based on the teaching of Rieker to check whether the prescription label data are intercepted correctly before extracting the drug name and prescription quantity to ensure no data errors were introduced during transmission, as accurate drug label data is important to patient safety since a person of skill in the art would understand that error checking is routinely performed when critical data has been received (See Rieker, Fig. 7F).

    *Referring to claim 17,* Dillon teaches that

- the testing step performs a checksum test on the printer output stream (Dillon describes: a "normal IP Packet" contains "checksum" for testing a checksum at Figs. 3-5; in general, it was well known in the art at the time of the invention such that performing a redundancy check for errors (i.e., checksum) to protect the integrity of the label print data).

- **Re. Ground #A-5:**

17.   <u>Claim 19 is rejected under 35 U.S.C. § 103(a) as being unpatentable over</u> <u>Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US</u>

4,847,764], and what was well known in the art, as applied to claims 2-4, 18, 46, 47, and
59 above, and further in view of Charhut [US 5,208,762 A].

*Referring to claim 19,* Spaulding, as modified by Dillon, Halvorson, and what was
well known in the art, discloses all the limitations of the claim 19, except that does not
expressly teach the limitation "the additional step of routing a suitable order to a
scheduler for handling in accordance with a prescribed priority" (See Ground #A-1:
Claim 3 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in
view of Dillon, Halvorson, and what was well known in the art).

Charhut discloses an automated prescription vial filling system (See col. 1, lines 39-
46 and Figs. 1-2), wherein

- a step of routing a suitable order to a scheduler for handling in accordance with a
  prescribed priority (Charhut describes that the system has a host computer 70
  that provides patient's order information to a control system 80 which will send
  back a message as to whether an order is valid or invalid, (See col. 5, line 66
  through col. 6, line 3). And, Charhut further describes a method of prioritizing the
  prescription orders. Specifically, Charhut's system maintains a Patient Entry List
  100 which is a collection of patient orders received by the control system 80 from
  the host computer 70. The patient orders are normally organized in a first-in, first-
  out (FIFO) manner. When an order is received with a priority status, however, the
  order can be placed at the head of the list so that it will be processed first (See
  col. 6, lines 7-13)).

Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have combined the teachings of Charhut and Spaulding, as
modified by Dillon, Halvorson, and what was well known in the art, to prioritize the
handling of prescriptions in the automated medication preparation system.[14]

- **Re. Ground #A-6:**

18.     Claim 49 is rejected under 35 U.S.C. § 103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US
4,847,764], what was well known in the art, and Charhut [US 5,208,762 A], as applied to
claim 19 above, and further in view of Smith [US 6,141,412 A].

---

[14] Refer to the Decision at page 13, FF11-FF13; and page 26, line19 through page 27, line 6.

*Referring to claim 49,* Spaulding, as modified by Dillon, Halvorson, what was well known in the art, and Charhut, discloses all the limitations of the claim 49, except that does not expressly teach the limitation "the prescribed priority causes the routing step to route the suitable order to the scheduler for handling ahead of a batch order" (See

5   Grounds #A-1 and #A-5: Claims 3 and 19 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, what was well known in the art, and Charhut).

Smith discloses a task processing system (See Abstract), wherein

* a prescribed priority causes a routing step to route a suitable order to a scheduler
10      for handling ahead of a batch order (i.e., scheduling of events by any criterion, including, by definition, the prescribed priority route of handling ahead of batch; Smith describes: "The events can be scheduled by any means including when the events occurred, a specific time for the event to be scheduled, or based on a priority system based on a predetermined criterion for prioritizing such events" at
15      col. 3, line 67 through col. 4, line 4).

Therefore, a person of ordinary skill in the art would have found an apparent reason to combine the teachings of Smith and Spaulding, as modified by Dillon, Halvorson, what was well known in the art, and Charhut, to prioritize the handling of prescriptions in the automated medication preparation system.

20

* **Re. Ground #A-7:**
19.   Claim 52 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], and what was well known in the art, as applied to claims 2-4, 18, 46, 47, and
25   59 above, and further in view of Yoshida [US 4,829,524].

*Referring to claim 52,* Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, discloses all the limitations of the claim 52, except that does not expressly teach the limitation "the additional step of providing a confirmation to the order entry system that information has been received intact" (See Ground #A-1: Claim 3 is
30   rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, and what was well known in the art).

Yoshida discloses a data communication apparatus (See Abstract), wherein

**A208**

- a step of providing a confirmation to an order entry system that information has been received intact (Dillon teaches that when using the conventional TCP/IP protocol (e.g., the Internet), confirmation messages are sent back to the source system once the destination system receives the data packet at col. 13, lines 50-59 (See the Decision at pages 10-11, FF7). Moreover, as evidence by Yoshida at col. 2, lines 56-58 and Fig.2, such confirmation is well known in the art for transferring data between computer systems through a communication line to provide error notification).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have readily modified Spaulding's communication link in said medication preparation system (i.e., Spaulding's system), as disclosed by Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, based on the teaching of Yoshida, to provide a bidirectional communication link so that a confirmation message can be sent from the destination system to the source system upon receipt of the data, and if no confirmation is received, the data packet can be re-sent to prevent data loss (See Yoshida, col. 2, line 54 through col. 3, line 33).

- **Re. Ground #A-8:**

20. Claim 53 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], what was well known in the art, and Yoshida [US 4,829,524], as applied to claim 19 above, and further in view of Davies [US 2003/0046114 A1].

*Referring to claim 53,* Spaulding, as modified by Dillon, Halvorson, what was well known in the art, and Yoshida, discloses all the limitations of the claim 53, except that does not expressly teach the limitation "the confirmation is provided using an HL7 over TCP/IP connection to the order entry system" (See Grounds #A-1 and #A-7: Claims 3 and 52 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, what was well known in the art, and Yoshida).

Davies discloses a method and system for storing and retrieving patient data in a database connected to a network (See paragraph [0002]), wherein

- a confirmation is provided using an HL7 over TCP/IP connection to an order entry system (Davies describes: "Using a communications protocol such as transmission control protocol/Internet protocol (TCP/IP) or file transfer protocol

(FTP), the system shown in FIG. 2 retrieves the appropriate information ... The field tagging may use a technology such as the Extensible Markup Language (XML), a tagging system based on the hypertext markup language (HTML) and the simple generalized markup language (SGML), or Health Level Seven (HE7),

5  a healthcare industry tagging standard" at paragraphs [0053]- [0054]).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have readily modified Spaulding's communication link in said medication preparation system (i.e., Spaulding's host system), as disclosed by Spaulding, as modified by Dillon, Halvorson, what was well known in the art, and

10  Yoshida, to utilize an HL7 format over TCP/IP connection so that Spaulding's communication link in said medication preparation system (i.e., Spaulding's host system) would conform to the healthcare industry tagging standard (See Davies, paragraphs [0053]).

15  • **Re. Ground #A-9:**

21.    Claims 7 and 9-14 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], Rieker [US 5,832,447 A], and what was well known in the art.

*Referring to claim 7,* Spaulding discloses a computer-implemented method for

20  selectively trapping output streams containing one or more medication data intended for a pharmacy (Spaulding discloses the recited method in Figs. 29 and 30), said one or more medication data (i.e., label print data) concerning respective patients and specifying a dose of a medication (i.e., pill-form medication; See col. 3, lines 17-18) to be delivered to the respective patients in a vial (See col. 6, line 9), comprising the steps of:

25  • (A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream (Spaulding describes: "The pharmacy host computer is normally used for keeping records of prescriptions filled for customers or patients and for prescription inventory tracking. In addition, the computer usually has the capability of causing

30  prescription labels to be printed by a label printer interfaced to the computer by way of the printer port. The control system of the dispensing system of the present invention includes a host computer interface which connects to the pharmacy host computer printer port and which conveys label print data to the

control system ..." at col. 3, lines 7-18; "... interfacing the controller of the system
to the printer port of the pharmacy computer, intercepting the prescription label
data ..." at col. 6, lines 1-4; "The system controller 7 intercepts prescription label
print data, including a drug name and a quantity, from a pharmacy host computer
10 ..." at col. 8, lines 28-30 and Fig. 30; "The system 1 employs the fairly high
level of standardization in computer printers to obtain data for controlling the
automatic dispensing of prescriptions by connecting a host interface 16 between
the printer port 15 and the label printer 14." at col. 8, lines 57-62 and Fig. 30;
"The host interface 16 intercepts the prescription label data and conveys it to the
controller 7, which is itself a computer." at col. 8, lines 63-65 and Fig. 30; "[t]he
controller 7 obtains the prescription label data from the printer port 15 of the host
computer 10 by way of a host interface 16." at col. 14, lines 51- 53 and Fig. 29);

- (B) parsing the output stream for prescribed information in accordance with a set
  of configuration rules associated with the source (Spaulding describes: "The
  prescription label data is coded in one of a limited number of standard data
  formats, such as ASCII coding ..." at col. 8, lines 50-52; "The control system of
  the dispensing system of the present invention includes a host computer
  interface ... which extracts the drug name and quantity of dosage units from the
  label print data." at col. 3, lines 13-18; "... intercepting the prescription label data
  and extracting the drug name and quantity therefrom." at col. 6, lines 2-4; "The
  system controller 7 ... extracts the drug name and quantity from the label print
  data ..." at col. 8, lines 28-32; "The drug name and the prescription quantity is
  extracted from the label data ..." at col. 8, lines 66-68 and Fig. 30, i.e., the
  Spaulding system follows the configuration rules for formatting the label print
  data to extract the drug name and prescription quantity.);

- (C) testing the parsed output stream against an order database to determine
  suitability of the medication data therein for automated handling by a medication
  preparation system associated with the pharmacy (Spaulding describes: "The
  drug name is searched within the database 17 to determine if one of the
  dispenser units 5 in the system 1 is loaded with the desired drug" at col. 8, line
  68 through col. 9, line 2 and Fig. 30; "[i]n step 176, the controller 7 searches the
  prescription data base 17 for the drug name extracted from the prescription label
  data." at col. 14, lines 53-56 and Fig. 29);

- (D) using the medication preparation system (See Fig. 30), manufacturing vials for delivery and administration to each respective patient (See col. 6, line 9) having the medication dose which corresponds to the one or more medication data (See col. 3, lines 17-18) determined to be suitable (i.e., medication data is "suitable" if it can be prepared using the dispenser apparatus in Spaulding's Fig. 30; Spaulding describes: "In step 179, if the required drug name is in the data base 17, the packing factor for the drug is obtained and multiplied by the required pill quantity to determine the required size of vial 11 and to select the vial size at step 180. The controller 7 then activates the vial manipulator assembly 6 to obtain a vial 11 of the correct size from the selected vial supply assembly 3 in step 181, and more the gripped vial 11 to the selected dispenser cell 5 in step 182. At step 183, the dispenser drive motor 94 is activated to cause the selected dispenser cell 5 to dispense pills 12 into the vial 11 and count and weigh the pills 12 to ensure accuracy of the count. At step 184, the vial manipulator 6 is activated to convey the filled vial 11 to the offload carousel 4 where the filled vial 11 is deposited on the next available carousel sector 167. Finally, the program 174 returns to step 175 to await the next prescription to be filled" at col. 14, line 68 through col. 15, line 17; and Fig. 29; and "The prescription label data is conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11" at col. 9, lines 8-1 and Fig. 30);

- (E) releasing only those portions of the output stream that are not suitable (Spaulding describes: "At branch 177, if the drug name is not found in the data base 17, the program branches to step 178 wherein an error message is sent to the system output, such as the display panel 31, and the program returns to step 175" in Fig. 29 and at col. 14, line 56–60. Any prescriptions that are not automatically filled must be prepared manually, and so the message to the pharmacist would contain portions of the output stream (e.g., drug name, quantity) that are sufficient to identify the prescriptions that are to be manually prepared (See Fig. 29, Step 176). As such, Spaulding discloses releasing portions of the label data back to the pharmacist for those prescriptions that cannot be automatically prepared by the dispenser unit at Step 177 in Fig. 29);

- (F)' sending onto a display panel at a system output a message (i.e., the released information for the drug not in the system) for manual handling within

the pharmacy (i.e., those released portions of the output stream that are not suitable; See Step 178 in Fig. 29 and col. 14, lines 47-60); and

- (G) populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules (i.e., from the above step (B), it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Fig. 29, Step 176),
  - o wherein the messaging at the system output comprises a filtered output stream (i.e., filtering the drug orders between those that can be filled by the automated dispenser apparatus and those art unsuitable for automated handling; See Step 177 in Fig. 29)[15] consisting of only those jobs that require manual handling (i.e., Drug is not in the System; See Steps 177-178 in Fig. 29) while the medication data determined as suitable for the medication preparation system are manufactured by the medication preparation system for administration from the vial to patients (See Steps 179-184 in Fig. 29 and col. 6, line 9).

Spaulding does not teach that the step of associating metadata with the output stream.

Dillon discloses a system in which a personal computer sends messages into a TCP/IP network (See Abstract), wherein

- a step of associating metadata with an output stream (Dillon shows a "normal IP Packet" as containing metadata that includes "source IP address," "destination IP address," "flags," and "header checksum," in addition to the data payload in Fig. 3; i.e., associating metadata with a data stream is old in the art).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have readily modified Spaulding's communication link in said medication preparation system (i.e., Spaulding's system), as disclosed by Spaulding, to associate the metadata with the output streams (i.e., the label print data with information about its source address, target address, size, status and the like), as disclosed by

---

[15] See the Declaration of David L. Trumper, at paragraphs 16, 25, and 26.

Dillon, because such information (i.e., metadata) would facilitate effective data management (e.g., bidirectional messaging functions)[16].

Spaulding, as modified by Dillon, does not expressly teach (F) printing onto a label at a printer the released output stream for manual handling within the pharmacy.

5      Halvorson discloses a system for dispensing medications in health care institutions (See Abstract), wherein

- printing onto a label (i.e., medication label) at a printer (i.e., printers 21 in Fig. 1) a released output stream (i.e., information including patient information, all medication orders, inventory data and patient order; See col. 3, lines 15-27).

10      Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have combined the teachings of Halvorson and Spaulding, as modified by Dillon, so that Spaulding's system (as modified by Dillon) could configure the controller to forward the released output stream within the pharmacy (i.e., within the institution), and thus, a pharmacist that is remotely located in a different building could

15      print the labels of those drugs that are filled by the pharmacist to determine whether the drug order has any interaction problem  with another drug order for the same patient and to issue warning to the personnel who is entering the order, as disclosed by Halvorson (See Halvorson, Abstract, Fig. 1, and col. 2, lines 54-61, col. 8, lines 5-31, and col. 26, lines 41-60)[17].

20      Spaulding, as modified by Dillon and Halvorson, does not expressly teach that the trapping step comprises saving the output stream as a record in a database.

Rieker discloses an automated system and method for providing real-time verification of health insurance eligibility (See Abstract), wherein

- a trapping step comprises saving an output stream as a record in a database

25      (i.e., the process of capturing and saving print data as a database record was well known in the art; See col. 8, lines 19-24 and Fig. 6)[18].

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have included said step of saving the output stream, as evidence by Rieker, in the trapping step (i.e., the feature in Spaulding's host interface),

30      as disclosed by Spaulding, as modified by Dillon and Halvorson, since it was well known

---

[16] Refer to the Decision at page 23, lines 4-11.
[17] Refer to the Decision at page 14, FF14; and at page 21, lines 1-15 and page 28, lines 14-19.
[18] Refer to the Decision at page 22, line 16 through page 23, line 3.

in the art at the time of the invention to keep the copy of the prescription (i.e., capturing and saving print data as a database record in the health-care computer system for maintaining a permanent record of the data) for later in case needed (See Rieker, col. 8, lines 19-22).

5      Spaulding, as modified by Dillon, Halvorson, and Rieker, does not expressly teach that the dose of said medication is delivered to the respective patients in a syringe; and the label is an adhesive label.

The Examiner takes Official Notice that the dose of said medication is delivered to the respective patients in a syringe, what was well known to one of ordinary skill in the

10     art, as evidenced by Ortiz, such that the dose of medication is delivered in a syringe (i.e., automatically filled sterile delivery device; See Ortiz, col. 3, line 49 through col. 4, line 64).

Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to have manufactured said syringes, as evidenced by Ortiz,

15     using said medication preparation system (i.e., automatic prescription dispensing system 1 in Fig. 30 of Spaulding) since it would have allowed to deliver the dose of medication to the respective patients in a syringe (i.e., sterile delivery device 12 of Fig. 7A) using the medication preparation system (i.e., automated apparatus 10 of Fig. 7A) with the advantage of savings in time and money (See Ortiz, col. 3, lines 32-45).

20     In addition, one of ordinary skill in the art would readily recognize that a pharmacy label printer usually provides adhesive-backed labels for application to a medical container (e.g., vial, syringe, etc.) containing the dose of medication to be delivered to the respective patients using said adhesive labels.

Therefore, it would have been *prima facie* obvious for a skilled artisan to use said

25     adhesive label to print the released output stream (i.e., regarding the dose of medication) that would necessarily be preferable since it can reduce the medical administration errors during the delivery of the dose of medication to the respective patients.

30     *Referring to claim 9,* Rieker teaches that
   • the metadata includes a marker indicative of whether a given record has been parsed (Rieker describes: "Once a capture process 170 has isolated a print image, it parses the print image and builds a data record (block 208) which it

then writes onto mass storage 172 (block 210)" at col. 8, lines 19-22 and Fig. 6;
"When control process 174 is started (block 250), it first determines whether
there are any print images stored on data storage 172 by capture process 170
that have not yet been processed" at col. 8, lines 27-30 and Fig. 7A; i.e., It would
have been obvious to a person of ordinary skill in the art at the time of the
invention was made to combine the teachings of the Spaulding, Dillon and Rieker
to provide this claim limitation because it is highly desirable to "process eligibility
transactions from an unlimited group of data sources" (See Rieker, col. 3, lines
63-64) in a non-linear fashion).

*Referring to claim 10,* Rieker teaches
- the additional step of querying the database to identify a subset of records
  marked as not having been parsed (See Rieker, col. 4, lines 27-28: "saves
  personnel resources and time"; i.e., a person of ordinary skill in the art would
  readily combine the teachings of the Spaulding, Dillon and Rieker to provide this
  claim limitation because it is highly desirable to track which data has been parsed
  and which data has not been parsed to achieve advantages, such as the ability
  to use batch processing as processor cycles become available because it can
  save time).

*Referring to claim 11,* Rieker teaches that the parsing step includes the steps of:
- (A) retrieving the subset of records (Rieker describes "Control process 174
  retrieves a print image from data storage 172 (block 252), and parses the print
  image for data elements based upon the location of the specific data elements
  within the print image (block 254)" at col. 8, lines 31-34); and
- (B) parsing the subset of records in accordance with a set of configuration rules
  (Rieker describes "Control process 174 next chooses, from the parsed data
  elements, those data elements necessary to perform an eligibility transaction
  (block 256)" at col. 8, lines 50-52; "Block 256 thus attempts to choose, from the
  various information inputted, the appropriate information for verifying insurance
  eligibility. As will be understood, the rules applied by block 256 to choose
  appropriate data elements will often vary" at col. 8, lines 61-65; i.e., a person of

ordinary skill in the art would readily combine the teachings of the Spaulding and
Rieker references to provide this claim limitation).

*Referring to claim 13,* Spaulding, as modified by Dillon, Halvorson, Rieker, and
5    what was well known in the art, teaches that
- the printer output stream is from a listener software module ("LSM")(i.e., when
  the host interface sends trapped label data to the printer, as discussed by
  Spaulding, the source of the printer output stream is the host interface),
- the metadata for each record identifies the trapped printer output stream as being
10   from that said LSM, and the set of configuration rules is prescribed for that said
  LSM (i.e., when Spaulding uses a normal IP packet, as modified by Dillon, the
  source address information (i.e., metadata) would identify the printer output
  stream as being from that particular host interface).

15   *Referring to claims 12 and 14,* Spaulding teaches
- the additional step of populating a data structure with data parsed from each
  retrieved record in accordance with the set of configuration rules (i.e., One of skill
  in the art would understand that, to format print data to send to the label printer,
  the host interface of Spaulding would populate the parsed data into memory
20   according to format rules so that the parsed data that fields can be compared to
  corresponding field data stored as records in the prescription database 17 (e.g.,
  patient name, drug name, quantity)).

- **Re. Ground #A-10:**
25   22.   The proposed rejection of claim 8 under 35 U.S.C. § 103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A],
Halvorson [US 4,847,764], **Liff** [US 5,797,515 A], and what was well known in the art is
**not adopted** for the reason as noted below.
   *With regard to claim 8,* the Third Party Requester's proposed rejection of the
30   claim 8 (See the Comments at page 12, lines 12-13) is not adopted because (i) the claim
7, which is the previous claim of the claim 8, has been rejected under 35 U.S.C. § 103(a)
as being unpatentable over Spaulding in view of Dillon, Halvorson, **Rieker,** and what
was well known in the art, *supra,* and (ii) **Liff** is **not** necessary for the claim 8 rejection

since the Examiner believes that the combination of teachings from Spaulding, Dillon, Halvorson, Rieker, and what was well known in the art, renders the obviousness of the claimed limitations including "the printer output stream is from a listener software module ("LSM") and the metadata for each record identifies the trapped printer output stream as being from that said LSM" recited in the claim 8.

23. <u>Claim 8 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], Halvorson [US 4,847,764], Rieker [US 5,832,447 A], and what was well known in the art</u>[19].

*Referring to claim 8,* Spaulding, as modified by Dillon, Halvorson, Rieker, and what was well known in the art, teaches that

- the printer output stream is from a listener software module ("LSM") (i.e., when the host interface sends trapped label data to the printer, as discussed by Spaulding, the source of the printer output stream is the host interface) and

- the metadata for each record identifies the trapped printer output stream as being from that said LSM (i.e., when Spaulding uses a normal IP packet, as modified by Dillon, the source address information (i.e., metadata) would identify the printer output stream as being from that particular host interface)[20].

**Regarding Group B**: Independent Claim 57

24. Contrary to the Examiner's determination as to the proposed rejection of the originally appealed claim 57 the Examiner refused to adopt (See RAN at page 21, ¶¶43-44), the Board decided that (i) the reference Liff qualifies as analogous art, and (ii) there is rationale to combine the teachings of Spaulding and Dillon (See the Decision, *Group B* at pages 32-33). As such, the Decision set forth new ground of rejection for the originally appealed claim 57 under 37 CFR § 41.77(b).

The Patent Owner has filed a response with <u>amended claims</u> requesting reopening of prosecution before the Examiner pursuant to 37 CFR § 41.77(b)(1), and the Third Party Requester has filed comments on the Patent Owner's response pursuant to

---

[19] The claim 7, which is the previous claim of the claim 8, has been rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Dillon, Halvorson, Rieker, and what was well known in the art (See <u>Re. Ground #A-9</u>).
[20] Refer to the Decision at page 23, lines 4-11.

37 CFR § 41.77(c). The Examiner will consider, *de novo*, the Patent Owner's response and the Third Party Requester's comments under 37 CFR § 41.77(d).

- **Re. Ground #B:**

25.     The proposed rejection of claim 57 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of **Dillon** [US 6,161,141 A], Halvorson [US 4,847,764], Liff [US 5,797,515 A], and what was well known in the art is **not adopted** for the reason as noted below.

      *With regard to claim 57,* the Third Party Requester's proposed rejection of the claim 57 (See the Comments at page 12, lines 12-13) is not adopted because **Dillon** is **not** necessary for the claim 57 rejection since the Examiner believes that the combination of teachings from Spaulding, Liff, Halvorson, and what was well known in the art, renders the obviousness of the claimed limitations including "the preparing step prepares plural mediations among the one or more medication data determined to be suitable in a batch production" recited in the claim 57.

26.     Claim 57 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Liff [US 5,797,515 A], Halvorson [US 4,847,764], and what was well known in the art.

      *Referring to claim 57,* Spaulding discloses a computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy (Spaulding discloses the recited method in Figs. 29 and 30), said one or more medication data (i.e., label print data) concerning respective patients and specifying a dose of a medication (i.e., pill-form medication; See col. 3, lines 17-18) to be delivered to the respective patients in a vial (See col. 6, line 9), comprising the steps of:

- (A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream (Spaulding describes: "The pharmacy host computer is normally used for keeping records of prescriptions filled for customers or patients and for prescription inventory tracking. In addition, the computer usually has the capability of causing prescription labels to be printed by a label printer interfaced to the computer by way of the printer port. The control system of the dispensing system of the present invention includes a host computer interface which connects to the

pharmacy host computer printer port and which conveys label print data to the control system ..." at col. 3, lines 7-18; "... interfacing the controller of the system to the printer port of the pharmacy computer, intercepting the prescription label data ..." at col. 6, lines 1-4; "The system controller 7 intercepts prescription label print data, including a drug name and a quantity, from a pharmacy host computer 10 ..." at col. 8, lines 28-30 and Fig. 30; "The system 1 employs the fairly high level of standardization in computer printers to obtain data for controlling the automatic dispensing of prescriptions by connecting a host interface 16 between the printer port 15 and the label printer 14." at col. 8, lines 57-62 and Fig. 30; "The host interface 16 intercepts the prescription label data and conveys it to the controller 7, which is itself a computer." at col. 8, lines 63-65 and Fig. 30; "[t]he controller 7 obtains the prescription label data from the printer port 15 of the host computer 10 by way of a host interface 16." at col. 14, lines 51- 53 and Fig. 29);

- (B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source (Spaulding describes: "The prescription label data is coded in one of a limited number of standard data formats, such as ASCII coding ..." at col. 8, lines 50-52; "The control system of the dispensing system of the present invention includes a host computer interface ... which extracts the drug name and quantity of dosage units from the label print data." at col. 3, lines 13-18; "... intercepting the prescription label data and extracting the drug name and quantity therefrom." at col. 6, lines 2-4; "The system controller 7 ... extracts the drug name and quantity from the label print data ..." at col. 8, lines 28-32; "The drug name and the prescription quantity is extracted from the label data ..." at col. 8, lines 66-68 and Fig. 30, i.e., the Spaulding system follows the configuration rules for formatting the label print data to extract the drug name and prescription quantity.);

- (C) testing the parsed output stream against an order database to determine suitability of the medication data therein for automated handling by a medication preparation system associated with the pharmacy (Spaulding describes: "The drug name is searched within the database 17 to determine if one of the dispenser units 5 in the system 1 is loaded with the desired drug" at col. 8, line 68 through col. 9, line 2 and Fig. 30; "[i]n step 176, the controller 7 searches the

prescription data base 17 for the drug name extracted from the prescription label data." at col. 14, lines 53-56 and Fig. 29);

- (D) using the medication preparation system (See Fig. 30), manufacturing vials for delivery and administration to each respective patient (See col. 6, line 9) having the medication dose which corresponds to the one or more medication data (See col. 3, lines 17-18) determined to be suitable (i.e., medication data is "suitable" if it can be prepared using the dispenser apparatus in Spaulding's Fig. 30; Spaulding describes: "In step 179, if the required drug name is in the data base 17, the packing factor for the drug is obtained and multiplied by the required pill quantity to determine the required size of vial 11 and to select the vial size at step 180. The controller 7 then activates the vial manipulator assembly 6 to obtain a vial 11 of the correct size from the selected vial supply assembly 3 in step 181, and more the gripped vial 11 to the selected dispenser cell 5 in step 182. At step 183, the dispenser drive motor 94 is activated to cause the selected dispenser cell 5 to dispense pills 12 into the vial 11 and count and weigh the pills 12 to ensure accuracy of the count. At step 184, the vial manipulator 6 is activated to convey the filled vial 11 to the offload carousel 4 where the filled vial 11 is deposited on th6 next available carousel sector 167. Finally, the program 174 returns to step 175 to await the next prescription to be filled" at col. 14, line 68 through col. 15, line 17; and Fig. 29; and "The prescription label data is conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11" at col. 9, lines 8-1 and Fig. 30);

- (E) releasing only those portions of the output stream that are not suitable (Spaulding describes: "At branch 177, if the drug name is not found in the data base 17, the program branches to step 178 wherein an error message is sent to the system output, such as the display panel 31, and the program returns to step 175" in Fig. 29 and at col. 14, line 56–60. Any prescriptions that are not automatically filled must be prepared manually, and so the message to the pharmacist would contain portions of the output stream (e.g., drug name, quantity) that are sufficient to identify the prescriptions that are to be manually prepared (See Fig. 29, Step 176). As such, Spaulding discloses releasing portions of the label data back to the pharmacist for those prescriptions that cannot be automatically prepared by the dispenser unit at Step 177 in Fig. 29);

- (F)' sending onto a display panel at a system output a message (i.e., the released information for the drug not in the system) for manual handling within the pharmacy (i.e., those released portions of the output stream that are not suitable; See Step 178 in Fig. 29 and col. 14, lines 47-60); and

5
- (G) populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules (i.e., from the above step (B), it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Fig. 29, Step 176),

10
  - wherein the messaging at the system output comprises a filtered output stream (i.e., filtering the drug orders between those that can be filled by the automated dispenser apparatus and those art unsuitable for automated handling; See Step 177 in Fig. 29)[21] consisting of only those jobs that require manual handling (i.e., Drug is not in the System; See Steps 177-178 in Fig.

15
29) while the medication data determined as suitable for the medication preparation system are manufactured by the medication preparation system for administration from the vial to patients (See Steps 179-184 in Fig. 29 and col. 6, line 9).

Spaulding does not teach that the preparing step prepares plural mediations among
20   the one or more medication data determined to be suitable in a batch production.

Liff discloses an automated drug dispensing system that operates to dispense drugs in real time or in a batch process (See col. 19, line 50 through col. 20, line 7), wherein

- a preparing step prepares plural mediations among one or more medication data determined to be suitable in a batch production (Liff discloses: "The host

25
computer 570 receives the message, unpacks the data, and dispenses the pharmaceutical automatically, in real time. In this manner, a pharmacist operating a remote workstation 571 causes the RCD unit 572 to dispense the pharmaceutical in real time. Alternatively, the dispense commands may be issued in a batch process, requiring the technician at the host computer 570 to

30
issue the dispense command to the RCD unit at col. 19, lines 64-67 and col. 20, lines 2-7; and many other prior art references, including those cited in the

---

[21] See the Declaration of David L. Trumper, at paragraphs 16, 25, and 26.

reexamination request, further demonstrate that automated systems such as that
described in Spaulding are ideally suited to preparing multiple dosages in a batch
processing technique).

Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have utilized Spaulding's automated system for preparing the
prescription orders sent from the host interface, as disclosed by Spaulding, in a batch
production, as disclosed by Liff, for the advantage of reducing the processing time[22].

Spaulding, as modified by Liff, does not expressly teach (F) printing onto a label at a
printer the released output stream for manual handling within the pharmacy.

Halvorson discloses a system for dispensing medications in health care institutions
(See Abstract), wherein

- printing onto a label (i.e., medication label) at a printer (i.e., printers 21 in Fig. 1)
  a released output stream (i.e., information including patient information, all
  medication orders, inventory data and patient order; See col. 3, lines 15-27).

Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have combined the teachings of Halvorson and Spaulding, as
modified by Liff, so that Spaulding's system (as modified by Liff) could configure the
controller to forward the released output stream within the pharmacy (i.e., within the
institution), and thus, a pharmacist that is remotely located in a different building could
print the labels of those drugs that are filled by the pharmacist to determine whether the
drug order has any interaction problem with another drug order for the same patient and
to issue warning to the personnel who is entering the order, as disclosed by Halvorson
(See Halvorson, Abstract, Fig. 1, and col. 2, lines 54-61, col. 8, lines 5-31, and col. 26,
lines 41-60)[23].

Spaulding, as modified by Liff and Halvorson, does not expressly teach that the dose
of said medication is delivered to the respective patients in a syringe; and the label is an
adhesive label.

The Examiner takes Official Notice that the dose of said medication is delivered to
the respective patients in a syringe, what was well known to one of ordinary skill in the
art, as evidenced by Ortiz, such that the dose of medication is delivered in a syringe (i.e.,

---

[22] Refer to the Decision at page 12, FF9; and at page 33, lines 1-14.
[23] Refer to the Decision at page 14, FF14; and at page 21, lines 1-15 and page 28, lines 14-19.

automatically filled sterile delivery device; See Ortiz, col. 3, line 49 through col. 4, line 64).

Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to have manufactured said syringes, as evidenced by Ortiz,

5   using said medication preparation system (i.e., automatic prescription dispensing system 1 in Fig. 30 of Spaulding) since it would have allowed to deliver the dose of medication to the respective patients in a syringe (i.e., sterile delivery device 12 of Fig. 7A) using the medication preparation system (i.e., automated apparatus 10 of Fig. 7A) with the advantage of savings in time and money (See Ortiz, col. 3, lines 32-45).

10   In addition, one of ordinary skill in the art would readily recognize that a pharmacy label printer usually provides adhesive-backed labels for application to a medical container (e.g., vial, syringe, etc.) containing the dose of medication to be delivered to the respective patients using said adhesive labels.

Therefore, it would have been *prima facie* obvious for a skilled artisan to use said

15   adhesive label to print the released output stream (i.e., regarding the dose of medication) that would necessarily be preferable since it can reduce the medical administration errors during the delivery of the dose of medication to the respective patients.

20   **Regarding Group C**: Independent Claim 58

27.   Contrary to the Examiner's determination as to the proposed rejections of the originally appealed claim 58 the Examiner refused to adopt (See RAN at page 11, ¶¶13-14), the Board decided that there is rationale to combine the teachings of Spaulding and Halvorson (See the Decision, *Group C* at pages 33-34). As such, the Decision set forth

25   new ground of rejection for the originally appealed claim 58 under 37 CFR § 41.77(b).

The Patent Owner has filed a response with <u>amended claims</u> requesting reopening of prosecution before the Examiner pursuant to 37 CFR § 41.77(b)(1), and the Third Party Requester has filed comments on the Patent Owner's response pursuant to 37 CFR § 41.77(c). The Examiner will consider, *de novo*, the Patent Owner's response

30   and the Third Party Requester's comments under 37 CFR § 41.77(d).

- **Re. Ground #C:**

28.    <u>The proposed rejection of claim 58 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of **Dillon** [US 6,161,141 A], Halvorson [US 4,847,764], and what was well known in the art is **not adopted** for the reason as noted below.</u>

5        *With regard to claim 58,* the Third Party Requester's proposed rejection of the claim 58 (See the Comments at page 10, lines 21-27) is not adopted because **Dillon** is **not** necessary for the claim 58 rejection since the Examiner believes that the combination of teachings from Spaulding, Halvorson, and what was well known in the art, renders the obviousness of the claimed limitations including "the releasing step

10  releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form" recited in the claim 58.

29.    <u>Claim 58 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well known in the art</u>.

15        *Referring to claim 58,* Spaulding discloses a computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy (Spaulding discloses the recited method in Figs. 29 and 30), said one or more medication data (i.e., label print data) concerning respective patients and

20  specifying a dose of a medication (i.e., pill-form medication; See col. 3, lines 17-18) to be delivered to the respective patients in a vial (See col. 6, line 9), comprising the steps of:

- (A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream (Spaulding describes: "The pharmacy host computer is normally used for keeping records of

25          prescriptions filled for customers or patients and for prescription inventory tracking. In addition, the computer usually has the capability of causing prescription labels to be printed by a label printer interfaced to the computer by way of the printer port. The control system of the dispensing system of the present invention includes a host computer interface which connects to the

30          pharmacy host computer printer port and which conveys label print data to the control system ..." at col. 3, lines 7-18; "... interfacing the controller of the system to the printer port of the pharmacy computer, intercepting the prescription label data ..." at col. 6, lines 1-4; "The system controller 7 intercepts prescription label

print data, including a drug name and a quantity, from a pharmacy host computer 10 ..." at col. 8, lines 28-30 and Fig. 30; "The system 1 employs the fairly high level of standardization in computer printers to obtain data for controlling the automatic dispensing of prescriptions by connecting a host interface 16 between the printer port 15 and the label printer 14." at col. 8, lines 57-62 and Fig. 30; "The host interface 16 intercepts the prescription label data and conveys it to the controller 7, which is itself a computer." at col. 8, lines 63-65 and Fig. 30; "[t]he controller 7 obtains the prescription label data from the printer port 15 of the host computer 10 by way of a host interface 16." at col. 14, lines 51- 53 and Fig. 29);

- (B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source (Spaulding describes: "The prescription label data is coded in one of a limited number of standard data formats, such as ASCII coding ..." at col. 8, lines 50-52; "The control system of the dispensing system of the present invention includes a host computer interface ... which extracts the drug name and quantity of dosage units from the label print data." at col. 3, lines 13-18; "... intercepting the prescription label data and extracting the drug name and quantity therefrom." at col. 6, lines 2-4; "The system controller 7 ... extracts the drug name and quantity from the label print data ..." at col. 8, lines 28-32; "The drug name and the prescription quantity is extracted from the label data ..." at col. 8, lines 66-68 and Fig. 30, i.e., the Spaulding system follows the configuration rules for formatting the label print data to extract the drug name and prescription quantity.);

- (C) testing the parsed output stream against an order database to determine suitability of the medication data therein for automated handling by a medication preparation system associated with the pharmacy (Spaulding describes: "The drug name is searched within the database 17 to determine if one of the dispenser units 5 in the system 1 is loaded with the desired drug" at col. 8, line 68 through col. 9, line 2 and Fig. 30; "[i]n step 176, the controller 7 searches the prescription data base 17 for the drug name extracted from the prescription label data." at col. 14, lines 53-56 and Fig. 29);

- (D) using the medication preparation system (See Fig. 30), manufacturing vials for delivery and administration to each respective patient (See col. 6, line 9) having the medication dose which corresponds to the one or more medication

data (See col. 3, lines 17-18) determined to be suitable (i.e., medication data is
"suitable" if it can be prepared using the dispenser apparatus in Spaulding's Fig.
30; Spaulding describes: "In step 179, if the required drug name is in the data
base 17, the packing factor for the drug is obtained and multiplied by the required
pill quantity to determine the required size of vial 11 and to select the vial size at
step 180. The controller 7 then activates the vial manipulator assembly 6 to
obtain a vial 11 of the correct size from the selected vial supply assembly 3 in
step 181, and more the gripped vial 11 to the selected dispenser cell 5 in step
182. At step 183, the dispenser drive motor 94 is activated to cause the selected
dispenser cell 5 to dispense pills 12 into the vial 11 and count and weigh the pills
12 to ensure accuracy of the count. At step 184, the vial manipulator 6 is
activated to convey the filled vial 11 to the offload carousel 4 where the filled vial
11 is deposited on th6 next available carousel sector 167. Finally, the program
174 returns to step 175 to await the next prescription to be filled" at col. 14, line
68 through col. 15, line 17; and Fig. 29; and "The prescription label data is
conveyed through the interface 16 to the label printer 14 to cause the printer 14
to print a label for the filled vial 11" at col. 9, lines 8-1 and Fig. 30);

- (E) releasing only those portions of the output stream that are not suitable
(Spaulding describes: "At branch 177, if the drug name is not found in the data
base 17, the program branches to step 178 wherein an error message is sent to
the system output, such as the display panel 31, and the program returns to step
175" in Fig. 29 and at col. 14, line 56–60. Any prescriptions that are not
automatically filled must be prepared manually, and so the message to the
pharmacist would contain portions of the output stream (e.g., drug name,
quantity) that are sufficient to identify the prescriptions that are to be manually
prepared (See Fig. 29, Step 176).  As such, Spaulding discloses releasing
portions of the label data back to the pharmacist for those prescriptions that
cannot be automatically prepared by the dispenser unit at Step 177 in Fig. 29);

- (F)' sending onto a display panel at a system output a message (i.e., the
released information for the drug not in the system) for manual handling within
the pharmacy (i.e., those released portions of the output stream that are not
suitable; See Step 178 in Fig. 29 and col. 14, lines 47-60); and

- (G) populating a data structure with data parsed from the printer output stream in accordance with the set of configuration rules (i.e., from the above step (B), it is clear that the Spaulding system uses a data structure to hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Fig. 29, Step 176),

  o wherein the messaging at the system output comprises a filtered output stream (i.e., filtering the drug orders between those that can be filled by the automated dispenser apparatus and those art unsuitable for automated handling; See Step 177 in Fig. 29)[24] consisting of only those jobs that require manual handling (i.e., Drug is not in the System; See Steps 177-178 in Fig. 29) while the medication data determined as suitable for the medication preparation system are manufactured by the medication preparation system for administration from the vial to patients (See Steps 179-184 in Fig. 29 and col. 6, line 9).

Spaulding does not expressly teach (F) printing onto a label at a printer the released output stream for manual handling within the pharmacy; and the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form.

Halvorson discloses a system for dispensing medications in health care institutions (See Abstract), wherein

- printing onto a label (i.e., medication label) at a printer (i.e., printers 21 in Fig. 1) a released output stream (i.e., information including patient information, all medication orders, inventory data and patient order; See col. 3, lines 15-27); and

- a releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form (Halvorson describes a system in which medication data specifying a tablet dosage form at col. 7, lines 49-53, and a releasing step releases among those portions of the output stream that are not suitable. For example, Halvorson teaches "When the supply is exhausted, the nurse may request another package from the system. If the medication is stocked in the dispenser 32, it will be dispensed immediately. If it is not in the dispenser 32, the nurse will receive

---

[24] See the Declaration of David L. Trumper, at paragraphs 16, 25, and 26.

notification that the medication has been ordered from pharmacy. A message will be automatically printed on the pharmacy restock area 22 to inform them of the need from immediate delivery of the medication". See col. 5, lines 8-16; Since the tablet medications in the Halvorson system will naturally be out of stock from time
5    to time the Halvorson system will release to the printer various prescriptions calling for the out-of-stock tablets. Halvorson thus meets the limitation recited in claim 58.)

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have combined the teachings of Halvorson and Spaulding, so
10   that Spaulding's system could configure the controller to forward the released output stream within the pharmacy (i.e., within the institution), and thus, a pharmacist that is remotely located in a different building could print the labels of those drugs that are filled by the pharmacist to determine whether the drug order has any interaction problem with another drug order for the same patient and to issue warning to the personnel who is
15   entering the order, as disclosed by Halvorson (See Halvorson, Abstract, Fig. 1, and col. 2, lines 54-61, col. 8, lines 5-31, and col. 26, lines 41-60)[25].

Spaulding, as modified by Halvorson, does not expressly teach that the dose of said medication is delivered to the respective patients in a syringe; and the label is an adhesive label.
20   The Examiner takes Official Notice that the dose of said medication is delivered to the respective patients in a syringe, what was well known to one of ordinary skill in the art, as evidenced by Ortiz, such that the dose of medication is delivered in a syringe (i.e., automatically filled sterile delivery device; See Ortiz, col. 3, line 49 through col. 4, line 64).
25   Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to have manufactured said syringes, as evidenced by Ortiz, using said medication preparation system (i.e., automatic prescription dispensing system 1 in Fig. 30 of Spaulding) since it would have allowed to deliver the dose of medication to the respective patients in a syringe (i.e., sterile delivery device 12 of Fig. 7A) using the
30   medication preparation system (i.e., automated apparatus 10 of Fig. 7A) with the advantage of savings in time and money (See Ortiz, col. 3, lines 32-45).

Control Number: 95/000,333                                                Page 46

Art Unit: 3992                              Examiner's determination under 37 CFR § 41.77(d)

In addition, one of ordinary skill in the art would readily recognize that a pharmacy
label printer usually provides adhesive-backed labels for application to a medical
container (e.g., vial, syringe, etc.) containing the dose of medication to be delivered to
the respective patients using said adhesive labels.

5      Therefore, it would have been *prima facie* obvious for a skilled artisan to use said
adhesive label to print the released output stream (i.e., regarding the dose of
medication) that would necessarily be preferable since it can reduce the medical
administration errors during the delivery of the dose of medication to the respective
patients.

10

**Regarding Group D: Independent Claim 20**

30.      Contrary to the Examiner's determination as to the proposed rejections of the
originally appealed claims 20-45 the Examiner refused to adopt (See RAN at page 11,
¶13 through page 16, ¶30), the Board decided that (i) the Patent Owner had not directed
15 the Board to where the specification of the '212 Patent expressly excludes the printing of
the prescription labels which are filled by the automated medication preparation system,
and (ii) there is rationale to combine the teachings of Spaulding and Halvorson (See the
Decision, *Group D* at pages 35-39). As such, the Decision set forth new ground of
rejection for the originally appealed claims20 under 37 CFR § 41.77(b), and the Board
20 decided to leave the Examiner to discretionally reconsider the patentability of the
dependent claims 21-45 of the claim 20 in view of the prior art of record and the new
grounds of rejection.

     The Patent Owner has filed a response with <u>amended claims</u> requesting
reopening of prosecution before the Examiner pursuant to 37 CFR § 41.77(b)(1), and the
25 Third Party Requester has filed comments on the Patent Owner's response pursuant to
37 CFR § 41.77(c). The Examiner will consider, *de novo*, the Patent Owner's response
and the Third Party Requester's comments under 37 CFR § 41.77(d).

-   **Re. Ground #D-1:**

---

[25] Refer to the Decision at page 14, FF14; and at page 21, lines 1-15, page 28, lines 14-19, and page 34, lines 5-24.

31.    Claims 20-22 and 60 are rejected under 35 U.S.C. § 103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and
what was well known in the art.

    *Referring to claim 20,* Spaulding discloses a computer system including software

5    loaded into a memory of one or more machines executable by one or more processors
in support of serial data stream management (Spaulding discloses the recited system in
Figs. 29 and 30), comprising:

- (a) at least one listener software module ("LSM") executing on a first machine,
the LSM receiving serial data streams containing one or more medication data

10        from a port of the first machine (Spaulding describes: "The pharmacy host
computer is normally used for keeping records of prescriptions filled for
customers or patients and for prescription inventory tracking. In addition, the
computer usually has the capability of causing prescription labels to be printed by
a label printer interfaced to the computer by way of the printer port. The control

15        system of the dispensing system of the present invention includes a host
computer interface which connects to the pharmacy host computer printer port
and which conveys label print data to the control system ... " at col. 3, lines 7-18;
"The system 1 employs the fairly high level of standardization in computer
printers to obtain data for controlling the automatic dispensing of prescriptions by

20        connecting a host interface 16 between the printer port 15 and the label printer
14" at col. 8, lines 57-62 and Fig. 30), said one or more medication data (i.e.,
label print data) concerning respective patients and specifying a drug and a dose
(i.e., pill-form medication; See col. 3, lines 17-18) to be delivered to the
respective patients in a vial (See col. 6, line 9);

25    
- (b) a parser software module ("PSM") communicatively connectable to the LSM
and executing on a second machine, the PSM processing the serial data streams
received from the LSM to extract the one or more medication data therefrom and
populate a data structure therewith (Spaulding describes: "The host interface 16
intercepts the prescription label data and conveys it to the controller 7, which is

30        itself a computer" at col. 8, lines 63-65 and Fig.30; "The system controller 7 ...
extracts the drug name and quantity from the label print data ..." at col. 8, lines
28-32 and Fig. 30; i.e., the Spaulding system uses a data structure to hold the

extracted drug name and prescription quantity in memory for further processing); and

- (c) a set of configuration rules accessible by the PSM, the set of configuration rules defining the manner of processing by the PSM on the serial data streams from a prescribed LSM (i.e., it is inherent that the controller 7 must follow configuration rules to extract label data, for example, to extract the drug name and prescription quantity; See Step 176 in Fig. 29),

  o wherein the PSM is configured to determine suitability for handling of drug orders by an automated medication preparation system with reference to an order database (Spaulding describes: "At branch 177, if the drug name is not found in the data base 17, the program branches to step 178 wherein an error message is sent to the system output, such as the display panel 31, and the program returns to step 175" at col. 14, line 56 through col. 14, line 60 and Fig. 29) and to forward drug orders determined as suitable to the automated medication preparation system (Spaulding discloses: "At branch 177, if the drug name is found in the data base 17, the program branches to step 179 wherein if the required drug name is in the data base 17, process the steps 180-184 for the automatic dispensing system for prescription" at col. 14, line 68 through col. 15, line 17 and Fig. 29) for manufacture of vials for delivery to each respective patient (See col. 6, line 9) and to forward only drug orders determined as not being suitable (i.e., the drug not in the system) to a display panel at a system output for manual handling (i.e., those portions of the serial data stream that are not suitable; See Step 178 in Fig. 29 and col. 14, lines 47-60), and

  o wherein the data structure enables data handling and preparation of one or more medications by the automated medication preparation system (Spaulding describes: "In step 179, if the required drug name is in the data base 17, the packing factor for the drug is obtained and multiplied by the required pill quantity to determine the required size of vial 11 and to select the vial size at step 180. The controller 7 then activates the vial manipulator assembly 6 to obtain a vial 11 of the correct size from the selected vial supply assembly 3 in step 181, and more the gripped vial 11 to the selected dispenser cell 5 in step 182. At step 183, the dispenser drive motor 94 is

activated to cause the selected dispenser cell 5 to dispense pills 12 into the vial 11 and count and weigh the pills 12 to ensure accuracy of the count. At step 184, the vial manipulator 6 is activated to convey the filled vial 11 to the offload carousel 4 where the filled vial 11 is deposited on the next available carousel section 167. Finally, the program 174 returns to step 175 to await the next prescription to be filled" at col. 14, line 68 through col. 15, line 17 and Fig. 29), and

o   wherein the system, including at least the PSM, is configured to provide said display panel at the system output with a filtered output stream (i.e., filtering the drug orders between those that can be filled by the automated dispenser apparatus and those art unsuitable for automated handling; See Step 177 in Fig. 29)[26] consisting of only those jobs that require manual handling (i.e., Drug is not in the System; See Steps 177-178 in Fig. 29) while the orders determined as suitable for the automated medication preparation system are manufactured by the automated medication preparation system for administration from the vial to patients (See Steps 179-184 in Fig. 29 and col. 6, line 9).

Spaulding does not expressly teach the PSM is configured to forward the drug orders determined as not being suitable (i.e., the drug not in the system) to a printer for manual handling.

Halvorson discloses a system for dispensing medications in health care institutions (See Abstract), wherein

•   a PSM is configured to forward the drug orders (i.e., information including patient information, all medication orders, inventory data and patient order; See col. 3, lines 15-27) determined as not being suitable to a printer (i.e., printers 21 in Fig. 1) for manual handling (Halvorson describes a system in which medication data specifying a tablet dosage form at col. 7, lines 49-53, and a releasing step releases among those portions of the output stream that are not suitable. For example, Halvorson teaches "When the supply is exhausted, the nurse may request another package from the system. If the medication is stocked in the dispenser 32, it will be dispensed immediately. If it is not in the dispenser 32, the

---

[26] See the Declaration of David L. Trumper, at paragraphs 16, 25, and 26.

nurse will receive notification that the medication has been ordered from pharmacy. A message will be automatically printed on the pharmacy restock area 22 to inform them of the need from immediate delivery of the medication". See col. 5, lines 8-16).

5    Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have combined the teachings of Halvorson and Spaulding, so that Spaulding's system could configure the controller to forward the drug orders within the pharmacy (i.e., within the institution), and thus, a pharmacist that is remotely located in a different building could print the labels of those drugs that are filled by the

10   pharmacist to determine whether the drug order has any interaction problem with another drug order for the same patient and to issue warning to the personnel who is entering the order, as disclosed by Halvorson (See Halvorson, Abstract, Fig. 1, and col. 2, lines 54-61, col. 8, lines 5-31, and col. 26, lines 41-60)[27].

     Spaulding, as modified by Halvorson, does not expressly teach that the drug and the

15   dose are delivered to the respective patients in a syringe.

     The Examiner takes Official Notice that the drug and the dose are delivered to the respective patients in a syringe, what was well known to one of ordinary skill in the art, as evidenced by Ortiz, such that the drug and the dose of medication are delivered in a syringe (i.e., automatically filled sterile delivery device; See Ortiz, col. 3, line 49 through

20   col. 4, line 64).

     Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made to have manufactured said syringes, as evidenced by Ortiz, using said medication preparation system (i.e., automatic prescription dispensing system 1 in Fig. 30 of Spaulding) since it would have allowed to deliver the dose of medication

25   to the respective patients in a syringe (i.e., sterile delivery device 12 of Fig. 7A) using the medication preparation system (i.e., automated apparatus 10 of Fig. 7A) with the advantage of savings in time and money (See Ortiz, col. 3, lines 32-45).

     *Referring to claim 21,* Spaulding teaches that

30   • the PSM communicates with only one LSM (i.e., the controller 7 is depicted as communicating with only one host interface 16 in Fig. 30).

---

[27] Refer to the Decision at page 14, FF14; and at page 36, line 13 through page 37, line 21.

*Referring to claim 22,* Spaulding teaches that

- the first and second machines are the same machine (in fact, Spaulding's Fig. 30 is merely a simplified flow diagram and may not necessarily disclose what was well known in the art, thus a person of ordinary skill in the art would readily attach the host interface 16 onto the controller computer 7 to save space or to centrally locate the host interface, controller on the same frame as the dispenser unit; See col. 2, lines 56-60 and the Decision at page 20, lines 18-21).

*Referring to claim 60,* Spaulding, as modified by Halvorson and what was well known in the art, teaches that

- each drug order in the medication data that is received in the serial data stream (Spaulding describes: "The system controller 7 intercepts prescription label print data, including a drug name and a quantity, from a pharmacy host computer 10 ..." at col. 8, lines 28-30 and Fig. 30) is either forwarded to the automated medication preparation system (i.e., to the dispenser apparatus 20 in Fig. 30 of Spaulding) or to the printer for manual handling (i.e., manual handling suggested by Halvorson)[28].

32. <u>The proposed rejection of claims 23-25 and 30 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well known in the art are **not adopted** for the reasons as noted below.</u>

*With regard to claim 23,* the Third Party Requester's proposed rejection of the claim 23 (See the Comments at page 12, lines 10-11) is not adopted because the Examiner believes that the combination of teachings from Spaulding, Halvorson, and what was well known in the art, does not render the obviousness of the particular limitations "the serial data stream identifies a particular LSM" and "the set of configuration rules used for processing the serial data stream by the PSM is selected for the identified LSM" recited in the claim 23. However, the reference Dillon in the record teaches those limitations.

---

[28] See the Declaration of David L. Trumper, at paragraph 26.

Control Number: 95/000,333                                    Page 52
Art Unit: 3992                          Examiner's determination under 37 CFR § 41.77(d)

     *With regard to claim 24,* the Third Party Requester's proposed rejection of the

claim 24 (See the Comments at page 12, lines 10-11) is not adopted because the

Examiner believes that the combination of teachings from Spaulding, Halvorson, and

5   what was well known in the art, does not render the obviousness of the particular

limitation "saving the received serial data streams as a record in a database" recited in

the claim 24.  However, the reference Rieker in the record teaches the limitation.

     *With regard to claim 25,* the Third Party Requester's proposed rejection of the

10  claim 25 (See the Comments at page 12, lines 10-11) is not adopted because the

Examiner believes that the combination of teachings from Spaulding, Halvorson, and

what was well known in the art, does not render the obviousness of the particular

limitation "the LSM associates metadata with the received serial data streams" recited in

the claim 25.  However, the reference Dillon in the record teaches the limitation.

15

     *With regard to claim 30,* the Third Party Requester's proposed rejection of the

claim 30 (See the Comments at page 12, lines 10-11) is not adopted because the

Examiner believes that the combination of teachings from Spaulding, Halvorson, and

what was well known in the art, does not render the obviousness of the particular

20  limitation "the PSM is configured to route the data in the populated data structure to a

scheduler for handling in accordance with a prescribed priority" recited in the claim 30.

However, the reference Charhut in the record teaches the limitation.

     33.    Claim 23 is rejected under 35 U.S.C. § 103(a) as being unpatentable over

25  Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well

known in the art, as applied to claims 20-22 and 60 above, and further in view of **Dillon**

[US 6,161,141 A].

     *Referring to claim 23,* Spaulding, as modified by Halvorson and what was well

known in the art, discloses all the limitations of the claim 23, except that does not

30  expressly teach the limitations "the serial data stream identifies a particular LSM" and

"the set of configuration rules used for processing the serial data stream by the PSM is

selected for the identified LSM" (See Ground #D-1: Claim 20 is rejected under 35

U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson and what was well known in the art).

Dillon discloses a system in which a personal computer sends messages into a TCP/IP network (See Abstract),

5    • wherein the serial data stream identifies a particular LSM (Dillon describes that a normal data IP packet contains the source IP address and destination IP address in Fig. 3; and if the prescription label data are sent over Internet from Spaulding's host interface 16 (the source system), the prescription label data packet would identify the source address (i.e., the host interface 16); thus, the combination of
10    Spaulding and Dillon teaches the source of the printer output stream identified by source address in the IP packet is the particular LSM for the printer identified by the destination address in the IP packet) and

• wherein the set of configuration rules used for processing the serial data stream by the PSM (i.e., it is clear that the Spaulding system uses a data structure to
15    hold the extracted drug name and prescription quantity in memory for further processing, including comparing extracted data to records in a database; See Spaulding, Fig. 29, Step 176) is selected for the identified LSM  (i.e., the particular LSM for the printer identified by the destination address in the IP packet, taught by Dillon).

20    Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have utilized a bidirectional communication link (i.e., Internet, which is an example of a TCP/IP network), as disclosed by Dillon, in place of a one-way communication link (See Spaulding, Fig. 3), as disclosed by Spaulding, as modified by Halvorson and what was well known in the art, for the advantage of providing the
25    bidirectional communication between the order entry system and the medication preparation system via the bidirectional communication link (i.e., Internet), which had over 10 million users at the time the invention (See Dillon, col. 1, lines 14-48)[29].

34.    Claim 24 is rejected under 35 U.S.C. § 103(a) as being unpatentable over
30    Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well

---

[29] Refer to the Decision at page 10, FF6; and at page 16, lines 6-22.

known in the art, as applied to claims 20-22 and 60 above, and further in view of **Rieker**
[US 5,832,447 A].

    *Referring to claim 24,* Spaulding, as modified by Halvorson and what was well

known in the art, discloses all the limitations of the claim 24, including "the LSM saves

5   the received serial data streams in a memory" (i.e., Spaulding teaches "The host

interface 16 intercepts the prescription label data and conveys it to the controller 7,

which is itself a computer" at col. 8, lines 63-65 and Fig. 30; "The controller 7 obtains the

prescription label data from the printer port 15 of the host computer 10 by way of a host

interface 16" at col. 14, lines 51- 53 and Fig. 29; in fact, data conveyed to a computer

10  results in data being stored in a memory location so that it can later send the data to the

printer for label printing), except that does not expressly teach the limitation "saving the

received serial data streams as a record in a database" as called for in the claim 24 (See

Ground #D-1: Claim 20 is rejected under 35 U.S.C. § 103(a) as being unpatentable over

Spaulding in view of Halvorson and what was well known in the art).

15      Rieker discloses an automated system and method for providing real-time

verification of health insurance eligibility (See Abstract), wherein

    • an LSM saves received serial data streams as a record in a database (i.e., the

       process of capturing and saving print data as a database record was well known

       in the art; See col. 8, lines 19-24 and Fig. 6)[30].

20      Therefore, it would have been obvious to one of ordinary skill in the art at the time

the invention was made to have included said step of saving the received serial data

streams, as evidence by Rieker, in the LSM (i.e., Spaulding's host interface), as

disclosed by Spaulding, as modified by Halvorson and what was well known in the art,

since it was well known in the art at the time of the invention to keep the copy of the

25  prescription (i.e., capturing and saving print data as a database record in the health-care

computer system for maintaining a permanent record of the data) for later in case

needed (See Rieker, col. 8, lines 19-22).

    35.    Claim 25 is rejected under 35 U.S.C. § 103(a) as being unpatentable over

30  Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], what was well known

---

[30] Refer to the Decision at page 22, line 16 through page 23, line 3.

in the art, and **Rieker** [US 5,832,447 A], as applied to claim 24 above, and further in view of **Dillon** [US 6,161,141 A].

    *Referring to claim 25,* Spaulding, as modified by Halvorson, what was well known in the art, and Rieker, discloses all the limitations of the claim 25, except that does not

5     expressly teach the limitation "the LSM associates metadata with the received serial data streams" (See <u>Ground #D-1</u>: Claims 20 and 24 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art, and Rieker).

    Dillon discloses a system in which a personal computer sends messages into a

10     TCP/IP network (See Abstract), wherein

- an LSM associates metadata with received serial data streams (Dillon shows a "normal IP Packet" as containing metadata that includes "source IP address," "destination IP address," "flags," and "header checksum," in addition to the data payload in Fig. 3; i.e., associating metadata with a data stream is old in the art).

15     Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have readily modified Spaulding's communication link in said medication preparation system (i.e., Spaulding's system), as disclosed by Spaulding, to associate the metadata with the received serial data streams (i.e., the label print data with information about its source address, target address, size, status and the like), as

20     disclosed by Dillon, because such information (i.e., metadata) would facilitate effective data management (e.g., bidirectional messaging functions)[31].

36.    <u>Claim 30 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well</u>

25     <u>known in the art, as applied to claims 20-22 and 60 above, and further in view of</u> **Charhut** [US 5,208,762 A].

    *Referring to claim 30,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 30, except that does not expressly teach the limitation "the PSM is configured to route the data in the populated

30     data structure to a scheduler for handling in accordance with a prescribed priority" (See

---

[31] Refer to the Decision at page 23, lines 4-11.

Ground #D-1: Claim 20 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson and what was well known in the art).

Charhut discloses an automated prescription vial filling system (See col. 1, lines 39-46 and Figs. 1-2), wherein

5 • a PSM is configured to route a data in a populated data structure to a scheduler for handling in accordance with a prescribed priority (Charhut describes that the system has a host computer 70 that provides patient's order information to a control system 80 which will send back a message as to whether an order is valid or invalid, (See col. 5, line 66 through col. 6, line 3). And, Charhut further

10 describes a method of prioritizing the prescription orders. Specifically, Charhut's system maintains a Patient Entry List 100 which is a collection of patient orders received by the control system 80 from the host computer 70. The patient orders are normally organized in a first-in, first-out (FIFO) manner. When an order is received with a priority status, however, the order can be placed at the head of

15 the list so that it will be processed first (See col. 6, lines 7-13)).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have combined the teachings of Charhut and Spaulding, as modified by Halvorson and what was well known in the art, to prioritize the handling of prescriptions in the automated medication preparation system.[32]

20

• **Re. Ground #D-2:**

37. The proposed rejection of claims 26-29 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well known in the art, and further in view of Rieker [US 5,832,447 A] are **not**

25 **adopted** for the reason as noted below.

With regard to claims 26-29, the Third Party Requester's proposed rejection of the claim 26 (See the Comments at page 12, lines 14-15) is not adopted because the previous claim 25 of the claim 26 has been rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known in the art,

30 Rieker, and Dillon. Therefore, the Examiner believes that the combination of teachings from Spaulding, Halvorson, what was well known in the art, and Rieker, does not render

---

[32] Refer to the Decision at page 13, FF11-FF13; and page 26, line19 through page 27, line 6.

Control Number: 95/000,333                                        Page 57

Art Unit: 3992                          . Examiner's determination under 37 CFR § 41.77(d)

the obviousness of the claimed invention in the claim 26 because the rejection of the

previous claim 25 requires the teaching from the reference Dillon of the record (See

Ground #D-1: Claims 20, 24, and 25 are rejected under 35 U.S.C. § 103(a) as being

unpatentable over Spaulding in view of Halvorson, what was well known in the art,

5    Rieker, and Dillon).  The dependent claims 27-29 of the claim 26 are not adopted as well

because of the same reason *supra*.


38.      Claims 26-29 are rejected under 35 U.S.C. § 103(a) as being unpatentable over

Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well

10    known in the art, Rieker [US 5,832,447 A], and **Dillon** [US 6,161,141 A] as applied to

claim 25 above.

*Referring to claim 26,* Rieker teaches that

- the metadata includes a marker indicative of whether a given record has been

parsed (Rieker describes: "Once a capture process 170 has isolated a print

15    image, it parses the print image and builds a data record (block 208) which it

then writes onto mass storage 172 (block 210)" at col. 8, lines 19-22 and Fig. 6;

"When control process 174 is started (block 250), it first determines whether

there are any print images stored on data storage 172 by capture process 170

that have not yet been processed" at col. 8, lines 27-30 and Fig. 7A; i.e., It would

20    have been obvious to a person of ordinary skill in the art at the time of the

invention was made to combine the teachings of the Spaulding, Dillon and Rieker

to provide this claim limitation because it is highly desirable to "process eligibility

transactions from an unlimited group of data sources" (See Rieker, col. 3, lines

63-64) in a non-linear fashion).

25

*Referring to claim 27,* Rieker teaches

- the PSM is configured to query the database to identify a subset of records

marked as not having been parsed (See Rieker, col. 4, lines 27-28: "saves

personnel resources and time"; i.e., a person of ordinary skill in the art would

30    readily combine the teachings of the Spaulding, Dillon and Rieker to provide this

claim limitation because it is highly desirable to track which data has been parsed

and which data has not been parsed to achieve advantages, such as the ability

to use batch processing as processor cycles become available because it can save time).

*Referring to claim 28,* Rieker teaches that the PSM is further configured to

- retrieve the subset of records (Rieker describes "Control process 174 retrieves a print image from data storage 172 (block 252), and parses the print image for data elements based upon the location of the specific data elements within the print image (block 254)" at col. 8, lines 31-34) and
- parse the subset of records in accordance with a set of configuration rules (Rieker describes "Control process 174 next chooses, from the parsed data elements, those data elements necessary to perform an eligibility transaction (block 256)" at col. 8, lines 50-52; "Block 256 thus attempts to choose, from the various information inputted, the appropriate information for verifying insurance eligibility. As will be understood, the rules applied by block 256 to choose appropriate data elements will often vary" at col. 8, lines 61-65; i.e., a person of ordinary skill in the art would readily combine the teachings of the Spaulding and Rieker references to provide this claim limitation).

*Referring to claim 29,* Spaulding, as modified by Halvorson, what was well known in the art, Rieker, and Dillon, teaches that

- the processing by the PSM includes selectively printing portions of the received serial data stream (See Spaulding, Fig. 30 and col. 8, lines 44-50); and
- printing the received serial data stream onto a label (See Halvorson, col. 3, lines 15-27; i.e., printing medication label including patient information, all medication orders, inventory data and patient order at a printers 21 in Fig. 1).

Even though Spaulding, as modified by Halvorson, what was well known in the art, Rieker, and Dillon, does not expressly teach that the label is an adhesive label, one of ordinary skill would readily recognize that a pharmacy label printer usually provides adhesive-backed labels for application to a medical container (e.g., vial) containing a filled prescription and using adhesive labels recited in the claim.

Therefore, it would have been *prima facie* obvious for a skilled artisan to use said adhesive label to print the released output stream that would necessarily be preferable since they can reduce errors.

- **Re. Grounds #D-3(a) and #D-3(b):**

39.     The proposed rejection of claim 31 under 35 U.S.C. § 103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of **Dillon** [US 6,161,141 A],
Halvorson [US 4,847,764], and what was well known in the art, and further in view of
either Smith [US 6,141,412 A] or Tayi [US 6,096,561 A] is **not adopted** for the reason as
noted below.

     *With regard to claim 31,* the Third Party Requester's proposed rejections of the
claim 31 (See the Comments at page 12, line 28 through page 13, line 2) are not
adopted because **Dillon** is **not** necessary for the claim 31 rejection since the Examiner
believes that the combination of teachings from Spaulding, Halvorson, what was well
known in the art, and Charhut, teaches all the limitations except that does not teach the
particular limitation "the prescribed priority routes the data for handling ahead of a batch
order" recited in the claim 31, which is not taught by Dillon, but either Smith or Tayi,
according to the Third Party Requester's proposal (See the right-most column at page
14 in the Third Party Requester's comments filed on 7th of July 2008).

40.     Claim 31 is rejected under 35 U.S.C. § 103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] what was well known in
the art, and Charhut [US 5,208,762 A], as applied to claim 30 above, and further in view
of either Smith [US 6,141,412 A] or Tayi [US 6,096,561 A].

     *Referring to claim 31,* Spaulding, as modified by Halvorson, what was well known
in the art, and Charhut, discloses all the limitations of the claim 31, except that does not
expressly teach the limitation "the prescribed priority routes the data for handling ahead
of a batch order" (See Ground #D-1: Claims 20 and 30 are rejected under 35 U.S.C. §
103(a) as being unpatentable over Spaulding in view of Halvorson, what was well known
in the art, and Charhut).

     Smith discloses a task processing system (See Smith, Abstract), and Tayi discloses
a scheduling operation of an automated analytical system (See Tayi, Abstract), wherein

- a prescribed priority routes the data for handling ahead of a batch order (Smith
describes: "The events can be scheduled by any means including when the
events occurred, a specific time for the event to be scheduled, or based on a
priority system based on a predetermined criterion for prioritizing such events" at

col. 3, line 67 through col. 4, line 4, i.e., scheduling of events by any criterion, including, by definition, the prescribed priority route of handling ahead of batch; and Tayi also describes a scheduling operation of the system with a priority handling in batch analyzers at col. 4, lines 30-48 and cols. 24-28).

5      Therefore, a person of ordinary skill in the art would have found an apparent reason to combine the teaching of either Smith or Tayi with the teaching of Spaulding, as modified by Halvorson, what was well known in the art, and Charhut, to prioritize the handling of prescriptions in the automated medication preparation system.

10   • **Re. Ground #D-4:**

41.      The proposed rejection of claims 32, 33, 36-40, and 42-45 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], **Dillon** [US 6,161,141 A], and what was well known in the art, and further in view of Housel [US 5,339,421 A] are **not adopted** for the reason as noted below.

15      *With regard to claims 32, 33, 36-40, and 42-45,* the Third Party Requester's proposed rejection of the claims 32, 36, 39, and 42 (See the Comments at page 12, lines 22-23) is not adopted because **Dillon** is **not** necessary for the respective claims 32, 36, 39, and 42 rejection since the Examiner believes that the combination of teachings from Spaulding, Halvorson, and what was well known in the art, teaches all the limitations of

20   the respective claims 32, 36, 39, and 42, except that does not teach the particular limitation recited in the respective claims 32, 36, 39, and 42, which is not taught by Dillon, but the reference Housel of record, according to the Third Party Requester's proposal (See the right-most column at pages 15 and 17-20 in the Third Party Requester's comments filed on 7th of July 2008). The dependent claims 33, 37, 38, 40,

25   and 43-45 of the claims 32, 36, 39, and 42 are not adopted as well because of the same reason *supra.*

42.      Claim 32, 33, 36-40, and 42-45 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and

30   what was well known in the art, as applied to claims 20-22 and 60 above, and further in view of Housel [US 5,339,421 A].

*Referring to claim 32,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 32, except that does not

expressly teach the limitation "the PSM is configured to determine during processing of the serial data streams received from the LSM whether required data is missing" (See Ground #D-1: Claim 20 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson and what was well known in the art).

5      Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein

- a feature of determining during processing of serial data streams received from an LSM whether required data is missing (See col. 15, line 64 through col. 16, line 3, wherein items marked as required are identified and produce an error if missing).

10     Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have configured said PSM, as disclosed by Spaulding, as modified by Halvorson and what was well known in the art, to determine whether required data is missing, as disclosed by Housel, for the advantage of providing error notification (See Housel, col. 16, lines 1-2).

15
       *Referring to claim 33,* Housel teaches that

- the PSM is further configured to include a reference pointer in the data structure being populated in the event that required data is missing (See col. 15, line 64 through col. 16, line 3, wherein the corresponding item vector null flag indicates
20     that no input value is present).


       *Referring to claim 36,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 36, except that does not expressly teach the limitation "a configuration routine arranged to configure the set of
25     configuration rules by which the PSM locates a start and end of the serial data stream for each label" (See Ground #D-1: Claim 20 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art).
       Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein
30     • a configuration routine arranged to configure a set of configuration rules by which a PSM locates a start and end of a serial data stream for each label (See col. 5, lines 53-57, wherein locating the beginning and end of groups of data such as a label).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have included said configuration routine, as disclosed by Housel, in said computer system, as disclosed by Spaulding, as modified by Dillon, Halvorson, and what was well known in the art, for the advantage of enabling the system
5    to handle diverse data formats (See Housel, col. 1, lines 7-13).

*Referring to claim 37,* Housel teaches that
- the configuration routine is further arranged to configure the set of configuration rules by which the PSM locates discrete data elements within the serial data
10    stream for each label (See col. 5, lines 4-5; i.e., parse tables are used that tell the parser how to encode and decode any given data stream implies the claimed limitation).

*Referring to claim 38,* Housel teaches that
15    - the software of the computer system includes an interface, wherein the configuration routine is part of the interface and is field-configurable to provide flexibility to the interface (See Fig. 10 and col. 5, lines 11-13; i.e., field-configurable rules by use of a parse table which contains a data item descriptor for each field).

20

*Referring to claim 39,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 39, including that the PSM is configured to populate the data structure with extracted medication data (i.e., One of skill in the art would understand that, to format print data to send to the label printer, the host
25    interface of Spaulding would populate the parsed data into memory according to format rules so that the parsed data that fields can be compared to corresponding field data stored as records in the prescription database 17 (e.g., patient name, drug name, quantity)), except that does not expressly teach said population corresponds to the drug orders determined to be suitable (See Ground #D-1: Claim 20 is rejected under 35
30    U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, and what was well known in the art).

Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein

- a PSM is configured to populate a data structure with extracted medication data corresponding to drug orders determined to be suitable (See Abstract, Housel describes: "The parser stores the individual data items in their respective allocated storage areas for the program during decoding"; i.e., the parser stores the data in allocated storage locations if all required items are present).

Therefore, a person of ordinary skill in the art would have found an apparent reason to combine the teachings of Housel and Spaulding, as modified by Halvorson and what was well known in the art, to provide a parser that can store parsed data, namely, enabling the system to be flexibly adapted to different data formats for the advantage of enabling the system to handle diverse data formats (See Housel, col. 1, lines 7-13).

*Referring to claim 40,* Halvorson teaches that

- the PSM is configured to direct drug orders (i.e., information including patient information, all medication orders, inventory data and patient order; See col. 3, lines 15-27) determined by the PSM as not being suitable to the printer (i.e., printers 21 in Fig. 1) for manual handling (Halvorson describes a system in which medication data specifying a tablet dosage form at col. 7, lines 49-53, and a releasing step releases among those portions of the output stream that are not suitable. For example, Halvorson teaches "When the supply is exhausted, the nurse may request another package from the system. If the medication is stocked in the dispenser 32, it will be dispensed immediately. If it is not in the dispenser 32, the nurse will receive notification that the medication has been ordered from pharmacy. A message will be automatically printed on the pharmacy restock area 22 to inform them of the need from immediate delivery of the medication". See col. 5, lines 8-16).

*Referring to claim 42,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 42, including the LSM receiving serial data streams on the port of the first machine (Spaulding describes: "The pharmacy host computer is normally used for keeping records of prescriptions filled for customers or patients and for prescription inventory tracking. In addition, the computer usually has the capability of causing prescription labels to be printed by a label printer interfaced to the computer by way of the printer port. The control system of the dispensing system of

the present invention includes a host computer interface which connects to the
pharmacy host computer printer port and which conveys label print data to the control
system ... " at col. 3, lines 7-18; "The system 1 employs the fairly high level of
standardization in computer printers to obtain data for controlling the automatic

5      dispensing of prescriptions by connecting a host interface 16 between the printer port 15
and the label printer 14" at col. 8, lines 57-62 and Fig. 30), except that does not
expressly teach that the LSM tests received serial data streams on the port of the first
machine to detect a beginning-of-string character (See <u>Ground #D-1:</u> Claim 20 is
rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of

10     Halvorson, and what was well known in the art).

Housel discloses a general data stream parser (See Abstract and Fig. 21), wherein

- an LSM tests received serial data streams on a port of a first machine to detect a
  beginning-of-string character (Housel describes: "Parse tables are used that tell
  the parser how to encode and decode any given data stream" at col. 5, lines 4-5;

15       i.e., parse tables are used that tell the parser how to encode and decode any
  given data stream implies the claimed limitation).

Therefore, a person of ordinary skill in the art would have found an apparent reason
to combine the teachings of Housel and Spaulding, as modified by Halvorson and what
was well known in the art, to provide a parser that can store parsed data, namely,

20     enabling the system to be flexibly adapted to different data formats for the advantage of
enabling the system to handle diverse data formats (See Housel, col. 1, lines 7-13).


*Referring to claim 42,* Housel teaches that

- the LSM tests received serial data streams on the port of the first machine to
25       detect a beginning-of-string character.


*Referring to claim 43,* Housel teaches that

- the LSM writes the received serial data stream to a database (Housel describes:
  "The parser stores the individual data items in their respective allocated storage
30       areas for the program during decoding" in the Abstract; i.e., the parser stores the
  data in allocated storage locations if all required items are present).


*Referring to claim 44,* Housel teaches that

- the LSM further writes metadata to the database together with the serial data
(Housel describes: "5. The method of claim 1 or claim 2 wherein the interface
between a said program and the parser includes a data structure which in
conjunction with the parse table points to the private storage for the individual
data items" at col. 24, line 67 through col. 25, line 3; i.e., the data is stored in a
data structure, which, by definition, is metadata).

*Referring to claim 45,* Housel teaches that
- the LSM continues to write the serial data to the database until an end-of-string
character is detected (Housel describes: "Parse tables are used that tell the
parser how to encode and decode any given data stream" at col. 5, lines 4-5; i.e.,
a parser that is configured to locate data elements in the stream).

- **Re. Ground #D-5:**

43.    The proposed rejection of claim 34 under 35 U.S.C. § 103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764],
**Dillon** [US 6,161,141 A], and what was well known in the art, and further in view of
Yoshida [US 4,829,524] is **not adopted** for the reason as noted below.

     *With regard to claim 34,* the Third Party Requester's proposed rejection of the
claim 34 (See the Comments at page 12, lines 24-25) is not adopted because **Dillon** is
**not** necessary for the claim 34 rejection since the Examiner believes that the
combination of teachings from Spaulding, Halvorson, and what was well known in the
art, teaches all the limitations of the claim 34, except that does not teach the particular
limitation "the LSM is configured to provide a confirmation to the order entry system that
information has been received intact" recited in the claim 34, which is not taught by
Dillon, but the reference Yoshida of record, according to the Third Party Requester's
proposal (See the right-most column at page 16 in the Third Party Requester's
comments filed on 7th of July 2008).

44.    Claim 34 is rejected under 35 U.S.C. § 103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well
known in the art, as applied to claims 20-22 and 60 above,  and further in view of
Yoshida [US 4,829,524].

Control Number: 95/000,333                                     Page 66
Art Unit: 3992                    Examiner's determination under 37 CFR § 41.77(d)

    *Referring to claim 34,* Spaulding, as modified by Halvorson and what was well known in the art, discloses all the limitations of the claim 34 including the LSM receives the serial data streams from an interface of an order entry system (See Spaulding, Step 175 in Fig. 29 and col. 14, lines 51-53), except that does not expressly teach the

5 limitation "the LSM is further configured to provide a confirmation to the order entry system that information has been received intact" (See <u>Ground #D-1:</u> Claim 20 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson and what was well known in the art).

    Yoshida discloses a data communication apparatus (See Abstract), wherein

10     •   an LSM is configured to provide a confirmation to an order entry system that information has been received intact (See col. 2, lines 56-58 and Fig.2, such confirmation is well known in the art for transferring data between computer systems through a communication line to provide error notification).

    Therefore, it would have been obvious to one of ordinary skill in the art at the time

15 the invention was made to have readily modified Spaulding's communication link in said medication preparation system (i.e., Spaulding's system), as disclosed by Spaulding, as modified by Halvorson and what was well known in the art, based on the teaching of Yoshida, to provide a bidirectional communication link so that a confirmation message can be sent from the destination system to the source system upon receipt of the data,

20 and if no confirmation is received, the data packet can be re-sent to prevent data loss (See Yoshida, col. 2, line 54 through col. 3, line 33).

    •   <u>**Re. Ground #D-6:**</u>

    45.   <u>The proposed rejection of claim 35 under 35 U.S.C. § 103(a) as being</u>

25 <u>unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764],</u> <u>**Dillon** [US 6,161,141 A], what was well known in the art, and Yoshida [US 4,829,524],</u> <u>and further in view of Davies [US 2003/0046114 A1] is **not adopted** for the reason as</u> <u>noted below.</u>

    *With regard to claim 35,* the Third Party Requester's proposed rejection of the

30 claim 35 (See the Comments at page 12, lines 26-27) is not adopted because **Dillon** is **<u>not</u>** necessary for the claim 35 rejection since the Examiner believes that the combination of teachings from Spaulding, Halvorson, what was well known in the art, and Yoshida, teaches all the limitations of the claim 35, except that does not teach the

particular limitation "the confirmations from the LSM are provided using an HL7 over
TCP/IP" recited in the claim 35, which is not taught by Dillon, but the reference Davies of
record, according to the Third Party Requester's proposal (See the right-most column at
pages 16-17 in the Third Party Requester's comments filed on 7th of July 2008).

5

46.    Claim 35 is rejected under 35 U.S.C. § 103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], what was well known
in the art, and Yoshida [US 4,829,524], as applied to claim 34 above, and further in view
of Davies [US 2003/0046114 A1].

10     *Referring to claim 35,* Spaulding, as modified by Halvorson, what was well known
in the art, and Yoshida, discloses all the limitations of the claim 35, except that does not
expressly teach the limitation " the confirmations from the LSM are provided using an
HL7 over TCP/IP" (See Grounds #D-1 and #D-5: Claims 20 and 34 are rejected under
35 U.S.C. § 103(a) as being unpatentable over Spaulding in view of Halvorson, what
15     was well known in the art, and Yoshida).

Davies discloses a method and system for storing and retrieving patient data in a
database connected to a network (See paragraph [0002]), wherein

- confirmations from an LSM are provided using an HL7 over TCP/IP (Davies
  describes: "Using a communications protocol such as transmission control
20     protocol/Internet protocol (TCP/IP) or file transfer protocol (FTP), the system
  shown in FIG. 2 retrieves the appropriate information ... The field tagging may
  use a technology such as the Extensible Markup Language (XML), a tagging
  system based on the hypertext markup language (HTML) and the simple
  generalized markup language (SGML), or Health Level Seven (HE7), a
25     healthcare industry tagging standard" at paragraphs [0053]- [0054]).

Therefore, it would have been obvious to one of ordinary skill in the art at the time
the invention was made to have readily modified Spaulding's communication link in said
medication preparation system (i.e., Spaulding's host system), as disclosed by
Spaulding, as modified by Halvorson, what was well known in the art, and Yoshida, to
30     utilize an HL7 format over TCP/IP connection so that Spaulding's communication link in
said medication preparation system (i.e., Spaulding's host system) would conform to the
healthcare industry tagging standard (See Davies, paragraphs [0053]).

- **Re. Ground #D-7:**

47.     The proposed rejection of claim 41 under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], **Dillon** [US 6,161,141 A], what was well known in the art, and Housel [US 5,339,421 A]

5   and further in view of **Brinker** [US 5,169,642 A] is **not adopted** for the reason as noted below.

*With regard to claim 41,* the Third Party Requester's proposed rejection of the claim 41 (See the Comments at page 13, lines 3-4) is not adopted because **Dillon** is **not** necessary for the claim 41 rejection since the Examiner believes that the combination of

10   teachings from Spaulding, Halvorson, what was well known in the art, and Housel, teaches all the limitations of the claim 41, except that does not teach the particular limitation "the drug orders not suitable include tablet dosage forms" recited in the claim 41, which is not taught by Dillon.  Furthermore, Brinker does not teach the particular limitation *supra* in contrary to the Third Party Requester's proposal (See the right-most

15   column at page 20 in the Third Party Requester's comments filed on 7th of July 2008).

Brinker does in fact teach a sustained-release coating composition (See Abstract).  Despite the detailed analysis of the claim 41 (i.e., Brinker describes: "As used herein, the term 'drug dosage unit' refers to a dosage form that is capable of being orally administered to provide a sustained release of a drug therefrom. Illustrative drug dosage

20   units include tables, capsules and lozenges" at col. 3, line 67 through col. 4, line 3; i.e., drug dosages include tablets), the Examiner cannot find a clue to support the asserted teaching of the particular limitation "the drug orders not suitable include tablet dosage forms" from Brinker (emphasis added).

However, the Examiner notices that this argued element in the claim 41 is

25   suggested by the reference Halvorson of record.

48.     Claim 41 is rejected under 35 U.S.C. § 103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], what was well known in the art, and Housel, as applied to claims 32, 33, 36-40, and 42-45 above.

30   *Referring to claim 41,* Halvorson teaches that

- drug orders not suitable include tablet dosage forms (Halvorson describes a system in which medication data specifying a tablet dosage form at col. 7, lines 49-53, and a releasing step releases among those portions of the output stream

that are not suitable. For example, Halvorson teaches "When the supply is exhausted, the nurse may request another package from the system. If the medication is stocked in the dispenser 32, it will be dispensed immediately. If it is not in the dispenser 32, the nurse will receive notification that the medication has

5    been ordered from pharmacy. A message will be automatically printed on the pharmacy restock area 22 to inform them of the need from immediate delivery of the medication". See col. 5, lines 8-16; Since the tablet medications in the Halvorson system will naturally be out of stock from time to time the Halvorson system will release to the printer various prescriptions calling for the out-of-stock

10   tablets. Halvorson thus meets the limitation recited in claim 41.)

**Regarding Group E:** In compliance with 35 U.S.C. § 112, 1st and 2nd paragraphs

49.     The Patent Owner has filed a response with amended claims requesting reopening of prosecution before the Examiner pursuant to 37 CFR § 41.77(b)(1), and the

15   Third Party Requester has filed comments on the Patent Owner's response pursuant to 37 CFR § 41.77(c).  The Examiner will consider, *de novo*, the Patent Owner's response and the Third Party Requester's comments under 37 CFR § 41.77(d).

- **Re. Ground #E-1:**

20   50.     The proposed rejection of claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, 1st paragraph, as failing to comply with the written description requirement, is **not adopted** for the reason as noted below.

*With regard to claims 2-5, 7-14, and 16-60,* the Patent Owner amended the claims 3, 7, 20, 57, and 58 containing the subject matter "manufacturing syringes" with

25   the support of written description at col. 3, lines 33-37 and 39-41 in the specification of the '212 Patent.  However, the Third Party Requester argues that the separate occurrences of "manufacturing" and "syringe" in the '212 Patent does not provide written description support for "manufacturing syringes," and thus the Third Party Requester proposes rejection of the claims 3, 7, 20, 57, and 58 (See the Comments at page 17, line

30   19 through page 18, line 3).

The Examiner revisits the embodiments disclosed in the specification of the '212 Patent, and finds that the "PARxD IV" 410 in Fig. 4 is an embodiment of the claimed subject matter "a medication preparation system associated with the pharmacy" (See

col. 5, lines 65-67), and said PARxD IV prepares syringes for intravenous introduction (viz., manufacturing syringes; See col. 3, lines 30-47).

Therefore, the Third Party Requester's proposed rejection of the respective claims 3, 7, 20, 57, and 58 is not adopted because the newly added subject matter 5 "manufacturing syringes" in the respective claims 3, 7, 20, 57, and 58 was described in the specification of the '212 Patent in such a way as to reasonably convey to one skilled in the relevant art that the patentees, at the time the application of the '212 Patent was filed, had possession of the claimed invention.

The claims 2, 4, 5, 8-14, 16-19, 21-56, 59, and 60 are dependent claims of their 10 associated independent claims 3, 7, 20, 57, and 58.

- **Re. Ground #E-2:**

51.     The proposed rejection of claims 2-5, 7-14, and 16-60 under 35 U.S.C. § 112, 2nd paragraph, as being indefinite for failing to particularly point out and distinctly claim the 15 subject matter which the Patent Owner regards as the invention, is **not adopted** for the reason as noted below.

*With regard to claims 2-5, 7-14, and 16-60,* the Patent Owner amended the claims 3, 7, 20, 57, and 58 using the term "while".

Essentially, the Third Party Requester asserts that the claimed limitations "the 20 printing at the printer … require manual handling" and "the medication data determined as suitable …are manufactured by…" should be interpreted such as those limitations must be occurred at the same time in light of the specification of the '212 Patent (See the Comments at page 18, lines 4+).  However, the scope of the respective claims 3, 7, 20, 57, 58, and their dependent claims are unclear and indefinite because the two 25 limitations in the respective claims 3, 7, 20, 57, and 58 are connected by the term "while," which may or may not be interpreted as requiring a temporal aspect.

In contrary to the Third Party Requester's assertion *supra,* the term "while" in the claims is used as a "conjunction" between the limitations with the meaning of "during the time that"; "similarly and at the same time that"; and etc. in accordance with the definition of the 30 dictionary[33].

---

[33] Merriam-Webster's Collegiate® Dictionary (10th ed.)

Control Number: 95/000,333                                                                    Page 71
Art Unit: 3992                                           Examiner's determination under 37 CFR § 41.77(d)

     Therefore, the Third Party Requester's proposed rejection of the respective claims 3, 7, 20, 57, and 58 is not adopted because the term "while" is clearly and definitely interpreted as requiring a temporal aspect, i.e., "occurring at the same time" in accordance with the dictionary definition.

5     The claims 2, 4, 5, 8-14, 16-19, 21-56, 59, and 60 are dependent claims of their associated independent claims 3, 7, 20, 57, and 58.

### Response to Arguments/Remarks

52.    The Patent Owner's arguments with respect to the newly amended claims 3, 7,

10 20, 57, and 58, and their associated dependent claims 2, 4, 5, 8-14, 16-19, 21-56, 59, and 60 have been considered but are moot because (i) the arguments do not apply to any of the new grounds of claim rejections (including the new references) being used in the current rejections, and (ii) the Third Party Requester's comments have been fully reflected on the current claim rejections, which were proposed by the Third Party

15 Requester.

### Conclusion

53.    This is an **Examiner's determination under 37 CFR § 41.77(d)** (See MPEP § 2682 II.(B)).

20     The time periods and other requirements pertaining to comments on this determination are identified in 37 CFR § 41.77(e). No further amendments to the claims are permitted by 37 CFR § 41.77(e). The time periods for response may not be extended. See 37 CFR § 41.77(g). Following the expiration of the time periods for response, the proceeding will be returned to the BPAI for reconsideration pursuant to 37

25 CFR § 41.77(f). Formal requirements of comments and replies are governed by reexamination laws and policies, such as 37 CFR §§ 1.943, 1.947, and 1.948.

     Any paper filed with the USPTO, i.e., any submission made, by either the Patent Owner or the Third Party Requester must be served on every other party in the reexamination proceeding, including any other Third Party Requester that is part of the

30 proceeding due to merger of the reexamination proceedings. As proof of service, the party submitting the paper to the Office must attach a Certificate of Service to the paper, which sets forth the name and address of the party served and the method of service.

Control Number: 95/000,333                                                    Page 72

Art Unit: 3992                              Examiner's determination under 37 CFR § 41.77(d)

Papers filed without the required Certificate of Service may be denied consideration. 37

CFR § 1.903; MPEP § 2666.06.

     The Patent Owner is reminded that any proposed amendment to the specification

and/or claims in this reexamination proceeding must comply with 37 CFR § 1.530(d)-(j).

5    And, the Patent Owner is reminded of the continuing responsibility under 37 CFR §

1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the instant Patent Under Reexamination or any related patent

throughout the course of this reexamination proceeding. The Third Party Requester is

also reminded of the ability to similarly inform the Office of any such activity or

10   proceeding throughout the course of this reexamination proceeding.  See MPEP §§

2686 and 2286.04.


     **All** correspondence relating to this *inter partes* reexamination proceeding should

be directed:

15   By EFS:     Registered users may submit via the electronic filing system EFS-Web, at
                http://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

    By Mail to:   Mail Stop *Inter Partes* Reexam
                Central Reexamination Unit
20             Commissioner for Patents
                United States Patent & Trademark Office
                P.O. Box 1450
                Alexandria, VA 22313-1450

25   By FAX to:   (571) 273-9900
                Central Reexamination Unit

    By hand:    Customer Service Window
                Randolph Building
30             401 Dulany Street
                Alexandria, VA 22314


     For EFS-Web transmissions, 37 CFR § 1.8(a)(1)(i) (C) and (ii) states that

correspondence (except for a request for reexamination and a corrected or replacement

35   request for reexamination) will be considered timely filed if (a) it is transmitted via the

Office's electronic filing system in accordance with 37 CFR § 1.6(a)(4), and (b) includes

a certificate of transmission for each piece of correspondence stating the date of

transmission, which is prior to the expiration of the set period of time in the Office action.

Control Number: 95/000,333                                                      Page 73

Art Unit: 3992                              Examiner's determination under 37 CFR § 41.77(d)

     Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

5     Signed:

     */Christopher E. Lee/*
     Christopher E. Lee / Primary Patent Examiner
     Patent Reexamination Specialist / Art Unit 3992
10     Central Reexamination Unit

     Conferees:

15     /Zoila Cabrera/

     /Sudhanshu C Pathak/
     Supervisory Patent Examiner, Art Unit 3992



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,333 | 01/18/2008 | 7096212 | 20010-016RX1 | 1001 |

76808          7590          04/20/2012
Leason Ellis LLP
One Barker Avenue
Fifth Floor
White Plains, NY 10601-1526

| EXAMINER |
|---|
| LEE, CHRISTOPHER E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/20/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

————————————

INTELLIGENT HOSPITAL SYSTEMS LTD.
Requester and Appellant

v.

FORHEALTH TECHNOLOGIES, INC.
Patent Owner and Respondent

————————————

Appeal 2012-001975
*Inter partes* Reexamination Control No. 95/000,333
Patent 7,096,212 B2
Technology Center 3900

————————————

Before, KARL D. EASTHOM, KEVIN F. TURNER, and JONI Y. CHANG,
*Administrative Patent Judges.*

CHANG, *Administrative Patent Judge.*

DECISION ON APPEAL

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

STATEMENT OF THE CASE

This proceeding arose from a request for *inter partes* reexamination of U.S. Patent 7,096,212 B2,[1] filed on January 11, 2008. Third-Party Requester, Intelligent Hospital Systems Ltd., appeals under 35 U.S.C. §§ 134(c) and 315(b) from the Examiner's determination that the following claims are patentable over the cited prior art references: original claims 3-5, 7-14 and 17, amended claims 2, 15-16, and 18-30, and new claims 31-58. (RAN 1; Ans. 4; App. Br. 4.)[2] The Patent Owner, ForHealth Technologies, Inc., filed a respondent brief in support of the Examiner's patentability determination. (Resp. Br 1.)[3] No litigation involving the '212 Patent has been identified. (App. Br. 4; Resp. Br. 1.) We heard oral arguments from both the Requester and Patent Owner on April 10, 2012. A written transcript of the oral hearing will be entered into the record in due course. We have jurisdiction under 35 U.S.C. §§ 134(c) and 315(b).

We REVERSE. We also enter new grounds of rejection as to claims 19-20, 47-49, and 57-58. As such, our decision is not final for purposes of further judicial review. *See* 37 C.F.R. § 41.77(b).

---

[1] U.S. Patent 7,096,212 B2 issued to Tribble et al. on Aug. 22, 2006, from Application 09/991,048, filed Nov. 21, 2001 (hereinafter "the '212 Patent").
[2] Right of Appeal Notice dated on Dec. 2, 2009 (hereinafter "RAN"); Examiner's Answer dated Mar. 14, 2011 (hereinafter "Ans."); and Requester's Appeal Brief filed on Mar. 4, 2010 (hereinafter "App. Br.").
[3] Patent Owner's Respondent Brief filed Apr. 5, 2010 (hereinafter "Resp. Br.").

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*The Invention*

The '212 Patent relates to a method and system for integrating a host
information system (*e.g.*, an order entry system in a hospital) and an automated
medication preparation system. (Col 1:11-45; col. 3:9-11 and 30-33.) In
particular, the system includes an interface that enables serial data streams (*e.g.*,
prescription orders) to be trapped, parsed, and tested for suitability for automated
handling by a medication preparation system. (Abs.) The interface includes a
listener software module (LSM) that receives serial data streams, and a parser
software module (PSM) that operates on the data streams to selectively cause the
automated medication preparation system to manufacture drug dosages or to reject
the data as not suitable for handling. (Abs.; col. 3:67-col. 4:13.) Those
prescription orders that are not suitable are sent to a label printer. (Col. 4:21-23.)

Figure 1 below is a functional block diagram of an order entry system 120
that is connected to: (1) an automated medication preparation system 110 that
includes a listener and parser module 110, via a communication connection 170;
and (2) a standard printer 130 via a data communication link 140:



## Figure 1

Figure 1 above illustrates a listener/parser interface.

3

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Representative Claims on Appeal*

The independent claims are claims 3, 7, 20, 57, and 58. The following claims are representative of the subject matter on appeal (reproduced from Claim Appendix of Resp. Br. 23-26 and 30, underlining and bracketed matters in the original, italics added to highlight the disputed limitations):[4]

1. (Canceled) A computer-implemented method for selectively trapping output streams containing one or more medication data intended for a pharmacy, comprising the steps of:

   (A) trapping a printer output stream of an order entry system, the printer output stream identifying a source of the printer output stream;

   (B) parsing the output stream for prescribed information in accordance with a set of configuration rules associated with the source;

   (C) testing the parsed output stream against an order database to determine suitability of the medication data therein for automated handling by a medication preparation system associated with the pharmacy;

   (D) using the medication preparation system, preparing one or more medications corresponding to the one or more medication data determined to be suitable;

   (E) releasing only those portions of the output stream that are not suitable, the released output stream being printed for manual handling; and

   (F) [population] <u>populating</u> a data structure with data parsed from the printer output stream in accordance with the set of configuration rules.

3. (Not Amended) The method of claim 1, *wherein the printer output stream identifies a particular listener software module ("LSM").*

6. (Canceled) The method of claim 1, wherein the trapping step comprises saving the output stream as a record in a database.

7. (Not Amended) The method of claim 6, including the additional step of associating *metadata* with the output stream.

---

[4] Since the disputed claims have incorporated by reference the limitations of canceled claims 1 and 6, the canceled claims are reproduced here for convenience.

4

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

19. (Once Amended)  The method of [claim 1] claim 3, including the additional step of *routing a suitable order to a scheduler for handling in accordance with a prescribed priority*.

57. (New)  The method of claim 1, wherein the preparing step prepares plural medications among the one or more medication data determined to be suitable in *a batch production*.

58. (New)  The method of claim 1, wherein the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a *tablet dosage form*.

20. (Once Amended)  A computer system including software loaded into a memory of one or more machines executable by one or more processors to support of serial data stream management, comprising:

(a)  at least one listener software module ("LSM") executing on a first machine, the LSM receiving serial data streams containing one or more medication data from a port of the first machine;

(b)  a parser software module ("PSM") communicatively connectable to the LSM and executing on a second machine, the PSM processing the serial data streams received from the LSM to extract the one or more medication data therefrom and populate a data structure therewith; and

(c)  a set of configuration rules accessible by the PSM, the set of configuration rules defining the manner of processing by the PSM on the serial data streams from a prescribed LSM,

wherein *the PSM is configured to* determine suitability for handling of drug [order] orders by an automated medication preparation system with reference to an order database <u>and to forward drug orders determined as suitable to the automated medication preparation system and *to forward only drug orders determined as not being suitable to a printer for manual handling*</u>, and

wherein the data structure enables data handling and preparation of one or more medications by [an] <u>the</u> automated medication preparation system.

5

**A682**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Prior Art Relied Upon*

The Requester relied upon the following as evidence:

| | | |
|---|---|---|
| Halvorson | US 4,847,764 | Jul. 11, 1989 |
| Yoshida | US 4,829,524 | May 9, 1989 |
| Brinker et al. | US 5,169,642 | Dec. 8, 1992 |
| Charhut | US 5,208,762 | May 4, 1993 |
| Housel, III | US 5,339,421 | Aug. 16, 1994 |
| Spaulding et al. | US 5,337,919 | Aug. 16, 1994 |
| Rieker | US 5,832,447 | Nov. 3, 1998 |
| Liff et al. | US 5,797,515 | Aug. 25, 1998 |
| Sattizahn et al. | US 5,884,273 | Mar. 16, 1999 |
| Dillon | US 6,161,141 | Dec. 12, 2000 |
| Smith et al. | US 6,141,412 | Oct. 31, 2000 |
| Tayif | US 6,096,561 | Aug. 1, 2000 |
| Davies et al. | US 2003/0046114 A1 | Mar. 6, 2003 |

*Proposed Rejections on Appeal*

The Requester seeks review of the Examiner's determination not to adopt the following proposed rejections (App. Br. 7-9):

<u>Group A – Independent Claim 3</u>:

1. Claims 2-4, 7, 8, and 15 as unpatentable over Spaulding and Dillon.

2. Claims 5, 9-14, 16, and 17 as unpatentable over Spaulding, Dillon, and Rieker.

3. Claims 18 and 46 as unpatentable over Spaulding, Dillon, and what was well known in the art.

4. Claim 19 as unpatentable over Spaulding, Dillon, and Charhut.

5. Claim 47 as unpatentable over Spaulding, Dillon, Halvorson, and what was well known in the art.

6. Claim 48 as unpatentable over Spaulding, Dillon, Halvorson, Sattizahn, and what was well known in the art.

6

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

7.  Claim 49 as unpatentable over Spaulding, Dillon, Charhut, Smith, and what was well known in the art.

8.  Claims 50, 51, and 54-56 as unpatentable over Spaulding, Dillon, and Housel.

9.  Claim 52 as unpatentable over Spaulding, Dillon, and Yoshida.

10.  Claim 53 as unpatentable over Spaulding, Dillon, Yoshida, and Davies.

Group B – Independent Claim 57:

Claim 57 as unpatentable over Spaulding and Liff.

Group C – Independent Claim 58:

Claim 58 as unpatentable over Spaulding and Halvorson.

Group D – Independent Claim 20:

1.  Claims 20, 21, 23, and 24 as unpatentable over Spaulding and Halvorson.

2.  Claims 22 and 30 as unpatentable over Spaulding, Halvorson, and what was well known in the art.

3.  Claim 25 as unpatentable over Spaulding, Halvorson, and Dillon.

4.  Claims 26-29 as unpatentable over Spaulding, Halvorson, Dillon, and Rieker.

5.  (a) Claim 31 as unpatentable over Spaulding, Halvorson, Smith, and what was well known in the art.

   (b) Claim 31 as unpatentable over Spaulding, Halvorson, Tayi, and what was well known in the art.

6.  Claims 32, 33, 36-40, and 42-45 as unpatentable over Spaulding, Halvorson, and Housel.

7.  Claim 34 as unpatentable over Spaulding, Halvorson, and Yoshida.

8.  Claim 35 as unpatentable over Spaulding, Halvorson, Yoshida, and Davies.

9.  Claim 41 as unpatentable over Spaulding, Halvorson, Housel, and Brinker.

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Issues on Appeal*

A. Whether one of ordinary skill in the art would have combined the teachings of Spaulding and Dillon?

B. Whether the combination of Spaulding and Liff would have taught or suggested the limitation "wherein the preparing step prepares plural mediations among the one or more medication data determined to be suitable in a batch production" as recited in claim 57?

C. Whether the combination of Spaulding and Halvorson would have taught or suggested the limitation "wherein the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form" as recited in claim 58?

D. Whether the combination of Spaulding and Halvorson would have taught or suggested a parser software module ("PSM") configured "to forward only drug orders determined as not being suitable [for the automated medication preparation system] to a printer for manual handling" as recited in claim 20?

FINDINGS OF FACT

The findings of fact that appear in this opinion are supported by a preponderance of the evidence. Additional findings as necessary may appear in the Analysis section of this opinion.

*Spaulding*

FF1. Spaulding describes an automated prescription dispensing system with a host interface 16 and a system controller 7. (Col. 8:20-33.) The host interface 16 intercepts the prescription label data and conveys it to the controller 7. (Col. 8:63-9:11.) The controller 7 extracts the drug name and quantity from

8

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

the label print data, and searches the data base 17 to determine if one of the dispenser units 5 is loaded with the desired drug. *Id.*

FF2.    Figure 30 of Spaulding is reproduced below:



**Fig.30.**

Figure 30 depicted above is a simplified flow diagram illustrating the operation of the automatic prescription dispensing system with a pharmacy host computer.

FF3.    If the drug name is in the data base 17, the spatial coordinates of the dispenser unit 5 are retrieved from a data record associated with the drug name. (Col. 9:2-5.) The dispenser coordinates are used by the controller 7 to control the operation of the dispenser apparatus 20, in general, and the vial manipulator 6 in particular. (Col. 9:5-8.) The prescription label data is conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11. (Col. 9:8-11.)

FF4.    If the drug name is not found in the data base 17, an error message is sent to the system output, such as the display panel 31, and the program returns to step 175. (Col. 14:47-60.)

9

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

FF5. Spaulding's figure 29 depicted below illustrates the overall program logic or
program 174 by which the system controller 7 operates:



Figure 29 above is a simplifed flow diagram illustrating the overal program
logic.

*Dillon*

FF6. Dillon discloses that the Internet is an example of a TCP/IP network which
had over 10 million users at the time of Dillon's invention. (Col. 1:14-48.)
Dillon teaches that "[a]s is well-known in the art, communication over the
Internet . . . is achieved through a group (suite) of protocols called
Transmission Control Protocol/ Internet Protocol (TCP/IP)." (Col. 3:36-38.)

FF7. Dillon further describes a normal IP data packet containing certain
information (*e.g.*, the source address) which enables the destination system

10

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

to identify where the data comes from and to send a confirmation back to the source system when the data is received successfully. (Col. 13:50-59.) In particular, Dillon's figure 3 below shows a normal IP data packet containing a source IP address and a destination IP address:

FIG. 3.

NORMAL IP PACKET

| VERS | HLEN | SERVICE TYPE | TOTAL PACKET LENGTH | |
|------|------|--------------|---------------------|---|
| IDENTIFICATION NUMBER | | | FLAGS | FRAGMENT OFFSET |
| TIME TO LIVE | | PROTOCOL | HEADER CHECKSUM | |
| SOURCE IP ADDRESS | | | | |
| DESTINATION IP ADDRESS | | | | |
| IP OPTIONS ( IF ANY ) | | | PADDING | |
| DATA | | | | |

BIT 0                                                                    BIT 32

Figure 3 of Dillon depicted above shows typical data items carried in a normal IP data packet.

FF8.  Dillon further teaches that when using the conventional TCP/IP protocol, confirmation messages are sent back to the source system once the destination system receives the data packet. (Col. 13:50-59.) Specifically, application server sends a predetermined number of data packets in accordance with a predetermined window size, and then waits to receive ACKs (*i.e.*, acknowledgements or confirmations) over the communication link before sending additional data packets. (Col. 13:50-59.) The purpose is to limit the number of data packets that must be re-sent if no ACK is received and to provide flow control, *e.g.*, to prevent sending packets faster than they can be received. *Id.* The packets that have not been ACK'ed are stored in a memory so that they can be re-sent if no ACK is received. *Id.*

11

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Liff*

FF9.   As evidenced by Liff, it was well known in the art at the time of the

invention that an automated drug dispensing system may utilize the Internet

to transfer prescription orders and patients records between the automated

drug dispensing system and the computer system at the pharmacist's facility.

(Col. 19:50-20:7; fig. 17.)   For instance, figure 17 below of Liff shows how

the prescription orders are being transferred over the Internet between a host

system 570 and a remote workstation 571 operated by a pharmacist:



FIG. 17

Figure 17 above is a schematic block diagram representing the transfer of data.

FF10. Liff further describes an automated drug dispensing system that may be

operated to dispense drugs in real time or in a batch process.   (Col. 19:50-

20:7; fig. 17.)

12

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Charhut*

FF11. Charhut likewise describes an automated system for dispensing drugs.
(Abs.) In particular, the system has a host computer 70 that provides
patient's order information to a control system 80 which will send back a
message as to whether an order is valid or invalid. (Col. 5:66-6:13.)

FF12. Charhut further describes a method of prioritizing the prescription orders.
Specifically, Charhut's system maintains a Patient Entry List 100 which is a
collection of patient orders received by the control system 80 from the host
computer 70. *Id.* The patient orders are normally organized in a first-in,
first-out (FIFO) manner. *Id.* When an order is received with a priority
status, however, the order can be placed at the head of the list so that it will
be processed first. *Id.*

FF13. Figure 3 depicted below shows a data flow diagram of Charhut's drug
dispensing system:



Figure 3 above illustrates the data flow diagram.

13

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Halvorson*

FF14. Halvorson describes a system for dispensing medications in a health care

institution that includes a computer system connected to control a plurality

of medication dispensing stations and printers. (Abs.; fig. 1.) Halvorson's

medication dispensing system includes a central computer 10 that is

connected to remote video displays, printers 21, and keyboard entry units 20

used for information entry (*e.g.*, patient information, all medication orders,

inventory data and patient orders). (Col. 3:15-27.) Figure 1 below

illustrates one of the embodiment:



Figure 1 above illustrates a system for dispensing medications.

*Rieker*

FF15. As evidence by Rieker, it was well-known in the art at the time of the

invention to capture and save print data as a database record in a health-care

computer system for maintaining a permanent record of the data. (Col. 8:19-

14

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

22; fig. 6.) In particular, Rieker describes "[o]nce a capture process 170 has isolated a print image, it parses the print image and builds a data record (block 208) which it then writes onto mass storage 172 (block 210)." *Id.*

## PRINCIPLES OF LAW

### *Obviousness*

"Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

## ANALYSIS

### *Group A — Independent Claim 3*

*1. Claims 2-4, 7, 8, and 15 as unpatentable over Spaulding and Dillon.*

<u>Claims 2-4 and 15</u>

The original claim 1 was rejected under 35 U.S.C. § 102(b) as being anticipated by Spaulding. (Non-Final Action 7-12; ACP 5-8.)[5] The Patent Owner

---

[5] Non-Final Office Action dated March 7, 2008 (hereinafter "Non-Final Action"), and Action Closing Prosecution dated May 5, 2009 (hereinafter "ACP").

15

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

subsequently canceled claim 1, and amended claims 2 and 15 to depend from
claim 3. (Amendment after ACP 2-3.)[6] Thus, claim 3 is an independent claim that
incorporates by reference the limitations of canceled claim 1, and expressly recites
the disputed limitation "wherein the printer output stream identifies a particular
listener software model ('LSM')." Claims 2, 4, and 15 depend from claim 3.

While Spaulding discloses a host interface 16 that intercepts the prescription
label data and conveys them to the controller 7, Spaulding does not expressly teach
that the prescription label data identify the host interface 16. (Col. 8:63-65; fig. 30;
reproduced in FF1 above.) Nevertheless, as the Requester points out, Dillon
discloses that a normal data IP packet contains the source IP address and
destination IP address. (Fig. 3; reproduced in FF6.) In other words, if the
prescription label data are sent over the **Internet** from Spaulding's host interface
16 (the source system), the prescription label data packet would identify the source
address (*i.e.*, the host interface 16).

The Requester asserts that one of ordinary skill in the art would have found
it obvious to use Spaulding's system with multiple label printers in a TCP/IP
network and, in such a configuration the printer, would identify the host interface
for addressing purposes.[7] (App. Br. 9.) Specifically, the Requester asserts that
"[a]s hospital pharmacies can have multiple label printers, the skilled artisan would
appreciate that the packets of label data would identify the target address of a
particular host interface that is associated with a least one label printer." (App. Br.
10, quoting Non-Final Action 21.)

---

[6] Amendment filed after ACP dated June 16, 2009 ("Amendment after ACP").
[7] The Internet is an example of a TCP/IP network. (Dillon, col. 1:14-48; FF5.)

A693

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Notwithstanding that the combination of Spaulding and Dillon would have taught every element of claim 3, the Examiner determines not to adopt the proposed rejection because, according to the Examiner, Dillon is non-analogous art. (Ans. 15 and 21-22.) To support that determination, the Examiner states that Dillon is "in the field of neither Patentee's endeavor (*i.e.*, interfaces using serial printer emulators) nor reasonably pertinent to the particular problem with which the Patentee was concerned (*i.e.*, serial data interface that permits data configuration and trapping)." (Ans. 15.) The Examiner further finds that the bidirectional messaging on TCP/IP network from Dillon cannot be combined with Spaulding's system. (Ans. 15-16.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 6-8.)

We, however, find the Examiner's determination not supported by a preponderance of evidence. It is our opinion that the Examiner has characterized the field of patentee's endeavor, and the particular problem with which the patentee was addressing, in a narrow and constrained manner that is not consistent with the Specification of the '212 Patent. Notably, the patentee was not merely concerned with "serial data interface that permits data configuration and trapping." Rather, the patentee was also addressing the implementation of the data interface in a network (*e.g.*, a TCP/IP network) in which prescription order data is being transferred between network devices. *See e.g.*, claim 53.

We first note that a reference qualifies as prior art for a determination under 35 U.S.C. § 103 when it is analogous to the claimed invention. *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992). "'Two separate tests define the scope of analogous prior art: (1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's

17

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involve.'" *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). "A reference is reasonably pertinent, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re Icon Health and Fitness, Inc.*, 496 F.3d 1374, 1379-1380 (Fed. Cir. 2007) (quoting *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992)). In that regard, "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." *KSR Int'l. Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007).

Here, the background of the invention section of the '212 Patent provides the following (col. 1:28-45 with emphasis added):

> On the other hand, most hospital information systems and pharmacy systems send data to label printers that identify a patient, a medication to be administered, the time of administration, contra-indications, and other data. **It makes no difference whether the label printer is a local or network device**. Thus, one way of **obtaining a reliable data stream from one system for importing into another** is to capture the data that is intended to be printed to a label. However, in order to operate on this data, subsequent processing is required. The present invention provides **improvements in device interaction** by initiating tasks in response to the receipt of data at a serial port that parse and manage the information in that **data stream for handling by other network devices**. In further aspects, the present invention identifies label data in a serial data stream and divides the label data into a first stream that launches automated medication preparation processes and a second stream that is redirected to a conventional printer.

18

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

The Specification of the '212 Patent also provides that the interface is used to bridge a hospital information system to an automated medication preparation station. (Col. 3:9-11.) The automated medication preparation system 110 that contains the interface module 100 may connected through a computer network to the serial port of the order entry system 120 through a communication connection 170. (Col. 3:64-67; fig. 1.) The communication link from the interface module may use a network protocol such as HL7 over TCP/IP to provide confirmation that all information has been received. (Col. 7:43-48; claims 52-53.) In other words, the patentee was concerned with the following: (1) identifying the source system in a network when the data are being transferred from the source system to the destination system; (2) determining whether the data transferred from the order entry system was received properly; (3) obtaining confirmations that all information has been received; and (4) using TCP/IP network protocol with the interface to provide such confirmations. (*See e.g.*, col. 5:65-col. 6:14; col 6:15-24; col. 7:42-48; claims 7 and 52-53.) Given those discussions in the Specification of the '212 Patent, we find that the patentee was also concerned with the problem of transferring data reliably to and from the host interface in a computer network.

The conventional Internet and TCP/IP teachings of Dillon address the same problem with which the patentee was involved, mainly **transferring data reliably in a computer network**. (Dillon, col. 1:11-20.) For instance, similar to the claimed invention (claim 53 of the '212 Patent; col. 7:42-48), Dillon utilizes the TCP/IP protocol to obtain the capability of a bidirectional communication link and receive confirmation messages (Dillon, col. 13:50-59). Dillon likewise uses a conventional IP data packet that contains the source IP address and destination IP

19

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

address so that the destination system would know where to send the confirmation message upon receipt of the data packet. (Fig. 3; reproduced in FF7.)

Hence, the teachings of Dillon are reasonably pertinent to those problems with which the patentee was involved. Contrary to the Examiner's determination, Dillon qualifies as analogous art. While we are cognizant that Dillon discloses other Internet access and digital package delivery methods (*e.g.*, fig. 15), Dillon is merely relied upon for the conventional and well-known teachings of the Internet and TCP/IP protocol.

The Examiner also determines that there is no rationale to combine the teachings of Spaulding and Dillon. (Ans. 15-16.) According to the Examiner, the bidirectional messaging on a TCP/IP network from Dillon cannot be combined with Spaulding's unidirectional communication link. (*Id.*) To support this determination, the Examiner cites to Spaulding's figure 30 (reproduced in FF1 above) which is a simplified flow diagram illustrating the operation of the automatic prescription dispensing system with a pharmacy host computer. In particular, the Examiner finds the arrows shown in the flow diagram represent unidirectional communication rather than bidirectional. (*Id.*)

At the outset, we note that Spaulding's figure 30 is merely a simplified flow diagram and may not necessarily disclose what was well-known in the art. We, thus, cannot rely upon such a flow diagram without considering the level of ordinary skill in the art at the time of the invention.

Based on the prior art of record, we find that it would have been obvious to a person having ordinary skill in the art to utilize a bidirectional communication link in place of a one-way communication link. For instance, the Internet, which is an example of a TCP/IP network, had over 10 million users at the time of the

20

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

invention. (Dillon, col. 1:14-48; FF5.) It was also well known in the art that an automated medication preparation system could be implemented in a computer network (*e.g.*, the Internet) to include a plurality of printers and devices for pharmacists to receive or send prescription data remotely. *See e.g.*, Halvorson, Abs. fig. 1, FF14; Liff, Abs. fig. 17, FF8. Given those teachings, one of ordinary skill in the art would have been led to modify Spaulding's communication link to provide a bidirectional communication link in view of Dillon so that confirmation messages could be sent from the destination system to the source system upon receipt of the data, and if no confirmation is received, the data packet could be re-sent (col. 13:50-59, FF7). This would also provide data flow control, *e.g.*, to prevent sending data packets faster than they can be received and prevent any data loss, thereby increase the reliability of the system. (*Id.*) Therefore, we find the prior art provides sufficient reasons with rational underpinning to support the obviousness determination in addition to those articulated by the Requester (App. Br. 9-10).

We recognize that the proposed combination of Spaulding and Dillon would require some modification to Spaulding's system. However, what matters in the context of obviousness is "whether a person of ordinary skill in the art, having all of the teachings of the references before him, is able to produce the structure defined by the claim." *Orthopedic Equip. Co., Inc. v. U.S.*, 702 F.2d 1005, 1013 (Fed. Cir. 1983). In this regard, it is not necessary that the references be physically combinable, without change, to render obvious the invention under review. *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983). Since Internet and TCP/IP networks were well-known in the art (FF5; FF9), one of ordinary skill in the art would have been capable of modifying Spaulding's communication link to provide a

21

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

bidirectional communication link so that the host interface could send prescription data over the Internet. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (The obviousness analysis may also include "recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion.")

With respect to the Examiner's argument that the proposed modification would change the principle operation of Spaulding's system, we do not find such argument persuasive. The Examiner does not explain as to how the principle of operation of Spaulding's system would change so that Spaulding's system could no longer be operated for its intended purpose. Moreover, we cannot find any reason as to why modifying Spaulding' communication link to a basic Internet connection would change the principle operation of Spaulding's system.

Accordingly, we reverse the Examiner's refusal to adopt the proposed rejection of claims 2-4 and 15 as unpatentable over Spaulding and Dillon.

Claims 7 and 8

Claim 7 depends from canceled claim 1 through intervening claim 6. Claim 6 which recites "wherein the trapping step comprises saving the output stream as a record in a database" was rejected as unpatentable over Spaulding in view of Rieker. (ACP 13-14.) Rieker teaches that the process of capturing and saving print data as a database record was well known in the art. (Col. 8:19-22; fig. 6; FF14.) In particular, Rieker describes "[o]nce a capture process 170 has isolated a print image, it parses the print image and builds a data record (block 208) which it then writes onto mass storage 172 (block 210)." (*Id.*) The Examiner determines that it would have been obvious to a person of ordinary skill in the art

22

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

to save the output stream as a record in a database in the Spaulding system to keep a copy of the prescription for later usages. (ACP 14.) The Patent Owner subsequently canceled claim 6. (Amendment after ACP 2.)

Claim 7 recites an additional step of "associating metadata with the output stream." Claim 8 depends from claim 7. The Requester proposes the rejection of claims 7 and 8 as unpatentable over Spaulding, Dillon and Rieker. (3PR Comment 5.)[8] As the Requester points out, figure 3 of Dillon shows identification number, protocol, source IP address, and destination IP address (*i.e.*, the metadata) associated with an output stream. The Requester asserts that it would have been obvious to one of ordinary skill in the art to combine Spaulding with Dillon which teaches metadata that can be associated with an output stream. (App. Br. 11-12.)

The Examiner refuses to adopt the proposed rejection of claims 7 and 8 because, in the Examiner's view, Dillon is non-analogous art. (Ans. 25.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 8-9.)

For the previously stated reasons, however, we find that Dillon qualifies as analogous art, and one of ordinary skill in the art would have combined the teachings of Dillon and Spaulding. As to the Patent Owner's unsupported argument of impermissible hindsight, we are not persuaded. *In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (Mere attorney arguments or conclusory statements do not take the place of evidence.)

Accordingly, we reverse the Examiner's refusal to adopt the proposed rejection of claims 7 and 8 as unpatentable over Spaulding, Dillon, and Rieker.

---

[8] Third Party Requester Comments filed on July 7, 2008 ("3PR Comment").

23

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

2. *Claims 5, 9-14, 16, and 17 as unpatentable over Spaulding, Dillon, and Rieker.*

Claims 5, 16, and 17 depend from claim 3. Similarly, claims 9-14 depend from claim 7. The Examiner refuses to adopt the proposed rejection of claims 5, 16, and 17 as unpatentable over Spaulding, Dillon, and Rieker for the same reasons given with respect to claim 3. (RAN 8-9; Ans. 9.) The Examiner likewise refuses to adopt the proposed rejection of claim 9-14 as unpatentable over Spaulding, Dillon, and Rieker for the same reasons provided as to claim 7. (RAN 8-9; Ans. 9.) The Patent Owner agrees with the Examiner. (Resp. Br. 9.)

As discussed *supra*, the Examiner's reasons for not adopting the proposed rejections of claims 3 and 7 are not persuasive. Accordingly, we reverse the Examiner's refusal to adopt the rejection of claims 5, 9-14, 16, and 17 as unpatentable over Spaulding, Dillon, and Rieker.

3. *Claims 18 and 46 as unpatentable over Spaulding, Dillon, and what was well known in the art.*

Claim 18 depends from claim 3, and claim 46 depends from claim 3 through intervening claim 18. Claim 18 recites three conditions for testing whether the drug order is suitable for automated handling. When claim 18 originally depended from claim 1, the Examiner rejected claim 18 as unpatentable over Spaulding in combination with the knowledge of a person of ordinary skill in the art of computer system and software design. (ACP 11-12; Non-Final Action 14-15.) As noted by the Examiner, Spaulding expressly discloses that if the drug name is not found in the database 17, it is considered as not suitable for automated handling (col. 14:56-60 and figure 29, reproduced in FF3-4), *i.e.*, Spaulding teaches condition 2. Spaulding, however, does not teach that if the system cannot recognize a drug code or the required drug is not available in stock at the present

24

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

time, then it is also considered as not suitable for automated handling as called for in the claim. The Examiner nevertheless determined that one of ordinary skill in the art would have recognized that "a prescription order is also not suitable for automated handing for conditions 1 and 3" as recited in claim 18. (ACP. 12.) The Examiner further concluded that "it would have been prima facie obvious for a skilled artisan to modify step 177 to take the negative branch for manual handling upon identifying such conditions that would necessarily prevent the order from being automatically prepared." (*Id*.)

The original claim 46 depended from claim 1 through intervening claim 18. Claim 46 recites "wherein, in the absence of the one or more conditions, the drug order is determined as being handleable by the medication preparation system." The Examiner likewise rejected the original claim 46 because Spaulding teaches this limitation (col. 14:56-60). (ACP 12.)

Consequently, the Patent Owner canceled claim 1 and amended the dependency of claim 18 from claim 1 to claim 3. (Amendment after ACP 4.) After the amendment, the Examiner refuses to adopt the proposed rejection of claims 18 and 46 for the same reasons given with respect to claim 3. (Ans. 28-29.)

As discussed previously, the Examiner's reasons for not adopting the proposed rejection of claim 3 are not persuasive. Accordingly, we reverse the Examiner's refusal to adopt the rejection of claims 18 and 46 as unpatentable over Spaulding, Dillon, and what was well known in the art.

### 4. *Claim 19 as unpatentable over Spaulding, Dillon, and Charhut.*

Claim 19 depends from claim 3, and additionally recites "the additional step of routing a suitable order to a scheduler for handling in accordance with a

25

**A702**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

prescribed priority." For the stated reasons above, we find independent claim 3 would have been obvious based on the collective teachings of Spaulding and Dillon.

The Examiner determines not to adopt the proposed rejection of claim 19 over Spaulding, Dillon, and Charhut. In the Examiner's view, the combination of Spaulding and Dillon does not teach the priority step, and Charhut was improperly presented by the Requester in violation of 37 C.F.R. § 1.948(a). (Ans. 31-32.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 10-11.)

The Requester introduced Charhut in a Third Party Comment filed on July 16, 2009, in response to the Patent Owner's amendment of claim 19 that changed the dependency from claim 1 to claim 3. Although no other claim language was modified as noted by the Examiner, claim 19, for the first time, requires a combination that includes the limitation recited in claim 3.

In any event, our reversal of the Examiner's determination not to adopt the proposed rejection of claim 3 constitutes a new ground of rejection. Moreover, we exercise our discretion to enter a new ground of rejection pursuant to 37 C.F.R. § 41.77(b) as to claim 19. As such, we are not prohibited from considering Charhut.

In that regard, Charhut describes an automated prescription vial filling system. (Col. 1:39-46; figs. 1-2.) Charhut's system includes a host computer 70 that provides a patient's order information to control system 80 which advises the host computer 70 as to whether an order is valid or invalid. (Col. 5:66-col.6:13; fig. 3; reproduced in FF10-12.) Charhut further describes the Patient Entry List 100 which is a collection of patient orders received by the control system 80 from the host computer 70. (*Id.*) The patient orders are normally organized in a first-in,

26

**A703**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

first-out (FIFO) manner. (*Id.*) When an order is received with a priority status, however, the order can be placed at the head of the list so that it will be processed first. (*Id.*) As articulated by the Requester, a person of ordinary skill in the art would have combined the teachings of Spaulding and Charhut to prioritize the handling of prescriptions in an automated medication preparation system. (App. Br. 13-14.)

Accordingly, we adopt the Requester's proposed rejection of claim 19 as unpatentable over Spaulding, Dillon, and Charhut, as a new ground of rejection.

> 5. *Claim 47 as unpatentable over Spaulding, Dillon, Halvorson, and what was well known in the art.*

Claim 47 depends from claim 3 through intervening claims 18 and 46. As discussed *supra*, the Examiner rejected the original claims 18 and 46 (depended from claim 1) as being unpatentable over Spaulding in view of what was well known in the art. (ACP 11-12.)

After the Patent Owner amended claim 18 to change the dependency from claim 1 to claim 3, the Examiner refused to adopt the rejection of claim 47 for the same reasons given with respect to claims 3. (RAN 16-17; Ans. 50.) The Examiner also finds Halvorson to be improperly submitted by the Requester in violation of 37 C.F.R. § 1.948(a). (RAN 17; Ans. 47-50.) The Patent Owner agrees with the Examiner, and further argues that the proposed combination does not teach the element "the printer output stream identifies a particular listener software module ('LSM')" as recited in claim 3.

For the stated reasons above, we find independent 3 would have been obvious based on the collective teachings of Spaulding and Dillon. Since our

27

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

reversal of the Examiner's refusal to adopt the proposed rejection of claim 3 constitutes a new ground of rejection and we exercise our discretion to enter a new ground of rejection pursuant to 37 C.F.R. § 41.77(b) as to claim 47, we consider Halvorson as prior art of record.

Claim 47 additionally recites "wherein the test for suitability is made with reference to an order database that maintains tables of data concerning drug names and drug codes associated with said drug names." Halvorson describes a system for dispensing medications in a health care institution that includes a computer system connected to control a plurality of remote medication dispensers. (Abs.; fig. 1, reproduced in FF13.) As pointed out by the Requester (App. Br. 24), Halvorson explains that a test for suitability is made with reference to an order database that maintains tables of data concerning drug names and drug codes associated with said drug names wherein the test for suitability is made with reference to an order database. (Col. 8:5-31 and col. 26:41-60.) Hence, one of ordinary skill in the art would have been led to combine the teachings of Halvorson and Spaulding so that Spaulding's system (as modified by Dillon and what was well known in the art) could determine whether the drug order has any interaction problem with another drug order for the same patient and to issue warning to the personnel who is entering the order as taught by Halvorson. (*Id.*)

Accordingly, we adopt the Requester's proposed rejection of claim 47 as unpatentable over Spaulding, Dillon, Halvorson, and what was well known in the art, as a new ground of rejection.

28

**A705**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

6. *Claim 48 as unpatentable over Spaulding, Dillon, Halvorson, Sattizahn, and what was well known in the art.*

Claim 48 depends from claim 3 through intervening claims 18, 46, and 47. Claim 48 further recites "wherein the drug codes in the database are in various dosages."

The Examiner refuses to adopt the rejection of claim 48 for the same reasons provided as to claims 3 and 47. (RAN 17-18; Ans. 50-51.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 19.)

As discussed *supra*, we are not convinced by the Examiner's reasons for not adopting the proposed rejection of claims 3 and 47. Accordingly, we adopt the Requester's proposed rejection of claim 48 as unpatentable over Spaulding, Dillon, Halvorson, Sattizahn, and what was well known in the art, as a new ground of rejection.

7. *Claim 49 as unpatentable over Spaulding, Dillon, Charhut, Smith, and what was well known in the art.*

Claim 49 depends from claim 3 through intervening claim 19. The Examiner refuses to adopt the rejection of claim 49 for the same reasons given with respect to claims 3 and 19. (RAN 18; Ans. 51-52.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 19.)

As discussed previously, the Examiner's reasons for not adopting the proposed rejection of claims 3 and 19 are not persuasive. Accordingly, we adopt the Requester's proposed rejection of claim 49 as unpatentable over Spaulding, Dillon, Charhut, Smith, and what was well known in the art, as a new ground of rejection.

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

8. *Claims 50, 51, and 54-56 as unpatentable over Spaulding, Dillon, and Housel.*

Claims 50 and 51 depend from claim 3, and claims 54-56 depend from claim 3 through intervening claim 2. The Examiner refuses to adopt the rejection of claims 50, 51, and 54-56 for the same reasons given with respect to claims 2 and 3. (RAN 18-19; Ans. 52-53.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 19.)

As discussed above, the Examiner's reasons for not adopting the proposed rejection of claims 2 and 3 are not persuasive. Accordingly, we reverse the Examiner's refusal to adopt the rejection of claims 50, 51, and 54-56.

9. *Claim 52 as unpatentable over Spaulding, Dillon, and Yoshida.*

Claim 52 depends from claim 3, and further recites "the additional step of providing a confirmation to the order entry system that information has been received intact."

The Examiner refuses to adopt the rejection of claim 52 for the same reasons given with respect to claim 3. (RAN 19-20; Ans. 53-54.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 19-20.)

As discussed previously, we are not convinced by the Examiner's reasons for not adopting the proposed rejection of claim 3. Additionally, as we noted *supra*, Dillon teaches that when using the conventional TCP/IP protocol (*e.g.*, the Internet), confirmation messages are sent back to the source system once the destination system receives the data packet. (Col. 13:50-59; FF7.) Moreover, as evidence by Yoshida (col. 2:56-58; fig.2), such confirmation is well known in the

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

art for transferring data between computer systems through a communication line to provide error notification. Based on the disclosure of Dillon and Yoshida, it would have been obvious to one of ordinary skill in the art to modified Spaulding's communication link to provide a bidirectional communication link so that a confirmation message can be sent from the destination system to the source system upon receipt of the data, and if no confirmation is received, the data packet can be re-sent to prevent data loss.

Accordingly, we reverse the Examiner's refusal to adopt the rejection of claim 52 as unpatentable over Spaulding, Dillon, and Yoshida.

10. *Claim 53 as unpatentable over Spaulding, Dillon, Yoshida, and Davies.*

Claim 53 depends from claim 3 through intervening claim 52. Claim 53 further recites "wherein the confirmation is provided using an HL7 over TCP/IP connection to the order entry system."

The Examiner refuses to adopt the rejection of claim 53 for the same reasons given with respect to claims 3 and 52. (RAN 20-21; Ans. 54-55.) Although the Examiner finds Davies teaches "a protocol HL7 over TCP/IP connection," the Examiner nonetheless finds Davies fails to teach a system that provides a confirmation to an order entry system. (RAN 20, citing to Davies ¶¶ 0052-0054.) The Patent Owner agrees with the Examiner's determination. (Resp. Br. 20.)

As discussed above, we are not persuaded by the Examiner's reasons for not adopting the proposed rejection of claims 3 and 52. We also disagree with the Examiner's determination because nonobviousness cannot be established by attacking the references individually when the rejection is based upon a

31

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

combination of prior art disclosures. *See In re Merck & Co. Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986).

As evidenced by Davies, Health Level Seven (HL7) is a healthcare industry tagging standard for maintaining medical or patient records electronically. (¶ 0053.) Given the collective teachings of Spaulding, Dillon, Yoshida, and Davies, it would have been obvious to one of ordinary skill in the art to further modify Spaulding's host system to utilize an HL7 format over TCP/IP connection so that Spaulding's host system would conform to the healthcare industry tagging standard.

Accordingly, we reverse the Examiner's refusal to adopt the rejection of claim 53 as unpatentable over Spaulding, Dillon, Yoshida, and Davies.

*Group B – Independent Claim 57 as unpatentable over Spaulding and Liff.*

The Examiner refuses to adopt the rejection of claim 57 because Liff was improperly presented by the Requester. (Ans. 21.) The Patent Owner agrees with the Examiner's determination. (Resp. 20-21.)

Since we exercise our discretion to enter a new ground of rejection pursuant to 37 C.F.R. § 41.77(b) as to claim 57, we consider Liff as prior art of record.

As noted previously, the original claim 1 was rejected as being anticipated by Spaulding. (Non-Final Action 7-12; ACP 5-8.) The Patent Owner subsequently canceled claim 1. (Amendment after ACP 2-3.) Thus, claim 57 is an independent claim that incorporates by reference the limitations of canceled claim 1 and expressly recites the limitation "wherein the preparing step prepares plural medications among the one or more medication data determined to be suitable in a batch production."

32

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

Spaulding describes an automatic prescription dispensing system which includes a plurality of vial supply assemblies 3, a vial offload carousel 4, a plurality of pill dispenser units 5, a vial manipulator assembly 6, and a system controller 7. (Col. 8:20-27; fig. 1.) Spaulding further teaches that the system controller 7 searches the database to determine if one of the dispenser units 5 is loaded with the desired drug, and if the drug name is in the database 17, the system prepares the medication. (Col. 8:66-col. 9:8; fig 29; FF2-4.) Liff describes an automated drug dispensing system that operates to dispense drugs in real time or in a batch process. (Col. 19:50-20:7; FF9.) In view of these collective teachings of Spaulding and Liff, one of ordinary skill in the art would have found it obvious to utilize Spaulding's automated system for preparing the prescription orders sent from the host interface in a batch production to reduce the processing time.

Accordingly, we adopt the Requester's proposed rejection of claim 57 as unpatentable over Spaulding and Liff, as a new ground of rejection.


*Group C – Independent Claim 58 as unpatentable over Spaulding and Halvorson.*

The Examiner refuses to adopt the rejection of claim 58 because Halvorson was improperly presented by the Requester. (Ans. 28-39.) The Patent Owner agrees with the Examiner's determination. (Resp. 14.) Since we enter a new ground of rejection pursuant to 37 C.F.R. § 41.77(b) as to claim 58, we consider Halvorson as prior art of record.

As discussed *supra*, the original claim 1 was rejected under 35 U.S.C. § 102(b) as being anticipated by Spaulding. (Non-Final Action 7-12; ACP 5-8.) The Patent Owner subsequently canceled claim 1. (Amendment after ACP 2-3.) Thus, claim 58 is an independent claim that incorporates by reference the

33

**A710**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

limitations of canceled claim 1 and expressly recites the limitation "wherein the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a **tablet dosage form**" (emphasis added).

While Spaulding discloses an automatic prescription dispensing system that includes a plurality of pill dispenser units 5 and a controller 7 that intercepts prescription orders to determine whether one of the dispenser units is loaded with the desired drug (col. 8:20-27 and col. 8:66-col. 9:8; fig. 1), Spaulding does not expressly disclose that the prescription orders include a tablet dosage form. Notwithstanding that, tablet is a well-known form for prescriptions as evidenced by Spaulding (col. 1:46-2:56) and Halvorson (col. 7:49-53). Spaulding specifically states that "[t]he present invention provides a fully automated system for filling prescriptions which greatly reduces the tedious aspects of filling prescriptions consisting of pills, **tablets**, capsules, caplets, or other types of pelletized dosage units, referred to herein generically as pills." (Col. 2:52-56, emphasis added.) Halvorson describes an automated dispensing medication system maintaining a record for each drug form (*e.g.*, **tablet**, capsule injection, etc.) that is recognized by the automated system. (Col. 7:49-53, emphasis added.) Given these express teachings of Spaulding and Halvorson, it would have been obvious to one of ordinary skill in the art to utilize Spaulding's automatic prescription dispensing system to fill prescription orders that specify a tablet dosage form because tablet is a well-known form for prescriptions.

Accordingly, we adopt the Requester's rejection of claim 58 as unpatentable over Spaulding and Halvorson, as a new ground of rejection.

34

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

*Group D – Independent Claim 20 as unpatentable over Spaulding and Halvorson*

The original claim 20 was rejected under 35 U.S.C. § 102(b) as being anticipated by Spaulding. (Non-Final Action 7-12.) In response, the Patent Owner amended claim 20 to add a new limitation. (Amendment 5.)[9] In view of the amendment, the Examiner determines not to adopt the rejection of claim 20. (Ans. 33-47.) According to the Examiner, Spaulding does not teach the newly added limitation in claim 20 because Spaulding teaches printing labels for all prescriptions even those that are to be automatically prepared. (Ans. 35.) The Patent Owner likewise argues that Spaulding's system is fundamentally different than its claimed invention. (Resp. Br. 4.) In the Patent Owner's opinion, Spaulding prints all prescription labels, regardless of whether they can be filled by an automated system or not, whereas the claimed system in the '212 Patent **only** prints those prescription labels which cannot be filled by an automated medication preparation system. (Resp. Br. 4-6.)

We, however, find that the Examiner's determination is not supported by a preponderance of evidence. Moreover, we are not convinced by the Patent Owner's arguments.

At the outset, we disagree with the Patent Owner's assertion that the claimed system in the '212 Patent **only** prints those prescription labels which cannot be filled automatically. One of ordinary skill in the art would have recognized that every prescription must have a label before it is given to the patient, regardless of whether the prescription is filled manually by a pharmacist or electronically by an automated prescription dispensing system. Although the Specification of the '212 Patent does not show how the prescription labels which are filled automatically

---

[9] Amendment dated June 12, 2008 ("Amendment").

35

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

being printed, but this does not support the Patent Owner's assertion that the claimed system in the '212 Patent **only** prints those prescription labels which cannot be filled automatically. The Patent Owner has not directed us to where the Specification of the '212 Patent expressly excludes the printing of the prescription labels which are filled by the automated medication preparation system. Indeed, figure 1 of the '212 Patent shows that a prescription label data may be sent to the printer 130 by: (1) the Order Entry System 120 via the communication link 140; (2) the listener software module (LSM) via the communication link 190; or (3) the parser software module (PSM) via the communication link 190. Even if the PSM is configured to forward only prescription labels that are determined to be manually filled, the Order Entry System 120 or the listener software module (LSM) may send the other prescription labels to the printer.

Contrary to the Examiner's determination, claim 20 does not preclude a system from sending all of the prescription orders to a label printer. Claim 20 recites the following newly added limitation: "wherein **the parse software module ('PSM')** is configured… to forward drug orders determined as suitable to the automated medication preparation system and **to forward <u>only</u> drug orders determined as not being suitable [for the automated medication preparation system] to a printer for manual handling**. . . . ." (Amendment 5, emphasis and bracketed matter added for clarity.) The claim limitation merely requires the **PSM** be configured to forward **only** drug order labels which are filled manually to a printer. In other words, the claim limitation is a negative limitation that precludes merely the **PSM** from forwarding the automatically-filled drug order labels to a printer, rather than precluding the automatically-filled drug order labels from printing.

36

**A713**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

It is important to note that Spaulding's dispenser system controller 7 equates to the PSM of the '212 Patent, whereas Spaulding's host interface 16 equates to the listener software module (LSM) of the '212 Patent. Even if Spaulding's host interface 16 (which is not equated to the PSM) were to forward all prescription labels to a printer as alleged by the Patent Owner, the claim language does not preclude such a system.

As to the prescription orders that are filled manually, Spaulding discloses that if the drug name is not found in the data base 17 (*i.e.*, not suitable for the automated medication preparation system), the controller 7 will send an error message to the **system output 178, such as the display panel 31**. (Col. 14:47-60; fig. 29; FF3-4.) Therefore, the only difference between Spaulding's controller 7 and the PSM of the claimed system is that Spaulding's controller 7 forwards the manually-filled drug orders to the **system output (e.g., a display panel)**, whereas the PSM of the claimed system forwards such drug orders to a **printer**. As evidence by Halvorson, it was well-known in the art at the time of the invention to connect a plurality of printers to an automatic medication dispensing system. (Col. 3:15-27; fig. 1; FF13.) Given that, it would have been obvious to one of ordinary skill in the art to configure Spaulding's controller 7 to forward the manually-filled drug orders to a printer (rather than a display) so that a pharmacist that is remotely located in a different building could print the labels of those drugs that are filled manually by the pharmacist to save time.

We understand that the Examiner finds Halvorson to be improperly submitted by the Requester. (Ans. 35-36.) The Patent Owner agrees with the Examiner's determination, and further argues that Halvorson does not teach using

37

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

a PSM to forward only drug orders determined as not being suitable to a printer for manual handling. (Resp. 4-6 and 13-15.)

In any event, we herein exercise our discretion to enter a new ground of rejection pursuant to 37 C.F.R. § 41.77(b) as to claim 20, and consider Halvorson as prior art of record. Furthermore, Halvorson is not relied upon for showing a PSM, but rather for the teaching of a plurality of printers connected to an automated prescription dispensing system to provide the flexibility of printing prescription labels where the pharmacist who is manually filling the prescription orders is located.

As to the Patent Owner's assertion that Spaulding's system sends **all** prescription orders to the label printer 14 from the host interface 16, regardless of whether the Spaulding system can automatically fill them, we do not find the disclosure of Spaulding supports such assertion. Indeed, Spaulding is silent as to whether all prescription orders are sent to the label printer 14 from the host interface 16. The Patent Owner points to Spaulding's simplified flow diagram of figure 30 and the following statement for support: "[t]he prescription label data is conveyed through the interface 16 to the label printer 14 to cause the printer 14 to print a label for the filled vial 11." (Col. 9:8-11; FF2.) The flow diagram and the statement, however, do not provide that **all** prescription orders are sent to the printer 14. Moreover, the mere showing of one printer does not necessarily preclude a person of ordinary skill in the art from connecting a plurality of printers to Spaulding's system in view of Halvorson.

Accordingly, we adopt the Requester's rejection of claim 20 as unpatentable over Spaulding and Halvorson, as a new ground of rejection.

38

**A715**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

With respect to claims 21-45 that depend from claim 20, we have not considered the patentability of these dependent claims in view of the art of record. The proposed rejections of these dependent claims also rely upon Halvorson which has not been considered by the Examiner. Therefore, we leave it to the discretion of the Examiner to reconsider the patentability of these dependent claims in view of the prior art including Halvorson and our new grounds of rejection.

CONCLUSION

For the forgoing reasons, we conclude that:

A. One of ordinary skill in the art would have combined the teachings of Spaulding and Dillon;

B. The combination of Spaulding and Liff would have taught or suggested the limitation "wherein the preparing step prepares plural mediations among the one or more medication data determined to be suitable in a batch production" as recited in claim 57;

C. The combination of Spaulding and Halvorson would have taught or suggested the limitation "wherein the releasing step releases among those portions of the output stream that are not suitable, portions that concern medication data specifying a tablet dosage form" as recited in claim 58; and

D. The combination of Spaulding and Halvorson would have taught or suggested a controller configured "to forward only drug orders determined as not being suitable [for the automated medication preparation system] to a printer for manual handling" as recited in claim 20.

39

**A716**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

## DECISION

We reverse the Examiner's decision not to reject claims 2-5 and 7-18, 46, and 50-56. Under 37 C.F.R. § 41.77(b), the Board's reversal of the Examiner's decision not to reject the claims constitutes a new ground of rejection.

We also enter new grounds of rejection pursuant to 37 C.F.R. § 41.77(b) as to claims 19-20, 47-49, and 57-58.

As to claims 21-45 that depend from claim 20, we leave it to the discretion of the Examiner to reconsider the patentability of these dependent claims in view of the prior art and our new grounds of rejection.

Requests for rehearing this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 41.79.

Section 41.77(b) provides that "[a] new ground of rejection . . . shall not be considered final for judicial review."

That section further provides that the Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal as to the rejected claims:

(1) *Reopen prosecution.* The patent owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so rejected or new evidence relating to the claims so rejected, or both.

(2) *Request rehearing.* The patent owner may request that the proceeding be reheard under § 41.79 by the Board upon the same record. The request for rehearing must address any new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in entering the new ground of rejection and also state all other grounds upon which rehearing is sought.

40

**A717**

Appeal 2012-001975
Reexamination Control No. 95/000,333
U.S. Patent 7,096,212 B2

An appeal to the United States Court of Appeals for the Federal Circuit under 35 U.S.C. §§ 141-144 and 315 and 37 C.F.R. § 1.983 for an *inter partes* reexamination proceeding "commenced" on or after November 2, 2002 may not be taken "until all parties' rights to request rehearing have been exhausted, at which time the decision of the Board is final and appealable by any party to the appeal to the Board." 37 C.F.R. § 41.81. *See also* MPEP § 2682 (8th ed., Rev. 8, July 2010).

<u>REVERSE</u>

<u>37 C.F.R. § 41.77(b)</u>

rvb

**<u>PATENT OWNER:</u>**

LEASON ELLIS LLP
81 MAIN STREET, SUITE 503
WHITE PLAINS, NY 10601

**<u>THIRD-PARTY REQUESTER:</u>**

FISH & RICHARDSON P.C.
3200 RBC PLAZA
60 SOUTH SIXTH STREET
MINNEAPOLIS, MINNESOTA 55402



## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/000,333 | 01/18/2008 | 7096212 | 20010-016RX1 | 1001 |

76808      7590      12/02/2009
Leason Ellis LLP
81 Main Street
Suite 503
White Plains, NY 10601

| EXAMINER |
|---|
| LEE, CHRISTOPHER E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/02/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS
GREG GARDELLA
FISH & RICHARDSON P.C.
P.O. BOX 1022
MINNEPOLIS, MN 55440-1022

Date:

MAILED

DEC 0 2 2009

CENTRAL REEXAMINATION UNIT

**Transmittal of Communication to Third Party Requester**
**Inter Partes Reexamination**

REEXAMINATION CONTROL NO. : 95000333
PATENT NO. : 7096212
TECHNOLOGY CENTER : 3999
ART UNIT : 3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified Reexamination proceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the inter partes reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it cannot be extended. See also 37 CFR 1.947.

If an ex parte reexamination has been merged with the inter partes reexamination, no responsive submission by any ex parte third party requester is permitted.

All correspondence relating to this inter partes reexamination proceeding should be directed to the Central Reexamination Unit at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

PTOL-2070(Rev.07-04)

| INTER PARTES REEXAMINATION COMMUNICATION | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/000,333 | 7096212 |
| | **Examiner** | **Art Unit** | |
| | Christopher E. Lee | 3992 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS ACTION IS SET TO EXPIRE ☒ <u>1</u> MONTH(S) ☐ THIRTY DAYS  FROM THE MAILING DATE OF THIS LETTER. EXTENSIONS OF TIME FOR PATENT OWNER ARE GOVERNED BY 37 CFR 1.956.

Each time the patent owner responds to this Office action, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

I

| **Right of Appeal Notice** | Control No. | Patent Under Reexamination |
|---|---|---|
| **(37 CFR 1.953)** | 95/000,333 | 7096212 |
| | Examiner | Art Unit | |
| | Christopher E. Lee | 3992 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address.* --

Responsive to the communication(s) filed by:
Patent Owner on <u>16 June 2009</u>
Third Party(ies) on <u>18 July 2009</u>

Patent owner and/or third party requester(s) may file a notice of appeal with respect to any adverse decision with payment of the fee set forth in 37 CFR 41.20(b)(1) within **one-month or thirty-days (whichever is longer)**. See MPEP 2671. In addition, a party may file a notice of **cross** appeal and pay the 37 CFR 41.20(b)(1) fee **within fourteen days of service** of an opposing party's timely filed notice of appeal. See MPEP 2672.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

If no party timely files a notice of appeal, prosecution on the merits of this reexamination proceeding will be concluded, and the Director of the USPTO will proceed to issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

The proposed amendment filed <u>16 June 2009</u>    ☒ will be entered    ☐ will not be entered*

*Reasons for non-entry are given in the body of this notice.

1a. ☒ Claims <u>1-58</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☒ Claims <u>1 and 6</u> have been cancelled.
3. ☒ Claims <u>3-5 and 7-14</u> are confirmed. [Unamended patent claims].
4. ☒ Claims <u>2 and 15-58</u> are patentable. [Amended or new claims].
5. ☐ Claims _____ are rejected.
6. ☐ Claims _____ are objected to.
7. ☒ The drawings filed on <u>7 June 2008</u>    ☒ are acceptable.    ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d) or (f). The certified copy has:
    ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No. _____.
10. ☐ Other _____

<u>**Attachments**</u>
1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

U.S. Patent and Trademark Office
PTOL-2066 (08-06)                   **Right of Appeal Notice (37 CFR 1.953)**          Part of Paper No.  20091120

Application/Control Number: 95/000,333                                                Page 2
Art Unit: 3992                                                    *Inter Partes* REX RAN Office Action

## DETAILED ACTION

1.      This is an *Inter Partes* Reexamination of Tribble et al. [US 7,096,212 B2; hereinafter '212 Patent].

### Receipt Acknowledgement

2.      Receipts are acknowledged of Patent Owner's response filed on 16th of June 2009 (hereinafter "the Response") and Third Party requester's comments filed on 16th of July 2009 (hereinafter "the Comments") to the *Inter Partes* REX ACP Office Action mailed on 5th of May 2009 (hereinafter "the previous Office action"). Claims 2, 15, 16, and 18-20 have been amended; claims 1 and 6 have been canceled; and no claim has been newly added since the previous Office action was mailed. Currently, the claims 2-5 and 7-58 are subject to reexamination in this *Inter Partes* Reexamination.

### Summary of Inter Partes Reexamination Prosecution

3.      In the original Third Party request filed on 11th of January 2008 (hereinafter "the Request"), Spaulding et al. [US 5,337,919 A; hereinafter Spaulding], either by itself or in combination with one or more additional references, were alleged to render at least some of the claims unpatentable.

In the *Inter Partes* Non-ACP REX Office Action mailed on 7th of March 2008, the Third Party proposed rejections, with or without modification, were adopted based on Spaulding reference with the original claims 1, 2, 16, 18-22, and 30 being rejected on the basis of Spaulding, either by itself or in combination with one or more additional references of the record. The original claims 3-15, 17, and 23-29 rejection proposed by the Third Party were not adopted. However, the Examiner rejected the original claims 3-15, 17, and 23-29 on the basis of Spaulding, either by itself or in combination with one or more additional references of the record.

In response to the *Inter Partes* Non-ACP REX Office Action, the Patent Owner filed the response to the *Inter Partes* Non-ACP REX Office Action on 7th of June 2008 with amending claims 1 and 20-30, and newly adding the claims 31-58. The Third Party requester filed the comments to the Patent Owner's response on 7th of July 2008.

The Examiner issued the *Inter Partes* ACP REX Office Action on 5th of May 2009 with the claims 3-5, 7-14, 19-45, 47-49, 51, 53, 57, and 58 determined to be patentable while the claims 1, 2, 6, 15-19, 46, 50, 52, and 54-56 are rejected.

Application/Control Number: 95/000,333                                    Page 3
Art Unit: 3992                                      *Inter Partes* REX RAN Office Action

In response to the *Inter Partes* ACP REX Office Action, the Patent Owner filed the Response with cancelling the rejected claims 1 and 6, and amending the rejected claims 2, 15, 16, and 18 for changing their respective dependency from the canceled claim 1 to the claim 3 determined to be patentable. The Third Party requester filed the Comments suggesting new grounds of rejections for the claims 3, 19, 20, 47, 57, and 58 determined to be patentable.

The newly cited references for the new ground of rejections in the Comments are as follows:

- Halvorson [US 4,847,764]
- Charhut et al. [US 5,208,762 A; hereinafter Charhut]
- Liff et al. [US 5,797,515 A; hereinafter Liff]

### Statutory Basis for Grounds of Rejections - 35 USC §103

4.      The following is a quotation of 35 U.S.C. §103(a) which forms the basis for all obviousness rejections set forth in this Office Action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This patent under reexamination currently names joint inventors. In considering patentability of the claims under 35 U.S.C. §103(a), the Examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Patent Owner is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the Examiner to consider the applicability of 35 U.S.C. §103(c) and potential 35 U.S.C. §102(e), (f) or (g) prior art under 35 U.S.C. §103(a).

### Third Party requester's Grounds of Rejections

Ground #1
- Claims 2-4, 7, 8, and 15 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A]

Ground #2

Application/Control Number: 95/000,333 Page 4

Art Unit: 3992 *Inter Partes* REX RAN Office Action

- Claims 5, 9-14, 16, and 17 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], and further taken with Rieker et al. [US 5,832,447 A; hereinafter Rieker]

Ground #3

- Claims 18 and 46 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], and further taken with what was well known in the art

Ground #4

- Claim 19 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], and further taken with Charhut [US 5,208,762 A]

Ground #5

- Claims 20, 21, 23, 24, and 58 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764]

Ground #6

- Claims 22 and 30 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764], and further taken with what was well known in the art

Ground #7

- Claim 25 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764], and further taken with Dillon [US 6,161,141 A]

Ground #8

- Claims 26-29 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764] and Dillon [US 6,161,141 A], and further taken with Rieker [US 5,832,447 A]

Ground #9(A)

- Claim 31 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764] and what was well known in the art, and further taken with Smith et al. [US 6,141,412 A; hereinafter Smith]

Ground #9(B)

- Claim 31 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764] and what was well known in the art, and further taken with Tayi [US 6,096,561 A]

Application/Control Number: 95/000,333                          Page 5

Art Unit: 3992                                    *Inter Partes* REX RAN Office Action

Ground #10

- Claims 32, 33, 36-40, and 42-45 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764], and further taken with Housel, III [US 5,339,421 A; hereinafter Housel]

Ground #11

- Claim 34 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764], and further taken with Yoshida [US 4,829,524]

Ground #12

- Claim 35 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764] and Yoshida [US 4,829,524], and further taken with Davies et al. [US 2003/0046114 A1; hereinafter Davies]

Ground #13

- Claim 41 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Halvorson [US 4,847,764] and Housel [US 5,339,421 A], and further taken with Brinker et al. [US 5,169,642 A; hereinafter Brinker]

Ground #14

- Claim 47 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A] and what was well known in the art, and further taken with Halvorson [US 4,847,764]

Ground #15

- Claim 48 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], what was well known in the art, and Halvorson [US 4,847,764], and further taken with Sattizahn et al. [US 5,884,273 A; hereinafter Sattizahn]

Ground #16

- Claim 49 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], Charhut [US 5,208,762 A], and further taken with what was well known in the art and Smith [US 6,141,412 A]

Ground #17

- Claims 50, 51, and 54-56 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], and further taken with Housel [US 5,339,421 A]

Application/Control Number: 95/000,333                                    Page 6

Art Unit: 3992                                          *Inter Partes* REX RAN Office Action

Ground #18

- Claim 52 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A], and further taken with Yoshida [US 4,829,524]

Ground #19

- Claim 53 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Dillon [US 6,161,141 A] and Yoshida [US 4,829,524], and further taken with Davies [US 2003/0046114 A1]

Ground #20

- Claim 57 of the '212 Patent to be unpatentable over Spaulding [US 5,337,919 A] taken with Liff [US 5,797,515 A]

### *Analysis of Proposed Third Party Requester's Rejection*

### Re. Ground #1: Spaulding in combination with Dillon

5.       Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claims 2-4, 7, 8, and 15

6.       <u>The proposed rejection of claims 2-4, 7, 8, and 15 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A] are **not adopted**</u> for the reasons as noted below.

*With regard to claims 2-4 and 15,* the Third Party requester's proposed rejection of the claim 3 is not adopted because neither Spaulding nor Dillon teaches the limitation "the printer output stream identifies a particular listener software module ("LSM")" as recited.

Essentially, the Third Party requester asserts that the argued element "the printer output stream identifies a particular listener software module ("LSM")" is taught by Dillon because the Third Party requester believes that the Examiner of record, Minh Nguyen, was correct in the Office action mailed on 7th of March 2008 such that the primary reference Spaulding discloses a standard printer interface protocols, which would be expected to have identifying information for the targeted host interface corresponding to a targeted label printer after combining with the secondary reference Dillon disclosing a "normal IP Packet" as containing, *inter alia*, "source IP address," and "destination IP address."

However, the reference Dillon is nonanalogous art because it is not held in the field of either Patentee's endeavor (i.e., interfaces using serial printer emulators) or reasonably

pertinent to the particular problem with which the Patentee was concerned (i.e., serial data interface that permits data configuration and trapping). In other words, while the Patentee was concerning the particular field of serial data interface that permits data configuration and trapping for a pharmacy, Dillon concerned a computer network for allowing both high-speed and regular-speed access to a computer network that forms a part of TCP/IP network, which cannot be regarded as not only the field of Patentee's endeavor, but also the field of reasonably pertinent to the particular problem with which the Patentee was concerned.

Furthermore, the Third Party requester believes that the claim 3 rejection under 35 U.S.C. §103(a) as being unpatentable over Spaulding in view of Dillon by the Examiner of record was correct, such that

> One of ordinary skill in the art understands that the label data intercepted by the host interface would generally be bidirectional (e.g., to permit error messages to be routed from the label printer back to the computer that originally sent the prescription).
> The skilled artisan recognizes that bidirectional messages contain both a source address (e.g., the pharmacy host computer) and a target address (e.g., a host interface associated with a label printer).
> Dillon shows a "normal IP Packet" as containing, inter alia, "source IP address," "destination IP address."(Fig. 3)) As hospital pharmacies can have multiple label printers, the skilled artisan would appreciate that packets of label data would identify the target address of a particular host interface that is associated with at least one label printer. Accordingly, a bidirectional stream of label data sent to the host interface 16, in Spaulding's device, then, would be expected to have identifying information for the targeted host interface corresponding to a targeted label printer.

The instant Examiner notices that the rationale for *prima facie* obviousness of combining Spaulding with Dillon is not proper because the primary reference Spaulding shows the label data intercepted by the host interface cannot be bidirectional in Fig. 30 (i.e., arrows Pharmacy Host Computer 10 to Label Printer 14 representing unidirectional communication for interfacing printer on standard printer protocol in Fig. 30), and thus, the bidirectional messaging on TCP/IP network from the secondary reference Dillon cannot be combined with the primary reference Spaulding in general.

In addition, the Examiner of record failed to show the evidences to support the following assertion from the references of record: (1) the label data intercepted by the host interface is bidirectional to permit error messages to be routed from the label printer back to the computer that originally sent the prescription, (2) bidirectional messages contain both a source address of the pharmacy host computer and a target address of, a host interface associated with a label printer, (3) hospital pharmacies have multiple label printers, and (4) at least one label printer are on a network for said IP Packet communication. Even though the Examiner of record described

Application/Control Number: 95/000,333                                    Page 8

Art Unit: 3992                                          *Inter Partes* REX RAN Office Action

the claim 3 rejection such that (1) as hospital pharmacies can have multiple label printers, (2) the skilled artisan would appreciate that packets of label data would identify the target address of a particular host interface that is associated with at least one label printer, and (3) accordingly, a bidirectional stream of label data sent to the host interface, in Spaulding's device, then, would be expected to have identifying information for the targeted host interface corresponding to a targeted label printer, the instant Examiner believes that it is based on impermissible hindsight reasoning because it includes knowledge gleaned only from the Patentee's disclosure, i.e., printer output stream identifying a particular listener software module.

*In conclusion, the Third Party requester fails to indicate any proper rationale for prima facie obviousness of combining Spaulding with Dillon. Therefore, the claim 3 is <u>not</u> deemed to be obvious over Spaulding in view of Dillon, and thus, the rejection of claim 3 proposed by the Third Party requester at pages 4-5 of the Comments is <u>**not adopted**</u>.*

*Furthermore, at least, since the claims 2, 4, and 15 are dependent claims of the claim 3, the claims 2, 4, and 15 are <u>not</u> deemed to be obvious over Spaulding in view of Dillon, and thus, the rejection of claims 2, 4, and 15 proposed by the Third Party requester in the Request are <u>**not adopted**</u>.*

*With regard to claims 7 and 8,* the Third Party requester's proposed obviousness rejection of these claims are not adopted because neither Spaulding nor Dillon teaches the limitation "the step of associating metadata with the output stream" as recited in the claim 7.

*In conclusion, the Third Party request fails to indicate any proper teaching from Spaulding in view of Dillon suggesting obviousness of the claimed subject matter "the step of associating metadata with the output stream." Therefore, the claim 7 is <u>not</u> deemed to be obvious over Spaulding in view of Dillon, and the rejection of claim 7 proposed by the Third Party requester at page 9 of the Comments is <u>**not adopted**</u>.*

*Furthermore, at least, since the claim 8 is a dependent claim of the claim 7, the claim 8 is <u>not</u> deemed to be obvious over Spaulding in view of Dillon, and thus, the rejection of claim 8 proposed by the Third Party requester at page 9 of the Comments is <u>**not adopted**</u>.*

### Re. Ground #2: Spaulding in combination with Dillon and Rieker

7.        Summary of Adoption of the proposed claim rejections:

- Adopted - None

Application/Control Number: 95/000,333                                   Page 9
Art Unit: 3992                                          *Inter Partes* REX RAN Office Action

- Not Adopted - Claims 5, 9-14, 16, and 17

8.      The proposed rejection of claims 5, 9-14, 16, and 17 under 35 U.S.C. §103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], and further in
view of Rieker [US 5,832,447 A] are **not adopted** for the reasons as noted below.

*With regard to claims 5, 16, and 17,* the Third Party requester's proposed obviousness
rejection of the respective claims 5, 16, and 17 is not adopted because of the reason as shown
in the above Re. Ground #1: Spaulding in combination with Dillon, such that the prior claim 3 is
not deemed to be obvious over Spaulding in view of Dillon.

*In conclusion, at least, since the claims 5, 16, and 17 are dependent claims of the claim
3, the claims 5, 16, and 17 are not deemed to be obvious over Spaulding in view of Dillon and
Rieker, and thus, the rejection of claims 5, 16, and 17 proposed by the Third Party requester in
the Request are **not adopted**.*

*With regard to claims 9-14,* the requester's proposed obviousness rejection of the
respective claims 9-14 is not adopted because of the reason as shown in the above Re. Ground
#1: Spaulding in combination with Dillon, such that the prior claim 7 is not deemed to be obvious
over Spaulding in view of Dillon.

*In conclusion, at least, since the claims 9-14 are dependent claims of the claim 7, the
claims 9-14 are not deemed to be obvious over Spaulding in view of Dillon and Rieker, and
thus, the rejection of claims 9-14 proposed by the Third Party requester in the Request are **not
adopted**.*

### Re. Ground #3: Spaulding in combination with Dillon and what was well known in the art

9.      Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claims 18 and 46

10.     The proposed rejection of claims 18 and 46 under 35 U.S.C. §103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], and further in
view of what was well known in the art are **not adopted** for the reasons as noted below.

*With regard to claims 18 and 46,* the Third Party requester's proposed obviousness
rejection of the respective claims 18 and 46 is not adopted because of the reason as shown in

Application/Control Number: 95/000,333                                      Page 10
Art Unit: 3992                                            *Inter Partes* REX RAN Office Action

the above <u>Re. Ground #1: Spaulding in combination with Dillon</u>, such that the prior claim 3 is not deemed to be obvious over Spaulding in view of Dillon.

*In conclusion, at least, since the claims 18 and 46 are dependent claims of the claim 3, the claims 18 and 46 are <u>not</u> deemed to be obvious over Spaulding in view of Dillon and what was well known in the art, and thus, the rejection of claims 18 and 46 proposed by the Third Party requester in the Request are **not adopted**.*

### Re. Ground #4: Spaulding in combination with Dillon and Charhut

11.     Summary of Adoption of the proposed claim rejections:
  * Adopted - None
  * Not Adopted - Claim 19

12.     <u>The proposed rejection of claim 19 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], and further in view of Charhut [US 5,208,762 A] is **not adopted** for the reasons as noted below.</u>

*With regard to claim 19,* the Third Party requester's proposed obviousness rejection of the claim 19 is not adopted because of the reason as shown in the above <u>Re. Ground #1: Spaulding in combination with Dillon</u>, such that the prior claim 3 is not deemed to be obvious over Spaulding in view of Dillon.  Furthermore, the Third Party requester violates the rule 37 CFR §1.948(a).  In fact, the rule 37 CFR §1.948(a) permits that new prior art can be submitted with the Comments only where the prior art (A) is necessary to rebut a finding of fact by the Examiner, (B) is necessary to rebut a response of the Patent Owner, or (C) for the first time became known or available to the third party requester after the filing of the request for inter partes reexamination.  Thus, the Third Party requester newly presents a reference Charhut, that describes a method and apparatus for dispensing drugs that includes routine for suitable order to a scheduler for handling in accordance with a prescribed priority (See the Comments at page 5).  It seems the new prior art is necessary to rebut the previous Office action of the Examiner's in light of the rule 37 CFR §1.948(a)(1).  However, such an addition of a new art for the art of record is not a rebuttal of the Examiner's finding that a feature in question is not taught by the art of record.  Rather, such an addition would amount to a rebuttal of a finding that a feature in question is not taught by any art in existence.

*In conclusion, the additional art Charhut in view of Examiner's claim rejection in the previous Office action is not complied with the 37 CFR §1.948(a)(1), and the rejection of claim 19 proposed by the Third Party requester at pages 5-6 of the Comments is **not adopted**.*

## Re. Ground #5: Spaulding in combination with Halvorson

13.    Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claims 20, 21, 23, 24, and 58

14.    The proposed rejection of claims 20, 21, 23, 24, and 58 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] is **not adopted** for the reasons as noted below.

*With regard to claims 20, 21, 23, and 24,* the Third Party requester's proposed obviousness rejection of the respective claims 20 and 58 is not adopted because the Third Party requester violates the rule 37 CFR §1.948(a).  In fact, the rule 37 CFR §1.948(a) permits that new prior art can be submitted with the Comments only where the prior art (A) is necessary to rebut a finding of fact by the Examiner, (B) is necessary to rebut a response of the Patent Owner, or (C) for the first time became known or available to the third party requester after the filing of the request for inter partes reexamination.  Thus, the Third Party requester newly presents a reference Halvorson, that describes a system for dispensing drugs in a health care institution, where received drug orders that request out-of-stock medications are forwarded to a printer for manual handling (See the Comments at pages 3 and 8).  It seems the new prior art is necessary to rebut the previous Office action of the Examiner's in light of the rule 37 CFR §1.948(a)(1).  However, such an addition/substitution of a new art for the art of record is not a rebuttal of the Examiner's finding that a feature in question is not taught by the art of record.  Rather, such an addition/substitution would amount to a rebuttal of a finding that a feature in question is not taught by any art in existence.

*In conclusion, the additional art Halvorson in view of Examiner's claim rejection in the previous Office action is not complied with the 37 CFR §1.948(a)(1), and the rejection of claims 20 and 58 proposed by the Third Party requester at pages 2-4 and 8 of the Comments are **not adopted**.*

*Furthermore, at least, since the claims 21, 23, and 24 are dependent claims of the claim 20, the claims 21, 23, and 24 are* not *deemed to be obvious over Spaulding in view of*

Application/Control Number: 95/000,333            Page 12

Art Unit: 3992            *Inter Partes* REX RAN Office Action

*Halvorson, and thus, the rejection of claims 21, 23, and 24 proposed by the Third Party*
*requester in the Request are **not adopted**.*

### Re. Ground #6: Spaulding in combination with Halvorson and what was well known in the art

15.     Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claims 22 and 30

16.     The proposed rejection of claims 22 and 30 under 35 U.S.C. §103(a) as being
unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], and further
in view of what was well known in the art are **not adopted** for the reasons as noted below.

      *With regard to claims 22 and 30,* the Third Party requester's proposed obviousness
rejection of the respective claims 22 and 30 is not adopted because of the reason as shown in
the above <u>Re. Ground #5: Spaulding in combination with Halvorson</u>, such that the prior claim 20
is not deemed to be obvious over Spaulding in view of Halvorson.

      *In conclusion, at least, since the claims 22 and 30 are dependent claims of the claim 20,*
*the claims 22 and 30 are <u>not</u> deemed to be obvious over Spaulding in view of Halvorson and*
*what was well known in the art, and thus, the rejection of claims 22 and 30 proposed by the*
*Third Party requester in the Request are **not adopted**.*

### Re. Ground #7: Spaulding in combination with Halvorson and Dillon

17.     Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claim 25

18.     The proposed rejection of claim 25 under 35 U.S.C. §103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], and further in view of Dillon
[US 6,161,141 A] is **not adopted** for the reasons as noted below.

      *With regard to claim 25,* the Third Party requester's proposed obviousness rejection of
the claim 25 is not adopted because of the reason as shown in the above <u>Re. Ground #5:</u>
<u>Spaulding in combination with Halvorson</u>, such that the prior claims 20 and 24 are not deemed
to be obvious over Spaulding in view of Halvorson.

Application/Control Number: 95/000,333                           Page 13

Art Unit: 3992                                    *Inter Partes* REX RAN Office Action

    *In conclusion, at least, since the claim 25 is a dependent claim of the claims 20 and 24, the claim 25 is* <u>*not*</u> *deemed to be obvious over Spaulding in view of Halvorson and Dillon, and thus, the rejection of claim 25 proposed by the Third Party requester in the Request is* <u>***not adopted***</u>.

### Re. Ground #8: Spaulding in combination with Halvorson, Dillon, and Rieker

19.    Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claims 26-29

20.    <u>The proposed rejection of claims 26-29 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and Dillon [US 6,161,141 A], and further in view of Rieker [US 5,832,447 A] is</u> **not adopted** <u>for the reasons as noted below.</u>

    *With regard to claims 26-29,* the Third Party requester's proposed obviousness rejection of the claim 26 is not adopted because of the reason as shown in the above <u>Re. Ground #7: Spaulding in combination with Halvorson and Dillon</u>, such that the prior claim 25 is not deemed to be obvious over Spaulding in view of Halvorson and Dillon.

    *In conclusion, at least, since the claim 26 is a dependent claim of the claim 25, the claim 26 is* <u>*not*</u> *deemed to be obvious over Spaulding in view of Halvorson, Dillon and Rieker, and thus, the rejection of claim 26 proposed by the Third Party requester in the Request is* <u>***not adopted***</u>.

    *Furthermore, at least, since the claims 27-29 are dependent claims of the claim 26, the claims 27-29 are* <u>*not*</u> *deemed to be obvious over Spaulding in view of Halvorson and Dillon, and thus, the rejection of claims 27-29 proposed by the Third Party requester in the Request are* <u>***not adopted***</u>.

### Re. Grounds #9(A)-(B): Spaulding in combination with Halvorson, what was well known in the art, and either Smith or Tayi

21.    Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claim 31

22.     The proposed rejection of claim 31 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and what was well known in the art, and further in view of either Smith [US 6,141,412 A] or Tayi [US 6,096,561 A] is **not adopted** for the reasons as noted below.

        *With regard to claim 31,* the Third Party requester's proposed obviousness rejection of the claim 31 is not adopted because of the reason as shown in the above Re. Ground #6: Spaulding in combination with Halvorson and what was well known in the art, such that the prior claim 30 is not deemed to be obvious over Spaulding in view of Halvorson and what was well known in the art.

        *In conclusion, at least, since the claim 31 is a dependent claim of the claim 30, the claim 31 is not deemed to be obvious over Spaulding in view of Halvorson, what was well known in the art, and either Smith or Tayi, and thus, the rejection of claim 31 proposed by the Third Party requester in the Request is **not adopted**.*

**Re. Ground #10: Spaulding in combination with Halvorson and Housel**

23.     Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claims 32, 33, 36-40, and 42-45

24.     The proposed rejection of claims 32, 33, 36-40, and 42-45 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], and further in view of Housel [US 5,339,421 A] are **not adopted** for the reasons as noted below.

        *With regard to claims 32, 33, 36-40, and 42-45,* the Third Party requester's proposed obviousness rejection of the respective claims 32, 36, 39, and 42 is not adopted because of the reason as shown in the above Re. Ground #5: Spaulding in combination with Halvorson, such that the prior claim 20 is not deemed to be obvious over Spaulding in view of Halvorson.

        *In conclusion, at least, since the claims 32, 36, 39, and 42 are dependent claims of the claim 20, the claims 32, 36, 39, and 42 are not deemed to be obvious over Spaulding in view of Halvorson and Housel, and thus, the rejection of claims 32, 36, 39, and 42 proposed by the Third Party requester in the Request are **not adopted**.*

        *Furthermore, at least, since the claim 33 is a dependent claim of the claim 32, the claims 37 and 38 are dependent claims of the claim 36, the claims 40 and 41 are dependent claims of the claim 39, and the claims 43-45 are dependent claims of the claim 42,  the claims 33, 37, 38,*

Application/Control Number: 95/000,333　　　　　　　　　　　　　Page 15
Art Unit: 3992　　　　　　　　　　　　　　　　*Inter Partes* REX RAN Office Action

40, 41, and 43-45 are <u>not</u> deemed to be obvious over Spaulding in view of Halvorson and
Housel, and thus, the rejection of claims 33, 37, 38, 40, 41, and 43-45 proposed by the Third
Party requester in the Request are **<u>not adopted</u>**.

### Re. Ground #11: Spaulding in combination with Halvorson and Yoshida

25.　　Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claim 34

26.　　<u>The proposed rejection of claim 34 under 35 U.S.C. §103(a) as being unpatentable over</u>
<u>Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764], and further in view of Yoshida</u>
<u>[US 4,829,524] is</u> **not adopted** <u>for the reasons as noted below.</u>

　　　　*With regard to claim 34,* the Third Party requester's proposed obviousness rejection of
the claim 34 is not adopted because of the reason as shown in the above <u>Re. Ground #5:</u>
<u>Spaulding in combination with Halvorson</u>, such that the prior claim 20 is not deemed to be
obvious over Spaulding in view of Halvorson.

　　　　*In conclusion, at least, since the claim 34 is a dependent claim of the claim 20, the claim*
*34 is <u>not</u> deemed to be obvious over Spaulding in view of Halvorson and Yoshida, and thus, the*
*rejection of claim 34 proposed by the Third Party requester in the Request is **not adopted***.

### Re. Ground #12: Spaulding in combination with Halvorson, Yoshida, and Davies

27.　　Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claim 35

28.　　<u>The proposed rejection of claim 35 under 35 U.S.C. §103(a) as being unpatentable over</u>
<u>Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and Yoshida [US 4,829,524],</u>
<u>and further in view of Davies [US 2003/0046114 A1] is</u> **not adopted** <u>for the reasons as noted</u>
<u>below.</u>

　　　　*With regard to claim 35,* the Third Party requester's proposed obviousness rejection of
the claim 35 is not adopted because of the reason as shown in the above <u>Re. Ground #11:</u>
<u>Spaulding in combination with Halvorson and Yoshida</u>, such that the prior claim 34 is not
deemed to be obvious over Spaulding in view of Halvorson and Yoshida.

*In conclusion, at least, since the claim 35 is a dependent claim of the claims 20 and 34,* *the claim 35 is <u>not</u> deemed to be obvious over Spaulding in view of Halvorson, Yoshida and Davies, and thus, the rejection of claim 35 proposed by the Third Party requester in the Request is **<u>not adopted</u>**.*

**Re. Ground #13: Spaulding in combination with Halvorson, Housel, and Brinker**

29.      Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claim 41

30.      <u>The proposed rejection of claim 41 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Halvorson [US 4,847,764] and Housel [US 5,339,421 A], and further in view of Brinker. [US 5,169,642 A] is **not adopted** for the reasons as noted below.</u>

*With regard to claim 41,* the Third Party requester's proposed obviousness rejection of the claim 41 is not adopted because of the reason as shown in the above <u>Re. Ground #10: Spaulding in combination with Halvorson and Housel</u>, such that the prior claim 40 is not deemed to be obvious over Spaulding in view of Halvorson and Housel.

*In conclusion, at least, since the claim 41 is a dependent claim of the claims 20, 39, and 40, the claim 41 is <u>not</u> deemed to be obvious over Spaulding in view of Halvorson, Housel and Brinker, and thus, the rejection of claim 41 proposed by the Third Party requester in the Request is **<u>not adopted</u>**.*

**Re. Ground #14: Spaulding in combination with Dillon, what was well known, and Halvorson**

31.      Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claim 47

32.      <u>The proposed rejection of claim 47 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A] and what was well known, and further in view of Halvorson [US 4,847,764] is **not adopted** for the reasons as noted below.</u>

*With regard to claim 47,* the Third Party requester's proposed obviousness rejection of the claim 47 is not adopted because of the reason as shown in the above <u>Re. Ground #3: Spaulding in combination with Dillon and what was well known in the art</u>, such that the prior

claim 46 is not deemed to be obvious over Spaulding in view of Dillon and what was well known in the art. Furthermore, the Third Party requester violates the rule 37 CFR §1.948(a). In fact, the rule 37 CFR §1.948(a) permits that new prior art can be submitted with the Comments only where the prior art (A) is necessary to rebut a finding of fact by the Examiner, (B) is necessary to rebut a response of the Patent Owner, or (C) for the first time became known or available to the third party requester after the filing of the request for inter partes reexamination. Thus, the Third Party requester newly presents a reference Halvorson, that describes a system for dispensing drugs in a health care institution, where received drug orders that request out-of-stock medications are forwarded to a printer for manual handling (See the Comments at page 6). It seems the new prior art is necessary to rebut the previous Office action of the Examiner's in light of the rule 37 CFR §1.948(a)(1). However, such a substitution of a new art for the art of record is not a rebuttal of the Examiner's finding that a feature in question is not taught by the art of record. Rather, such a substitution would amount to a rebuttal of a finding that a feature in question is not taught by any art in existence.

   *In conclusion, the additional art Halvorson in view of Examiner's claim rejection in the previous Office action is not complied with the 37 CFR §1.948(a)(1), and the rejection of claim 47 proposed by the Third Party requester at pages 6-7 of the Comments is **not adopted**.*

### Re. Ground #15: Spaulding in combination with Dillon, what was well known, Halvorson, and Sattizahn

33.    Summary of Adoption of the proposed claim rejections:

- Adopted - None

- Not Adopted - Claim 48

34.    The proposed rejection of claim 48 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], what was well known, and Halvorson [US 4,847,764], and further in view of Sattizahn [US 5,884,273 A] is **not adopted** for the reasons as noted below.

*With regard to claim 48,* the Third Party requester's proposed obviousness rejection of the claim 48 is not adopted because of the reason as shown in the above Re. Ground #14: Spaulding in combination with Dillon, what was well known, and Halvorson, such that the prior claim 47 is not deemed to be obvious over Spaulding in view of Dillon, what was well known, and Halvorson.

Application/Control Number: 95/000,333           Page 18
Art Unit: 3992            *Inter Partes* REX RAN Office Action

*In conclusion, at least, since the claim 48 is a dependent claim of the claims 3, 18, 46, and 47, the claim 48 is not deemed to be obvious over Spaulding in view of Dillon, what was well known in the art, Halvorson, and Sattizahn, and thus, the rejection of claim 48 proposed by the Third Party requester in the Request is **not adopted**.*

### Re. Ground #16: Spaulding in combination with Dillon, Charhut, what was well known in the art, and Smith

35.     Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claim 49

36.     The proposed rejection of claim 49 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A] and Charhut [US 5,208,762 A], and further in view of what was well known in the art and Smith [US 6,141,412 A] is **not adopted** for the reasons as noted below.

*With regard to claim 49,* the Third Party requester's proposed obviousness rejection of the claim 49 is not adopted because of the reason as shown in the above Re. Ground #4: Spaulding in combination with Dillon and Charhut, such that the prior claim 19 is not deemed to be obvious over Spaulding in view of Dillon and Charhut.

*In conclusion, at least, since the claim 49 is a dependent claim of the claims 3 and 19, the claim 49 is not deemed to be obvious over Spaulding in view of Dillon, Charhut, what was well known in the art, and Smith, and thus, the rejection of claim 49 proposed by the Third Party requester in the Request is **not adopted**.*

### Re. Ground #17: Spaulding in combination with Dillon and Housel

37.     Summary of Adoption of the proposed claim rejections:
- Adopted - None
- Not Adopted - Claims 50, 51, and 54-56

38.     The proposed rejection of claims 50, 51, and 54-56 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], and further in view of Housel [US 5,339,421 A] are **not adopted** for the reasons as noted below.

*With regard to claims 50 and 51,* the Third Party requester's proposed obviousness rejection of the claim 50 is not adopted because of the reason as shown in the above Re.

Application/Control Number: 95/000,333                                    Page 19

Art Unit: 3992                                              *Inter Partes* REX RAN Office Action

Ground #1: Spaulding in combination with Dillon, such that the prior claim 3 is not deemed to be obvious over Spaulding in view of Dillon.

    *In conclusion, at least, since the claim 50 is a dependent claim of the claim 3, the claim 50 is not deemed to be obvious over Spaulding in view of Dillon and Housel, and thus, the rejection of claim 50 proposed by the Third Party requester in the Request is **not adopted**.*

    *Furthermore, at least, since the claim 51 is a dependent claim of the claim 50, the claim 51 is not deemed to be obvious over Spaulding in view of Dillon and Housel, and thus, the rejection of claim 51 proposed by the Third Party requester in the Request is **not adopted**.*


    *With regard to claims 54-56,* the Third Party requester's proposed obviousness rejection of the claim 54 is not adopted because of the reason as shown in the above Re. Ground #1: Spaulding in combination with Dillon, such that the prior claim 2 is not deemed to be obvious over Spaulding in view of Dillon.

    *In conclusion, at least, since the claim 54 is a dependent claim of the claims 2 and 3, the claim 54 is not deemed to be obvious over Spaulding in view of Dillon and Housel, and thus, the rejection of claim 54 proposed by the Third Party requester in the Request is **not adopted**.*

    *Furthermore, at least, since the claims 55 and 56 are dependent claims of the claim 54, the claims 55 and 56 are not deemed to be obvious over Spaulding in view of Dillon and Housel, and thus, the rejection of claim 55 and 56 proposed by the Third Party requester in the Request are **not adopted**.*


**Re. Ground #18: Spaulding in combination with Dillon and Yoshida**

39.     Summary of Adoption of the proposed claim rejections:

    • Adopted - None

    • Not Adopted - Claim 52

40.     The proposed rejection of claim 52 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A], and further in view of Yoshida [US 4,829,524] is **not adopted** for the reasons as noted below.

    *With regard to claim 52,* the Third Party requester's proposed obviousness rejection of the claim 52 is not adopted because of the reason as shown in the above Re. Ground #1: Spaulding in combination with Dillon, such that the prior claim 3 is not deemed to be obvious over Spaulding in view of Dillon.

Application/Control Number: 95/000,333                                   Page 20

Art Unit: 3992                                       *Inter Partes* REX RAN Office Action

*In conclusion, at least, since the claim 52 is a dependent claim of the claim 3, the claim 52 is not deemed to be obvious over Spaulding in view of Dillon and Yoshida, and thus, the rejection of claim 52 proposed by the Third Party requester in the Request is **not adopted**.*

## Re. Ground #19: Spaulding in combination with Dillon, Yoshida, and Davies

41.     Summary of Adoption of the proposed claim rejections:

- Adopted - None
- Not Adopted - Claim 53

42.     The proposed rejection of claim 53 under 35 U.S.C. §103(a) as being unpatentable over Spaulding [US 5,337,919 A] in view of Dillon [US 6,161,141 A] and Yoshida [US 4,829,524], and further in view of Davies [US 2003/0046114 A1] is **not adopted** for the reasons as noted below.

With regard to claim 53, the Third Party requester's proposed obviousness rejection of the claim 53 is not adopted because of the reason as shown in the above Re. Ground #18: Spaulding in combination with Dillon and Yoshida, such that the prior claim 52 is not deemed to be obvious over Spaulding in view of Dillon and Yoshida.  Furthermore, the Third Party requester asserts that Davies teaches the limitation "the confirmation is provided using an HL7 over TCP/IP connection to the order entry system" recited in the claim 53, which is not taught by the art of record in particular.

In fact, Davies does teach that a protocol HL7 over TCP/IP connection; See ¶¶[0052]-[0054]).  However, despite the detailed analysis of the claim 53 at page 7 of the Comments, the Examiner cannot locate any clue of the asserted teaching from not only the reference Davies but also the art of record, i.e., a confirmation is provided using said HL7 over TCP/IP connection to an order entry system.

Even though the Third Party requester points out at ¶¶[0053]-[0054] of Davies as an evidence of the asserted teaching from Davies, the disclosure of the excerpt is silent upon the claimed subject matters "a confirmation is provided using the HL7 over TCP/IP connection," and "said confirmation is provided to an order entry system."

*In conclusion, the Third Party request fails to indicate any proper teaching from Spaulding in view of Dillon, Yoshida, and Davies suggesting obviousness of the claimed subject matter "the confirmation is provided using an HL7 over TCP/IP connection to the order entry system." Therefore, the claim 53 is not deemed to be obvious over Spaulding in view of Dillon,*

*Yoshida and Davies, and the rejection of claim 53 proposed by the Third Party requester at*
*page 7 of the Comments is **not adopted**.*

### Re. Ground #20: Spaulding in combination with Liff

43.    Summary of Adoption of the proposed claim rejections:

  - Adopted - None
  - Not Adopted - Claim 57

44.    The proposed rejection of claim 57 under 35 U.S.C. §103(a) as being unpatentable over
Spaulding [US 5,337,919 A] in view of Liff [US 5,797,515 A] is **not adopted** for the reasons as
noted below.

 *With regard to claim 57,* the Third Party requester's proposed obviousness rejection of
the claim 57 is not adopted because the Third Party requester violates the rule 37 CFR
§1.948(a).  In fact, the rule 37 CFR §1.948(a) permits that new prior art can be submitted with
the Comments only where the prior art (A) is necessary to rebut a finding of fact by the
Examiner, (B) is necessary to rebut a response of the Patent Owner, or (C) for the first time
became known or available to the third party requester after the filing of the request for inter
partes reexamination.  Thus, the Third Party requester newly presents a reference Liff, that
describes a host computer receives the message, unpacks the data, and dispenses the
pharmaceutical automatically, in real time (See the Comments at page 8).  It seems the new
prior art is necessary to rebut the previous Office action of the Examiner's in light of the rule 37
CFR §1.948(a)(1).  However, such a substitution of a new art for the art of record is not a
rebuttal of the Examiner's finding that a feature in question is not taught by the art of record.
Rather, such a substitution would amount to a rebuttal of a finding that a feature in question is
not taught by any art in existence.

 *In conclusion, the additional art Liff in view of Examiner's claim rejection in the previous*
*Office action is not complied with the 37 CFR §1.948(a)(1), and the rejection of claim 57*
*proposed by the Third Party requester at pages 7-8 of the Comments is **not adopted**.*

### STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

45.    Claims 2-5 and 7-58 are determined to be patentable.

46.    The following is an Examiner's statement of reasons for patentability and/or confirmation
of the claims found patentable in this reexamination proceeding:

Application/Control Number: 95/000,333                                    Page 22
Art Unit: 3992                                         *Inter Partes* REX RAN Office Action

     With respect to claim 3, the claim limitations of the claim 3 are deemed patentable over
the prior art of record as the prior art fails to teach or suggest that the printer output stream
identifies a particular listener software module ("LSM").
The claims 2, 4, 5, 15-19, and 46-56 are dependent claims of the claim 3.

     With respect to claim 7, the claim limitations of the claim 7 are deemed patentable over
the prior art of record as the prior art fails to teach or suggest that the step of associating
metadata with the output stream.
The claims 8-14 are dependent claims of the claim 7.

     With respect to claim 20, the claim limitations of the claim 20 are deemed patentable
over the prior art of record as the prior art fails to teach or suggest that the PSM is configured to
forward only drug orders determined as not being suitable to a printer for manual handling.
The claims 21-45 are dependent claims of the claim 20.

     With respect to claim 57, the claim limitations of the claim 57 are deemed patentable
over the prior art of record as the prior art fails to teach or suggest that the preparing step
prepares plural medications among, the one or more medication data determined to be suitable
in a batch production.

     With respect to claim 58, the claim limitations of the claim 58 are deemed patentable
over the prior art of record as the prior art fails to teach or suggest that the releasing step
releases among those portions of the output stream that are not suitable, portions that concern
medication data specifying a tablet dosage form.

     Any comments considered necessary by PATENT OWNER regarding the above
statement must be submitted promptly to avoid processing delays.  Such submission by the
patent owner should be labeled: "Comments on Statement of Reasons for Patentability and/or
Confirmation" and will be placed in the reexamination file.

### Response to Arguments/Remarks

**Issue 1:**     *Whether Spaulding does in fact teach a bidirectional communication path.*

     Spaulding discloses an operation of the automatic prescription dispensing system.  In
particular, the Fig. 30 illustrates the retrieval of print data from a pharmacy host computer printer
port for extraction of drug name and prescription quantity data therefrom.  The retrieved
prescription label data is conveyed to the label printer through the host interface through a

Application/Control Number: 95/000,333                                    Page 23

Art Unit: 3992                                    *Inter Partes* REX RAN Office Action

unidirectional communication path (i.e., uni-directional arrows from Pharmacy Host Computer 10 to Label Printer 14 in Fig. 30).

The Third Party requester quotes the statement of Examiner of record, such that said automatic prescription dispensing system of Spaulding uses a standard printer interface protocols, and said standard printer interface protocols use bidirectional communication between the computer and the printer for sending error messages back to the computer when error occurs. The instant Examiner assumes, *arguendo,* that it is correct. However, the asserted bidirectional communication (i.e., dedicated point-to-point communication between a computer and its printer) cannot be understood as a bidirectional communication path for a network, which is required for combining Spaulding with the IP Packet communication on a TCP/IP network of Dillon with rationale. In fact, Spaulding is silent upon a plurality of label printers. Therefore, the instant Examiner concludes that the rationale for *prima facie* obviousness of combining Spaulding with Dillon suggested by the Examiner of record is not proper because the primary reference Spaulding shows the label data intercepted by the host interface cannot be bidirectional in Fig. 30, and thus, the bidirectional messaging on a IP Packet communication network from the secondary reference Dillon cannot be combined with the primary reference Spaulding in general.

Thus, the Third Party requester 's comment is not persuasive, and the proposed rejection by the Third Party requester for the amended claim 3, and its dependent claims 2, 4, 5, 15-19, and 46-56 are not adopted.

**Issue 2:**     *Third Party requester's arguments with respect to claims 3, 19, 20, 47, 53, 57, and 58 have been considered but are moot in view of new grounds with or without newly added prior art.*

The Third Party requester violates the rule 37 CFR §1.948(a). In fact, the rule 37 CFR §1.948(a) permits that new prior art can be submitted with the Comments only where the prior art (A) is necessary to rebut a finding of fact by the Examiner, (B) is necessary to rebut a response of the Patent Owner, or (C) for the first time became known or available to the third party requester after the filing of the request for inter partes reexamination. However, such an addition/substitution of a new art for the art of record is not a rebuttal of the Examiner's finding that a feature in question is not taught by the art of record. Rather, such an addition/substitution

would amount to a rebuttal of a finding that a feature in question is not taught by any art in existence.

Thus, the Third Party requester's comment is not persuasive, and the proposed rejection by the Third Party requester for the claims 3, 19, 20, 47, 53, 57, and 58 are not adopted.

### *Conclusion*

47.     **This is a RIGHT OF APPEAL NOTICE (RAN);** see MPEP § 2673.02 and § 2674. The decision in this Office action as to the patentability or unpatentability of any original patent claim, any proposed amended claim and any new claim in this proceeding is a FINAL DECISION.

No amendment can be made in response to the Right of Appeal Notice in an *inter partes* reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can be submitted in an *inter partes* reexamination proceeding after the right of appeal notice, except as provided in 37 CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37 CFR 1.116(f).

Each party has a **thirty-day or one-month time period, whichever is longer,** to file a notice of appeal. The patent owner may appeal to the Board of Patent Appeals and Interferences with respect to any decision adverse to the patentability of any original or proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR 41.20(b)(1). The third party requester may appeal to the Board of Patent Appeals and Interferences with respect to any decision favorable to the patentability of any original or proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set forth in 37 CFR 41.20(b)(1).

In addition, a patent owner who has not filed a notice of appeal may file a notice of cross appeal within **fourteen days of service** of a third party requester's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1). A third party requester who has not filed a notice of appeal may file **a notice of cross appeal within fourteen days of service** of a patent owner's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).

Any appeal in this proceeding must identify the claim(s) appealed, and must be signed by the patent owner (for a patent owner appeal) or the third party requester (for a third party requester appeal), or their duly authorized attorney or agent.

Any party that does not file a timely notice of appeal or a timely notice of cross appeal will lose the right to appeal from any decision adverse to that party, but will not lose the right to

---

\* "Label data" being uni-directionally conveyed to the label printer is not including any printer command and error message.

Application/Control Number: 95/000,333                                                 Page 25
Art Unit: 3992                                                        *Inter Partes* REX RAN Office Action

file a respondent brief and fee where it is appropriate for that party to do so. If no party files a

timely appeal, the reexamination prosecution will be terminated, and the Director will proceed to

issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

**All** correspondence relating to this *inter partes* reexamination proceeding should be

directed:

By EFS:            Registered users may submit via the electronic filing system EFS-Web, at
                   http://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

By Mail to:        Mail Stop *Inter Partes* Reexam
                   Central Reexamination Unit
                   Commissioner for Patents
                   United States Patent & Trademark Office
                   P.O. Box 1450
                   Alexandria, VA 22313-1450

By FAX to:         (571) 273-9900
                   Central Reexamination Unit

By hand:           Customer Service Window
                   Randolph Building
                   401 Dulany Street
                   Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence

(except for a request for reexamination and a corrected or replacement request for

reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic

filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission

for each piece of correspondence stating the date of transmission, which is prior to the

expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:

_____/Christopher E. Lee/_____

Christopher E. Lee / Art Unit 3992
Primary Examiner (Reexamination)
Central Reexamination Unit

Conferees:

A1135